## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IRIS CALOGERO,** | **CIVIL ACTION** |
| **Plaintiff** | **NO. 2:18-cv-06709** |
| **vs** | **JUDGE: BARRY W. ASHE** |
| **SHOWS, CALI & WALSH, LLP a Louisiana limited liability partnership; MARY CATHERINE CALI, an individual; and JOHN C WALSH, an individual.** | **MAGISTRATE JUDGE DANIEL E. KNOWLES, III** |
| **Defendants.** | |

_____

## <u>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO</u>
## <u>DEFENDANTS' MOTION TO DISMISS</u>

NOW INTO COURT, comes Plaintiff, IRIS CALOGERO (hereinafter referred to as "PLAINTIFF") who by and through undersigned counsel, hereby files her memorandum in opposition to the defendants' motion to dismiss.[1]

## I.    INTRODUCTION

This matter involves claims arising from SHOWS, CALI & WALSH, LLP; MARY CATHERINE CALI, and JOHN C WALSH's (the "defendants") alleged violations of the Fair Debt Collection Practices Act (the "FDCPA"), 15 U.S.C. § 1692, *et seq*. Specifically, Mrs. Calogero alleges that the defendants threatened to file suit on time-barred debt and misrepresented the nature of the alleged debt, in violation of 15 U.S.C. §§1692e and f. On July 16, 2018, Mrs. Calogero filed the instant action.[2] On September 7, 2018, the defendants' filed

_____

[1] (Dkt. No. 11.)
[2] (Dkt. No. 1.)

1

the underlying motion to dismiss.[3] They allege that (1) Louisiana's 10 year liberative prescriptive period rather than the federal 6 year statute of limitation should apply to breach of the grant contract, (2) the defendants did not misrepresent the nature of the debt, and (3) a grant overpayment is not a debt subject to FDCPA protection.[4] The defendants are wrong as follows: (1) the State of Louisiana, Division of Administration, Office of Community Development (OCD) assumed the role of a quintessential federal agency and is therefore subject to the federal 6 year statute of limitation, (2) the alleged debt prescribed even under Louisiana's 10 year liberative prescriptive periods, (3) the grant overpayment is a debt subject to the FDCPA because it arose from a consumer transaction between the OCD and Mrs. Calogero, which contained a provision for the repayment of overages, and was used to repair her primary residence; and (4) the collection letter to Mrs. Calogero included false and misleading information.

## II.     BACKGROUND

### 1.   The Housing and Community Development Act of 1974.

Congress enacted the Housing and Community Development Act of 1974 (HCDA), 42 U.S.C. §5301 *et seq.* to meet the social, economic, and environmental problems facing cities.[5] The HCDA creates a "consistent system of Federal aid" by "distributing funds committed by Congress through organizations outside the Federal Government, while retaining federal control to assure compliance with statutory federal objectives and implementing regulations."[6] "Within the federal constraints, grant recipients design programs addressing local needs."[7] "To obtain federal funds, local communities must submit to the Secretary a plan made in accordance with

---

[3] (Dkt. No. 11.)
[4] (Dkt. No. 11-1.)
[5] *Dixson v. U.S.,* 465 U.S. 482, 486 (1984). (internal citations omitted).
[6] *Id.* at 486-87.
[7] *Id.* at 487.

national urban growth policies, and supplement the plan with annual performance reports."[8] Importantly, "[t]he Federal Government retains the right to audit the records of HCDA programs" and to "recover improperly expended funds."[9]

HCDA grantees "give assurances to HUD that they, and their subgrantees, will abide by specific financial accountability, equal opportunity, fair labor, environmental, and other requirements."[10] By "administering HCDA funds, private nonprofit organizations subject themselves to numerous federal restrictions beyond those imposed directly by HUD".[11] Like other recipients of federal grant funds, HUD grantees and subgrantees are subject to a uniform audit procedure, adopted by the Federal Government as an 'integral element; of 'full accountability by those entrusted with the responsibility for administering the programs.'"[12]

The "HCDA vests in local administrators…the power to allocate federal fiscal resources for the purpose of achieving congressionally established goals."[13] To receive HCDA funds, recipient state and local authorities must go through an application and approval process. HUD audits administration of the federal funds and may take corrective actions ranging from issuing a warning letter to instituting collections procedures to recover improperly expended funds. ***HUD grantees and subgrantees assume "the quintessentially official role of administering a social service program established by the United States Congress."*** [14]

---

[8] *Id*.

[9] *Id*.

[10] *Id*. (internal citations omitted).

[11] *Id*.

[12] *Id*.

[13] *Id*. at 500.

[14] *Id*. at 497. (emphasis added) (holding "[b]y accepting the responsibility for distributing these federal fiscal resources, [local administrators] assume[] the quintessentially official role of administering a social service program established by the United States Congress.").

**2. Congressional response to Hurricanes Katrina, Rita and Wilma ("the Hurricanes").**

In 2005, the State of Louisiana was slammed by two major hurricanes that devastated the Gulf Coast. Hurricane Katrina made landfall on August 29, 2005; Hurricane Rita made landfall on September 24, 2005 (collectively "the 2005 Hurricanes"). The devastation created an unprecedented housing crises. In response, Congress appropriated billions of dollars in disaster relief through the U.S. Department of Housing and Urban Development's (HUD) Community Development Block Grant (CDBG) to affected areas in five states, including Louisiana.

On December 30, 2005, the first appropriation, Pub. L. No. 109-148, 119 Stat. 2779 (Dec. 30, 2005) designated $11,500,000,000 "for the "Community development fund", for necessary expenses related to disaster relief, long-term recovery, and restoration of infrastructure in the most impacted and distressed areas related to the consequences of hurricanes in the Gulf of Mexico in 2005 in States for which the President declared a major disaster under title IV of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) in conjunction with Hurricane Katrina, Rita, or Wilma." Public Law No. 109-148 designated funds to "be administered through an entity or entities designated by the Governor of each State," and established a framework for how the money should be spent. To receive financing, each State was required to "submit a plan to the Secretary detailing the proposed use of all funds, including criteria for eligibility and how the use of these funds will address long-term recovery and restoration of infrastructure". Each State was required to report quarterly to the Committees on Appropriations on all awards and uses of funds made available".[15] In early 2006, Louisiana submitted its Action Plan for CDBG funds.

---

[15] Congress enacted two subsequent appropriations to assist disaster relief. Public Law 109-234, enacted June 15, 20016, provided an additional $25,000,000 for the "Working Capital Fund", "to

### A.  Federal Amendments to the Road Home Program

Contrary to the defendants' assertions of program independence, the federal government exercised significant control and oversight of the State's administration of the Road Home program, as reflected in HUD's publications in the Federal Register.

Public Law No. 109-148, 119 Stat. 2779 (Dec. 30, 2005) permitted the "Secretary of Housing and Urban Development [to] waive, or specify alternative requirements for, any provision of any statute or regulation that the Secretary administers in connection with the obligation by the Secretary of the use of the recipient of these funds or guarantees (except for requirements related to fair housing, nondiscrimination, labor standards, and the environment), upon a request by the State that such waiver is required to facilitate the use of such funds or guarantees, and a finding by the Secretary that such waiver would not be inconsistent with the overall purpose of the statute, as modified."[16] No later than 5 days before the effective date of such waiver, "the Secretary shall publish in the Federal Register any waiver of any statute or regulation that the Secretary administers."[17]

On February 13, 2006, HUD published one of its first notices in the Federal Register entitled "Allocations and Common Application and Reporting Waivers Granted to and

---

remain available until September 30, 2007, for necessary expenses related to the consequence of Hurricane Katrina and other hurricanes of the 2005 season," plus additional amounts for related entities such as the Office of the Inspector General, the Agricultural Research Service, Building and Facilities, etc. Public Law 110-116, enacted November 13, 2007, made available an additional $3,000,000,000 for the "'Department of Housing and Urban Development –Community Planning and Development –Community Development Fund', to remain available until expended, to enable the Secretary of Housing and Urban Development to make a grant or grants to the State of Louisiana solely for the purpose of covering costs associated with otherwise uncompensated but eligible claims that were filed on or before July 31, 2007, under the Road Home program administered by the State in accordance with plans approved by the Secretary."

[16] Public Law 109-148, 119 Stat. 2779.

[17] *Id.*

Alternative Requirements for CDBG Disaster Recovery Grantees under the Department of Defense Appropriations Act, 2006," Notice Docket No. FR-5051-N-01. The defendants rely on this notice in their moving papers to argue HUD waived significant federal oversight of the State's administration of its Action Plan and allowed Louisiana direct administration of the funds.[18] A review of the notice itself reveals that HUD merely streamlined processes and reinforced its commitment to overseeing the program.[19]

HUD granted "an overall benefit waiver that allows for up to 50 percent of the grant to assist activities under the urgent need or prevention or elimination of slums and blight nationals objectives, rather than the 30 percent allowed in the annual State CDBG program," allowed a "state to carry out activities directly rather than distribute all funds to units of local government," permitted "a more streamlined public process, but one that still provides for reasonable public notice, appraisal, examination, and comment on the activities proposed for the use of CDBG disaster recovery grant funds," waived "the requirement for consistency with the consolidated plan because the effects of a major disaster usually alter a grantee's priorities for meeting housing, employment, and infrastructure needs," and waived the CDBG action plan requirements, "substituting an Action Plan for Disaster Recovery."[20] "**During the course of the grant, HUD will [continue to] monitor the State's use of funds *and* its actions for consistency with the Action Plan**."[21]

Further,

[] **this Notice includes specific reporting, written procedures, monitoring, and internal audit requirements for grantees. *Second, to the extent its resources***

---

[18] (Dkt. No. 11-1, p. 8.)
[19] Notice Docket No. FR-5051-N-01 (Feb 13. 2006) at 7667, a copy is attached herewith for convenience as Exhibit 1.
[20] *Id*.
[21] *Id*. (italics in original) (emphasis added).

***allow, HUD will institute risk analysis and on-site monitoring of grantee management of the grants and of the specific use of funds*. Third, HUD will be extremely cautious in considering any waiver related to basic financial requirements. The standard, time-tested CDBG financial requirements will continue to apply. Fourth, HUD is collaborating with the HUD Office of Inspector General to plan and implement oversight of these funds**.[22]

On May 12, 2006, Louisiana submitted Amendment 1 to its original action plan known.

On October 30, 2006, HUD published Allocations and Waivers Granted to and Alternative Requirements for CDBG Disaster Recovery Grantees Under Chapter 9 of Title II of the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006.[23] There the Department recognized the massive impact the 2005 Hurricanes had on affordable housing in Louisiana and provided an alternative requirement to the State of Louisiana ***requiring*** that "before the State of Louisiana expends any funds to meet the minimum requirement for affordable rental housing under this notice, the Governor of Louisiana shall demonstrate to the Secretary's satisfaction that the State will provide funds or has identified dedicated resources sufficient to meet the key disaster recovery needs for repair, rehabilitation, and reconstruction of affordable rental housing stock."[24] HUD also ***required*** the "State of Louisiana [to] target 70 percent of its disaster recovery funds under Pub L. 109-234 towards the disaster recovery needs in the New Orleans-Metairie-Bogalusa Metropolitan Area."[25]

HUD ***required*** the State of Louisiana to give "priority to the rehabilitation and reconstruction of the affordable rental housing stock including public and other HUD-assisted

---

[22] Notice Docket No. FR-5051-N-01 (emphasis added).
[23] Notice Docket No. FR-5067-N-02, 63337. A true and correct copy is attached hereto as Exhibit 2.
[24] *Id*. at 63338.
[25] *Id*. at 63339.

housing;" "[a]n explanation of how the State will give priority to infrastructure development and rehabilitation, and a description of the infrastructure activities it plans to undertake with grant funds;" "[a]n explanation of how the method of distribution or use of funds described in accordance with the applicable notices will result in the State meeting the requirement that at least 19.3311 percent of its allocation under this notice shall be used for repair, rehabilitation, and reconstruction (including demolition, site clearance and remediation) of the affordable rental housing stock (including public and other HUD-assisted housing in the impacted areas);" and to "target 70 percent of its disaster recovery funds under Pub. L. 109-234 towards the disaster recovery needs in the New Orleans-Metairie-Bogalusa Metropolitan Area," etc.[26]

On March 6, 2007, HUD published "Additional Waivers Granted to and Alternative Requirements for the State of Louisiana Under Public Laws 109-148 and 109-234,"[27] which **permitted** the State of Louisiana to, among other things, create the "eligible activity called Louisiana Research Commercialization and Educational Enhancement." The "waiver and alternative requirements allow the state a choice" in measuring the benefit within a housing development project.[28] The state may measure benefit "(1) according to the existing CDBG requirements, (2) according to the HOME program requirements at 24 CFR 92.205(d) or (3) according to the modified CDBG alternative requirements specified in this notice, which extend the CDBG exception noted above. The state **must** select and use just one [federal] method for each project."[29]

---

[26] *Id.*
[27] Notice Docket No. FR-5089-N-03, 10014, a true and correct copy attached hereto as Exhibit 3.
[28] *Id.* at 10015.
[29] *Id.* (emphasis added).

**B.  Federal Oversight of the Road Home Program**

As part of its oversight of the Road Home program, the federal government performed regular audits. Through these audits, HUD discovered, among other things, that the State was misspending CDBG funds. After the audits, HUD would issue additional requirements to ensure State compliance with federal law.

In December of 2007, The Regional Inspector General for Audit (RIGA)[30] found that the "State's Road Home housing manager, ICF, did not always provide contract deliverables in accordance with the terms and conditions of its contract with the State" and "recommend[ed] that the U.S. Department of Housing and Urban Development's (HUD) General Deputy Assistant Secretary for Community Planning and Development *require* the State to set realistic goals for ICF, taking timely appropriate action against ICF when performance problems arise as stipulated by contract; and verify whether the State adequately implemented its new monitoring policies and procedures."[31]

A month later, on January 30, 2008, the RIGA identified "possible eligibility issues through a review of the electronic data;" concluded that the "State had misspent federal funds;" and recommended that HUD "*require* the State to repay amounts disbursed for ineligible grants to its Road Home program, either support or repay amounts disbursed for unsupported grants, review all of the remaining 392 grants coded ineligible or lacking an eligibility determination

---

[30] The RIGA initiated audits in conjunction with the Office of Inspector General Gulf Coast Region's Audit Plan to examine relief efforts provided by the federal government in the aftermath of the 2005 Hurricanes. The federal government used these audits to ensure States complied with federal rules/regulations and as a basis to issue alternative requirements.

[31] Office of Inspector General Audit Report, Issue Date December 19, 2007, Audit Report Number: 2008-AO-1001, attached hereto as Exhibit 4. (emphasis added).

and either support or repay the $14.6 million disbursed for them, and implement system controls to prevent future improper disbursements."[32]

On August 7, 2008, the RIGA found that although the State had implemented "grant income policies and procedures *as required by HUD rules and regulations*," they were not enough "to ensure that all applicants were eligible to receive their grants." [33]

Clearly, the federal government maintained significant oversight and control of the State's administration of the federal grants.

### 3. Background to Mrs. Calogero's Claims.

Mrs. Calogero's home, like many others, suffered significant damage caused by the 2005 Hurricanes. On May 11, 2007, Mrs. Calogero contracted with the OCD to obtain a HUD Road Home grant.[34] She executed several agreements related to her receipt of the Road Home grant, including The Road Home Declaration of Covenants Running with the Land Hurricane Katrina/Hurricane Rita; State of Louisiana Division of Administration Office of Community Development (OCD) The Road Home Program Grant Agreement Homeowners Grant No. 06HH050655; and The Road Home Limited Subrogation/Assignment Agreement (collectively "the Agreements").[35]

Retention of the Road Home grant required satisfaction of a number of conditions. For a three year period commencing on the effective date of the Agreements, Mrs. Calogero covenanted (1) not to sell, assign, transfer or otherwise dispose of her interest in the property, (2)

---

[32] Office of Inspector General Audit Report, Issue Date January 30, 2008, Audit Report Number: 2008-AO-1002, attached hereto as Exhibit 5.
[33] Office of Inspector General Audit Report, Issue Date August 7, 2008, Audit Report Number: 2008-AO-1005, attached hereto as Exhibit 6. (emphasis added).
[34] (Dkt. No. 1-1.)
[35] *Id*.

to occupy the property as her primary residence, (3) to insure the property under a casualty insurance policy and name OCD as an additional insured, and (4) to insure the property under a Flood policy if it is located in a Special Flood Hazard Area under the FEMA Flood Maps.[36] Breach of the above covenants would result in reimbursement of the federal monies to either the federal government, the State of Louisiana, or both.[37] As for reimbursement of overpaid grant monies, Mrs. Calogero "acknowledge[d] that [she] may be prosecuted by ***Federal***, State and/or local authorities in the event that [she] make or file false, misleading and/or incomplete statements and/or documents."[38] A federal action may only be brought within 6 years from the date of default.[39] The defendants cannot allege that they have 4 more years than the federal government to prosecute the same claims.

On February 9, 2018, the defendants sent a collection letter to Mrs. Calogero threatening suit to collect an alleged $4,598.89 grant overpayment.[40] The defendants wrote in pertinent part:

> Our office represents the State of Louisiana, Division of Administration, Office of Community Development-Disaster Recovery Unit ("Road Home"), in connection with certain Road Home Grant Funds ("Grant funds") which you received. The amount due to Road Home for repayment is described above. Our client's records indicate that you received more in total insurance proceeds than the amount used to calculate your Grant

---

[36] *Id*.

[37] If Mrs. Calogero violated paragraph 4 of the Road Home Declaration of Covenants Running with the Land, she would need to "reimburse the federal government in an amount of the federal disaster relief assistance provided with respect to the Property. *Id*. According to paragraph 8, should Mrs. Calogero fail to cure violations to the covenants set forth in paragraphs 1-3, then "the entire amount of the Grant shall become due and payable, without notice or demand, by the Defaulting Owner to OCD immediately upon expiration of the 30-day cure period." Paragraph 6 entitled "Enforcement of Covenants" states "[t]hese Covenants shall be enforceable, at law or in equity, by the State of Louisiana or the United States of America, and Owner hereby agrees that the State of Louisiana or the United States of America may demand repayment of Grant proceeds." *Id*.

[38] *Id*. at State of Louisiana Division of Administration Office of Community Development (OCD) The Road Home Program Grant Agreement Homeowners Grant No. 06HH05068800, p. 2. (emphasis added).

[39] 28 USC §2415(a) and/or (b).

[40] (Dkt. No. 1-2.)

award. Since you have not repaid those additional insurance funds to Road Home in accordance with your Road Home Grant Agreement, you have breached your Grant obligations. Those obligations are clearly outlined in your Road Home Grant Agreement.

\*\*\*\*\*

Please be advised that if you do not take any action to resolve this matter *within ninety days after your receipt of this letter, Road Home may proceed with further action against you, including legal action, in connection with the full Grant repayment balance owed as outlined above. You may also be responsible for legal interest from judicial demand, court costs, and attorney fees if it is necessary to bring legal action against you*.

\*\*\*\*\*

*This office is a debt collector*. The purpose of this letter is to recover the Road Home Grant Funds repayment set forth above. Any information obtained as a result of this correspondent will be used for the purpose of recovering the Road Home Grant Funds repayment.[41]

On March 5, 2018, Mrs. Calogero disputed receiving $4,598.89 in insurance proceed overages.  On April 10, 2018, the defendants sent correspondence which included the following breakdown of the alleged debt: $5,300 due to duplicated FEMA benefits, $1,269.85 in overpaid homeowner insurance proceeds, plus a $1,970.96 credit due to a decrease in an insurance penalty.[42] As purported proof of the duplicated FEMA benefits, the defendants provided a document (with a print date of October 27, 2008) detailing the FEMA benefits paid to her.[43] As for the alleged overpayment of homeowner's insurance benefits, the defendants claim Mrs. Calogero's "homeowner's insurance carrier electronically provided confirmation" of the amount paid.[44]

---

[41] *Id*. (emphasis added)
[42] (Dkt. No. 1-3.)
[43] *Id*.
[44] *Id.*

### III. LAW AND ARGUMENT

#### 1. Motion to Dismiss

For a complaint to survive a motion to dismiss, it must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."[45] A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.[46] Only when there are well-pleaded factual allegations, should a court assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[47] In the instant matter, Plaintiff's claims are sufficiently pled to survive dismissal.

#### 2. The State of Louisiana, Division of Administration, Office of Community Development (OCD), assumed the role of a quintessential federal agency and is therefore subject to the federal 6 year statute of limitation for breach of contract.

28 USC §2415(a) imposes a six year statute of limitation on "every action for money damages brought by the United States or an officer or agency thereof." Section 2415(b) imposes a six year statute of limitation on "an action to recover for diversion of money paid under a grant program." In *Dixson*, the United States Supreme Court held that local authorities "with the power to allocate federal fiscal resources for the purpose of achieving congressionally established goals" act as public officials. That "[b]y accepting the responsibility for distributing these federal fiscal resources, [local administrators] assume[] the quintessentially official role of administering a social service program established by the United States Congress."[48]

---

[45] *Ashcroft vs. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal citations omitted).
[46] *Id*.
[47] *Id*. at 664.
[48] *Dixson* at 497.

In *Dixson*, the United States Supreme Court held that two employees of a private nonprofit organization, designated by the City of Peoria, to administer the distribution of CDBG grants, were subject to federal anti-bribery laws because "petitioners assumed the quintessentially official role of administering a social service program established by Congress."[49] Similarly, the State of Louisiana, Division of Administration, Office of Community Development, tasked by Congress to administer congressionally appropriated federal disaster recovery funds to the citizens of Louisiana, was acting as a federal agency subject to the 6 year federal statute of limitations.

The defendants distinguish administration of the Road Home program from administration of the *Dixson* CDBG grant by claiming that there were fewer restrictions on the State of Louisiana's ability to distribute the federal funding - that Louisiana was acting independently because HUD was permitted to waive certain federal requirements for administration of the federal funding. As set forth in detail above, HUD maintained significant oversight of the State's Road Home program to ensure compliance with federal rules, policies and intent.

Even the Agreements "acknowledge that [Mrs. Calogero] may be prosecuted by ***Federal***, State and/or local authorities in the event that [she] make or file false, misleading and/or incomplete statements and/or documents."[50]  A federal action may only be brought within 6 years from the date of default. 28 USC §2415(a) and/or (b). The defendants cannot allege that they have 4 more years than the federal government to prosecute the same claims.

---

[49] *Id*. at 483.
[50] (Dkt. No. 1-1, at State of Louisiana Division of Administration Office of Community Development (OCD) The Road Home Program Grant Agreement Homeowners Grant No. 06HH05068800, p. 2. (emphasis added).)

Like the private administrators in *Dixson*, the State of Louisiana assumed the role of a quintessential federal agency by administering federal funds pursuant to federal rules, regulations, and policies in furtherance of a federal objective. Thus, the federal 6 year statute of limitation applies.

The defendants' threat to take legal action on time-barred debt was deceptive and misleading. The defendants' collection letter was also misleading because it failed to notify Mrs. Calogero that the alleged debt is judicially unenforceable and that any repayment of the alleged debt could restart the statute of limitations. Based on the foregoing, the defendants collection letter violates 15 U.S.C. §§ 1692e(2)(A), (5), (10) and 1692f as a matter of law.

### 3. The defendants' collection lawsuits are prescribed under Louisiana's 10 year prescriptive period.

On May 11, 2007, Mrs. Calogero entered into the Agreements with the OCD and shortly thereafter, received the $33,392.68 grant award, including the alleged $4,598.89 overpayment. Thus, HUD and the State were injured at the time Mrs. Calogero received the alleged $4,598.89 overpayment unless the doctrine of *contra non valetum* prevents prescription from running. The doctrine of *contra non valentem agere nulla currit praescriptio* prevents the running of liberative prescription when the cause of action is not known or ***reasonably knowabl***e by the plaintiff.[51] However, the principle of *contra non valentum* "will not exempt a plaintiff's claim from running if his ignorance is attributable to his own willfulness, neglect, or unreasonableness."[52]

Mrs. Calogero received FEMA benefits between September 9, 2005 and March 9, 2006.[53] She executed the Agreements with the OCD over a year later, on May 11, 2007.[54] On April 10,

---

[51] *Cole v. Celotex Corp.*, 620 So.2d 1154, 1156 (La. 1993).
[52] *Dominion Exploration & Prod. V. Waters*, 972 So. 2d 350 at 360 (La. App. 4 Cir. 11/14/07).
[53] *See* (Dkt. No. 1-3, p. 8.)
[54] *See* (Dkt No. 1-1.)

2018, the defendants mailed to Mrs. Calogero a screen shot from FEMA's Individual Assistance Center website reflecting all FEMA benefits she received during that period.[55] Apparently, Mrs. Calogero's FEMA payment information was only a click away on FEMA's website.[56]

According to the defendants, the "State ***discovered*** Plaintiff received additional FEMA assistance and homeowner's insurance benefits" in October of 2008.[57] However, this information was clearly available to the State at an earlier date.

The defendants' February 9, 2018 collection letter to Mrs. Calogero claimed that a collection lawsuit could be filed to recover the alleged overpayment in May of 2018 ("if you do not take any action to resolve this matter within ***ninety days*** after your receipt of this letter, Road Home may proceed with further action against you, including legal action."[58] However, as set forth above, the defendants' breach of contract claims prescribed in May of 2017. As such, the threat to take legal action was deceptive and misleading, and the defendants' failure to notify Mrs. Calogero that the alleged debt is judicially unenforceable and that any repayment of the alleged debt could restart the statute of limitations, violate 15 U.S.C. §§ 1692e(2)(A), (5), (10) and 1692f as a matter of law.

///

///

///

///

---

[55] *See* (Dkt. No. 1-3.)
[56] (Dkt. No. 1-3, p. 8.)
[57] (Dkt. No. 11-1, p. 17.) (emphasis added).
[58] (Dkt. No. 1-2.)

### 4.  The FDCPA Applies to Plaintiff's Claims.

**A.  The CDBG grant is a "debt" subject to the FDCPA because Mrs. Calogero's obligation to refund the alleged overpayment arose out of a transaction (the Road Home agreement) in which the money was primarily used for personal, family, or household purposes.**

The defendants allege that a grant overpayment is not a "debt" subject to the FDCPA because the Road Home grant was not intended to be an extension of credit (the grant funding "would <u>never</u> have to be repaid" absent certain circumstances).[59]

An FDCPA "debt" is "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."[60]

A "debt" under the FDCPA does not require an extension of credit. In *Hamilton vs. United Healthcare*, 310 F.3d 385, 391 (5th Cir. 2002), the 5th Circuit explained that the FDCPA's definition of debt "may not be alternatively read to reference only a limited set of obligations…As long as the transaction creates an obligation to pay, a debt is created."  Other courts of appeals have similarly concluded that a "debt" need not result from an extension of credit. [61]

---

[59] (Dkt. No. 11-1, p. 21.) (underline in original).
[60] 15 U.S.C. § 1692a(5).
[61] *See, e.g., Duffy v. Landberg*, 133 F.3d 1120, 1123 n.2 (8th Cir. 1998) ("[W]e conclude that a debt need not arise from a credit transaction in order to be covered by [the FDPCA].");  *Brown v. Budget Rent-A-Car Sys., Inc.*, 119 F.3d 922, 924 (11th Cir. 1997) ("Extension of credit is not a prerequisite to the existence of a debt covered by the FDCPA.");  *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1326 (7th Cir. 1997) ("[A]n offer or extension of credit is not required for a payment obligation to constitute a 'debt' under the FDCPA.").

"[A] 'transaction' under the FDCPA must involve some kind of business dealing **or consensual obligation**."[62] In *Oppenheim*, the 11th Circuit considered whether an "obligation to refund" an unintended payment is "an obligation which arose from [a] transaction" and therefore a "debt" subject to the FDCPA.

Mr. Oppenheim sought to sell a laptop and requested payment through PayPal. Pursuant to the PayPal user agreement, PayPal could "'reverse' a transaction if, among other reasons, a payment is invalidated by the sender's bank or if the sender did not have authorization to transfer the funds."[63] The PayPal account user "bears the risk of such reversals and is liable for the full amount of the invalidated payment, plus applicable fees."[64]

A buyer agreed to purchase Mr. Oppenheim's laptop and paid the money to PayPal. When PayPal notified Mr. Oppenheim the funds had cleared, Mr. Oppenheim transferred the laptop to the buyer.[65] Mr. Oppenheim then transferred the money from his PayPal account to his personal account.[66] Weeks later PayPal learned that the money was fraudulent and requested a refund from Mr. Oppenheim pursuant to the terms of the PayPal user agreement.[67] The 11th Circuit found that PayPal's request for a refund was a "debt" under the FDCPA.

The 11th Circuit disagreed that a debt can only be incurred as a loan or in exchange for a service. Rather, the 11th Circuit focused on whether the debt arose from the transaction itself and concluded that since the obligation (refund) arose from that transaction (the refund provision in the user agreement), the refund is an FDCPA debt.

---

[62] *Oppenheim vs. I.C. Sys.*, 627 F. 3d 833, 838 (11th Cir. 2010). (internal quotations and citations omitted) (emphasis added)
[63] *Oppenheim* at 836.
[64] *Id*.
[65] *Id*. at 835.
[66] *Id*. at 835-36.
[67] *Id*. at 836.

According to the 11th Circuit,

> Oppenheim's transaction with PayPal did not cease upon the transfer of funds to his account; rather he remained under a continuing contractual obligation to refund any invalidated payments – an obligation which arose from the transaction itself. By contrast, there is no indication that the plaintiffs in Arnold or Orenbach **had a contractual obligation dictating their liability in the event of any overpayment**.

> Contrary to I.C. System's contention, Arnold and Orenbach **do not stand for the proposition that one who improperly receives money does not incur a "debt" subject to the FDCPA**. Rather, they stand for the proposition that a consumer's obligation must arise from a "transaction" in order for the FDCPA to apply. In this case, Oppenheim's obligation to PayPal amply meets that test.[68]

In the instant matter, the parties agree that Mrs. Calogero and the OCD entered into Agreements (the transaction) that contained consensual obligations, one of which was to return any alleged overpayments (the debt). Mrs. Calogero satisfied the covenants, and used the grant for its intended purpose - the repair of her home. The defendants' request for reimbursement of an alleged overpayment is "an obligation which arose from the transaction itself."[69] Based on the foregoing, the alleged grant overpayment is a "debt" subject to the FDCPA.

The defendants compare the collection of a grant overpayment to the collection of tax debt, child support payments, and fines.[70] Courts find those debts fall outside the FDCPA because they do not arise out of a "consensual transaction".[71]

---

[68] *Id*. at 838. (emphasis added)

[69] *Id*. at 838.

[70] (Dkt. No. 11-1, fn. 15.)

[71] *See Reid vs. American Traffic Solutions, Inc.* 2010 WL 5289108  (S.D. Ill. Dec. 20, 2010) ("Transactions under the FDCPA do not include non-consensual obligations"); *Shorts v. Palmer*, 155 F.R.D. 172, 175-76 (S.D. Ohio 1994) (Transactions under the FDCPA do not include non-consensual obligations such as those resulting from shoplifting); *Mabe v. G.C. Servs. Ltd. P'ship*, 32 F.3d 86, 88 (4th Cir. 1994) (child support orders); *Graham v. ACS State & Local Solutions, Inc.*, 2006 U.S. Dist. LEXIS 73973, (D. Minn. Oct. 10, 2006) (parking tickets); *Betts v. Equifax Credit Information Servs., Inc.*, 245 F. Supp. 2d 1130, 1133-34 (W.D. Wash. 2003) (automobile impoundment and storage fees); *Mills v. City of Springfield, Mo.*, 2010 U.S. Dist. LEXIS 92031 (W.D. Mo. Sept. 3, 2010) (traffic fines imposed as a result of a red light are not debt subject to the

In the instant matter, the consumer debt (the alleged overpayment) arose from a consensual transaction between Mrs. Calogero and the OCD. Based on the foregoing, the grant overpayment is a debt subject to FDCPA protection.

### B. The defendants are subject to the FDCPA

Ironically, the defendants themselves believed they were pursuing collection activities subject to the FDCPA. The defendants' collection letter contains the following FDCPA mandated language setting forth the respective parties rights and duties: [72]

> You have 30 days after your receipt of this letter to notify our office that you dispute the validity of this Road Home Grant repayment claim, or any portion thereof. Failure to timely do so will result in an assumption by our office that the full amount of the Road Home Grant repayment claim is valid. If you notify our office in writing within the 30 day period that the Road Home Grant repayment claim, or any portion thereof, is disputed, our office will obtain verification of the Road Home Grant repayment claim and a copy of such verification will be mailed to you by our office. If you request verification, we will suspend action on your account until we send the requested verification to you.
>
> **This office is a debt collector**. The purpose of this letter is to recover the Road Home Grant Funds repayment set forth above. Any information obtained as a result of this correspondent will be used for the purpose of recovering the Road Home Grant Funds repayment. [73]

---

FDCPA because the vehicle owners were not acting as consumers and the traffic fine was not consensual.).

[72] Within 5 days of a debt collector's initial communication with a consumer, the debt collector must send the consumer a written notice containing –

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor. 15 U.S.C.S. § 1692g

[73] (Dkt. No. 1-2.) (emphasis added)

By including the FDCPA's required notices, the defendants clearly considered their activities to be subject to the FDCPA. The allegation that the "debt" underlying their collection activities is now outside the FDCPA's purview is simply an attempt to avoid FDCPA liability.

**5.   The collection letter to Mrs. Calogero contained false and misleading information.**

As set forth above, the defendants violated 15 U.S.C. §§1692e(2)(A), (5), (10), and 1692f by threatening to file suit on time-barred debt. Relatedly, the defendants violated the FDCPA by failing to notify Mrs. Calogero that the alleged debt is judicially unenforceable and that any repayment could restart the statute of limitations.[74]

The defendants also violated the FDCPA by misstating the nature of the debt. The defendants' February 9, 2018 letter notifies Mrs. Calogero that she "received more in total insurance proceeds than the amount used to calculate [the] Grant award," to the tune of $4,598.89.[75] The letter goes on to state "[s]ince you have not repaid those additional *insurance funds* to Road Home in accordance with your Road Home Grant Agreement, you have breached your Grant obligations." [76] On April 10, 2018, the defendants sent another collection letter to Mrs. Calogero.[77] This letter identified only $1,269.85 in unreported insurance proceeds from a "total negative variance of $4,598.89."[78]

---

[74] *Daugherty vs. Convergent Outsourcing Inc.*, 836 F.3d 507, 511 (5th Cir. 2016) (holding that a collection letter violates the FDCPA when its statements could mislead an unsophisticated consumer to believe that her time-barred debt is legally enforceable and does not "acknowledge[e] that such debt is judicially unenforceable").
[75] (Dkt. No. 1-2.)
[76] *Id.* (emphasis added).
[77] (Dkt. No. 1-3.)
[78] *Id.*

The defendants claim the collection letter does not violate the FDCPA because the total amount owed was accurate.[79] The defendants miss the point. The collection letter was misleading "because it gave a false impression of the character of the debt. It is unfair to consumers under the FDCPA to hide the character of the debt, thereby impairing their ability to knowledgeably assess the validity of the debt."[80]

When Mrs. Calogero received the defendant's February 9, 2018 letter, she thought she owed $4,598.89 in unpaid insurance proceeds. She had no reason to know that the $4,598.80 also included reimbursement for unreported FEMA benefits. The mischaracterization of the debt impaired her ability to knowledgeably assess the validity of the debt. That Mrs. Calogero could have contacted the defendants to ask for an explanation of the debt does not matter. "[C]onsumers are under no obligation to seek explanation of confusing or misleading language in debt collection letters."[81] Based on the foregoing, the defendants' mischaracterization of the debt violates the FDCPA as a matter of law.

///

///

///

///

///

///

---

[79] (Dkt. No. 11-1, p. 19.)
[80] *Fields vs. Wilber Law Firm, P.C.*, 383 F. 3d 562, 566 (7th Cir. 2004).
[81] *Gonzales v. Arrow Fin. Servs. LLC*, 660 F.3d 1055, 1062 (9th Cir. 2011)

## IV.    CONCLUSION

For the reasons set forth above, Mrs. Calogero's complaint pleads factual content that allows this Honorable Court to draw the reasonable inference that the defendants are liable for the misconduct alleged. Based on the foregoing, Mrs. Calogero respectfully requests that this Honorable Court deny the defendants' motion to dismiss.

DATED this16th day of October 2018.

**GESUND AND PAILET, LLC**

*/s/ Keren E. Gesund, Esq.*
Keren E. Gesund, Esq.
Louisiana Bar No. 34397
3421 N. Causeway Blvd., Suite 805
Metairie, LA  70002
Tel: (504) 836-2888
Fax: (504) 265-9492
keren@gp-nola.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of October 2018, a true and correct copy of the foregoing pleading was served electronically via ECF on all counsel of record.

*/s/ Keren E. Gesund*