UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IRIS CALOGERO                                    CIVIL ACTION

VERSUS                                           NO. 18-6709

SHOWS, CALI & WALSH, LLP, *et al.*               SECTION M (3)

## ORDER & REASONS

Before the Court are four motions for partial summary judgment filed by plaintiffs Iris Calogero and Margie Nell Randolph (together, "Plaintiffs"), with each motion addressing one of the four claims asserted.[1] Additionally, before the Court is a motion for summary judgment filed by defendants Shows, Cali & Walsh, LLP ("SCW"), Mary Catherine Cali, and John C. Walsh (collectively, "Defendants"), which addresses all of Plaintiffs' claims.[2] Also before the Court are Plaintiffs' motion to strike[3] and motion for class certification.[4] The parties respond in opposition and submit various replies in support of their respective motions.[5] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons.

## I.    BACKGROUND

This case arises from alleged violations of the Fair Debt Collection Practices Act ("FDCPA") stemming from Defendants' attempt to collect repayment of grant funds Plaintiffs received from the Louisiana Road Home program following Hurricanes Katrina and Rita.[6] In

---

[1] R. Docs. 162; 174; 214; 215.
[2] R. Doc. 212.  The parties' arguments concerning Defendants' motion for summary judgment are set out in footnotes in this Order & Reasons.
[3] R. Doc. 220.  As described below, the Court did not rely upon the materials and statements that are the object of Plaintiffs' motion to strike.  Therefore, the motion is denied as moot.
[4] R. Doc. 127.
[5] R. Docs. 146; 154; 199; 208; 200; 210; 218; 223; 225; 231.
[6] R. Doc. 147-1 at 1.

response to the devastation these hurricanes caused, the federal government appropriated disaster-relief funds to affected areas, including Louisiana, through the U.S. Department of Housing and Urban Development's ("HUD") Community Development Block Grant ("CDBG").[7]   HUD authorized the state of Louisiana to distribute the federal funds to its constituents.[8]   The state tasked the Louisiana Office of Community Development (the "OCD") and the Louisiana Recovery Authority (the "LRA") with administering the Road Home program, which distributed CDBG funds through grants to Louisiana homeowners who sustained unreimbursed hurricane-related damage.[9]   One such grant was the homeowners' compensation grant, which both Plaintiffs received.   Its purpose was to compensate for damages incurred and to mitigate against future damages from hurricanes and similar natural disasters.[10]   As part of the Road Home application process, applicants like Plaintiffs were required to disclose any funds they received from either the Federal Emergency Management Agency ("FEMA") or from a private insurer for hurricane-related damage to their homes.[11]   The grant was based on a formula: the OCD would calculate the damage it believed the storm had caused to applicants' homes, less any FEMA or insurance payments applicants had received for the same damage.[12]   The OCD subtracted FEMA and insurance payments to avoid awarding "duplicate benefits."[13]   Plaintiff Iris Calogero contracted with the OCD for a homeowners' compensation grant on May 11, 2007, and received $33,393.[14] Plaintiff Margie Nell Randolph contracted with the OCD for the same kind of grant on June 30, 2007, and received $28,793.[15]   When Plaintiffs signed their grant agreements, they acknowledged

---

[7] R. Doc. 80 at 5.
[8] *Id.* at 6.
[9] R. Docs. 80 at 6; 147-1 at 13-14 (citing *Groby v. Davis*, 575 F. Supp. 2d 762 (E.D. La. 2008)).
[10] R. Docs. 80 at 7; 162-7 at 5.
[11] R. Doc. 162-7 at 5.
[12] *Id.* at 5-6.
[13] *Id.* at 6.
[14] *Id.*
[15] R. Docs. 80 at 7; 162-7 at 6.

their obligation to report duplicate payments, past or future, and acknowledged that they could be sued for the failure to do so.[16]

In the ensuing years, the OCD discovered numerous errors in the distribution of the grants: thousands of recipients had received overpayments.[17]  For example, during the grant application process, Plaintiffs allegedly failed to report payments received from their insurers and FEMA and so, because the monies were not deducted in calculating their grants, the grants received were greater than they should have been.[18]  Accordingly, the state hired Defendants to assist with efforts to recover the amount of unreported funds that resulted in grant overpayments.[19]  On August 3, 2017, Defendants sent Randolph a collection letter seeking to recover $2,500 in allegedly overpaid grant funds.[20]  On February 9, 2018, Defendants sent a similar letter to Calogero seeking to recover $4,598.89.[21]  Both letters charged Plaintiffs with breach of their Road Home grant obligations and advised that:

> [I]f you do not take any action to resolve this matter within ninety days after your receipt of this letter, Road Home may proceed with further action against you, including legal action, in connection with the full Grant repayment balance owed as outlined above.  You may also be responsible for legal interest from judicial demand, court costs, and attorney fees if it is necessary to bring legal action against you.[22]

Plaintiffs allege that Defendants' communications were intimidating and caused them fear, anxiety, and emotional distress.[23]

---

[16] R. Doc. 174-1 at 3.
[17] R. Doc. 80 at 9.
[18] R. Docs. 174-3 at 6; 212-1 at 16.
[19] R. Docs. 80 at 10; 147-1 at 10.
[20] R. Doc. 80 at 10.
[21] *Id.*
[22] R. Doc. 174-2 at 103, 105.
[23] R. Doc. 80 at 14.

Randolph alleges that she did not understand the collection letter.[24]  She was purportedly "terrified by Defendants' letter because she did not have the money demanded, and she feared she would be sued and lose her home."[25]  Randolph contacted the OCD and entered into a payment plan of $25 a month and, on October 24, 2017, executed a promissory note on this repayment obligation.[26]  The promissory note provided in part:

> Margie N. Randolph ("Maker") acknowledges that she received funds pursuant to the Louisiana Road Home compensation grant program for a residence affected during the 2005 hurricane season.  MAKER, Margie N. Randolph, further acknowledges that the Grant Funds received in the amount of $2,500.00 are subject to repayment to State of Louisiana, Office of Community Development, Disaster Recovery Unit ("OCD-DRU") because of a duplication of homeowner's insurance proceeds benefits received and not reported to Road Home prior to the closing on her Road Home grant agreement.[27]

Calogero says she, too, was scared when she received the collection letter.[28]  She was "upset" and "intimidated" by it, and worried about her credit score and "what would happen to her friends and neighbors who received similar letters from Defendants."[29]  Following the instructions provided in the letter,[30] she disputed the repayment claim.[31]  In response, Defendants provided Calogero a "verification of the Road Home Grant Funds owed to [their] client"[32] that included a narrative-form and an itemized-list breakdown of Calogero's debt calculation.[33]  Defendants

---

[24] R. Doc. 174-3 at 7.

[25] *Id.*

[26] R. Docs. 80 at 11-12; 80-1 at 31; 147-1 at 6.

[27] R. Doc. 215-3 at 113.

[28] R. Doc. 174-3 at 7.

[29] *Id.*

[30] Randolph's letter also contained instructions on how to dispute the claim.  R. Doc. 162-3 at 1.

[31] R. Docs. 80-1 at 32 (letter from Defendants addressed to Calogero's lawyer: "[P]lease be advised we have noted your representation of Iris Calogero and her dispute of the repayment claim."); 127-2 at 2.

[32] R. Doc. 80-1 at 32-33.

[33] *Id.*  The letter also enclosed copies of (1) an eGrants calculation sheet along with the compensation grant calculation; (2) compensation grant closing documents, including: (a) a First American Title Insurance Co. of Louisiana final disbursement statement, (b) the Road Home declaration of covenants running with the land, (c) owner information and an immovable property description, (d) the Road Home program grant agreement, (e) the Road Home limited subrogation/assignment agreement, (f) the Road Home grant recipient affidavit, (g) receipt of instructions for filing an appeal, (h) a file balance sheet and disbursement summary, and (i) a wire transfer order; and (3) a FEMA application overview.  *Id.* at 32.

4

explained that Calogero's misrepresentations of the benefits she received from both FEMA and her homeowners' insurance carrier prior to the execution of the Road Home grant affected its calculation.[34]  Defendants calculated the grant amount Calogero should have been awarded based on the total amount of benefits she received (reported and unreported) and then subtracted that amount from the amount she was awarded, resulting in a $4,598.89 overpayment due back to the OCD.[35]

Plaintiffs allege that Defendants' efforts to seek repayment of the grant funds violated multiple provisions of the FDCPA, specifically, 15 U.S.C. §§ 1692e and 1962f, because Defendants: (1) misrepresented the amount, character, and nature of the debt by failing to itemize the debts; (2) improperly attempted to collect a time-barred debt; (3) improperly attempted to collect attorney's fees; and (4) improperly required persons to sign a promissory note.[36]

## II.  LAW & ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*  A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment

---

[34] *Id.* at 33.
[35] *Id.*
[36] R. Docs. 80; 147-1 at 1.

and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id*. Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014). Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting,

competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

## B. The FDCPA

"Congress enacted the FDCPA 'to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.' [15 U.S.C.] § 1692(e). The FDCPA pursues these stated purposes by imposing affirmative requirements on debt collectors and prohibiting a range of debt-collection practices. §§ 1692b-1692j." *Rotkiske v. Klemm*, 140 S. Ct. 355, 358 (2019). The FDCPA "bars debt collectors from deceiving or misleading consumers; it does not protect consumers from fearing the actual consequences of their debts." *Sheriff v. Gillie*, 578 U.S. 317, 329 (2016).

To establish a claim under the FDCPA, a plaintiff must establish "(1) that she was the object of collection activity arising from a consumer debt; (2) that [the d]efendant is a debt collector as defined by the FDCPA; and (3) that [the d]efendant engaged in an act or omission prohibited by the FDCPA." *Weiser v. Castille*, 2021 WL 4168414, at *4 (E.D. La. Sept. 14, 2021))

(quotation and alteration omitted).  Only the third element is disputed in this case.  The provisions of the FDCPA upon which Plaintiffs rely are 15 U.S.C. §§ 1692e and 1692f.  Under these sections, "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," 15 U.S.C. § 1692e, or "use unfair or unconscionable means to collect or attempt to collect any debt."  *Id.* § 1692f.  "'[T]here is a growing consensus' that a claim under § 1692f is a 'backstop' to catch conduct outside that barred by § 1692e and other provisions [of the FDCPA]."  *Manuel v. Merchants & Pro. Bureau, Inc.*, 956 F.3d 822, 825 (5th Cir. 2020).

"'When evaluating whether a collection letter violates § 1692e or § 1692f, a court must view the letter from the perspective of an "unsophisticated or least sophisticated consumer."'" *Manuel*, 956 F.3d at 826 (quoting *Daugherty v. Convergent Outsourcing, Inc.*, 836 F.3d 507, 511 (5th Cir. 2016)).  This is an objective standard.  *McKenzie v. E.A. Uffman & Assocs., Inc.*, 119 F.3d 358, 362 (5th Cir. 1997).  Courts "must 'assume that the plaintiff-debtor is neither shrewd nor experienced in dealing with creditors.'"  *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Goswami v. Am. Collections Enter., Inc.,* 377 F.3d 488, 495 (5th Cir. 2004)).  "'At the same time [courts] do not consider the debtor as tied to the very last rung on the intelligence or sophistication ladder.'"  *Salinas v. R.A. Rogers, Inc.*, 952 F.3d 680, 683 (5th Cir. 2020) (quoting *Goswami*, 377 F.3d at 495).  "'This standard serves the dual purpose of protecting all consumers, including the inexperienced, the untrained and the credulous, from deceptive debt collection practices and protecting debt collectors against liability for bizarre or idiosyncratic consumer interpretations of collection materials.'"  *Gonzalez*, 577 F.3d at 603 (quoting *Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1236 (5th Cir. 1997)).

Plaintiffs claim that Defendants violated the following proscribed practices: (1) the false representation of "the character, amount, or legal status of any debt"; (2) "the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer"; and (3) the "use [of] unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. §§ 1692e(2)(A), (10), 1692f.  The Fifth Circuit has not explicitly defined the terms "deceptive" and "misleading" as used in the context of the FDCPA, but "[b]ecause Congress 'intended the FDCPA to have a broad remedial scope,' the FDCPA should 'be construed broadly and in favor of the consumer.'" *Salinas*, 952 F.3d at 683-84 (quoting *Daugherty*, 836 F.3d at 511); *see also Manuel*, 956 F.3d at 826.  When assessing whether a defendant's actions are false, deceptive, or misleading under § 1692e, courts impose a "materiality standard." *Gomez v. Niemann & Heyer, L.L.P.*, 2016 WL 3562148, at \*4 (W.D. Tex. June 24, 2016).  "A false, deceptive, or misleading statement is 'material' when it has 'the ability to influence a consumer's decision.'" *Id.* (quoting *O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 942 (7th Cir. 2011)); *see also Powell v. Palisades Acquisition XVI, LLC*, 782 F.3d 119, 126 (4th Cir. 2014) (observing that a demand letter that misstates interest as principal but accurately states the total amount owed is a technical, not material error).  The materiality requirement "advances the purpose of the FDCPA, which is to 'provide information that helps consumers to choose intelligently, and by definition immaterial information neither contributes to that objective nor undermines it.'" *Gomez*, 2016 WL 3562148, at \*4 (quoting *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 757-58 (7th Cir. 2009), and citing *Jensen v. Pressler & Pressler*, 791 F.3d 413, 421 (3d Cir. 2015) ("[T]he FDCPA was designed to give debtors reliable information so that they can make informed decisions about how to address debts.")) (alterations omitted).

"The ultimate question in each [FDCPA case] is whether the unsophisticated or least sophisticated consumer would have been led by the debt collection letter into believing something untrue that would have influenced their decision-making." *Id.* at *5 (collecting cases).[37] Although the Fifth Circuit has not specifically decided whether the application of the unsophisticated-consumer standard is a question of law or question of fact, it "generally treat[s] the issue as a question of law." *Salinas*, 952 F.3d at 683 n.2; *see also Manuel*, 956 F.3d at 826.

## C. Plaintiffs' first claim for relief – that Defendants violated the FDCPA by failing to itemize alleged debts – fails.

### 1. The parties' contentions

In their motion for partial summary judgment on their first claim for relief, Plaintiffs argue that Defendants' failure to itemize Plaintiffs' alleged debts constitutes (1) a false, deceptive, or misleading representation, in violation of § 1692e; and (2) an unfair means to collect or attempt to collect a debt, in violation of § 1692f.[38] Plaintiffs contend that Defendants' collection letters "lacked any itemization of which provision(s) of the Road Home Agreement Plaintiffs purportedly breached, or the breakdown of alleged duplicate benefits, and further lacked any basis of the calculation made by their client, OCD."[39] Defendants' failure to itemize Plaintiffs' debts hid the debts' true character, say Plaintiffs, thereby impairing their ability to assess the debts' validity and intelligently respond.[40] Further, Plaintiffs argue that each of the three defendants – SCW, Cali, and Walsh – is a debt collector and, therefore, each is liable for the alleged FDCPA violations committed.[41]

---

[37] To this end, the Second Circuit has stated that a debt collection letter is deceptive "when it can be reasonably read to have two or more different meanings, one of which is inaccurate." *Russell v. Equifax A.R.S.*, 74 F.3d 30, 35 (2d Cir. 1996). This definition is "widely accepted." *Gomez*, 2016 WL 3562148, at *5 (collecting cases).
[38] R. Doc. 174-3 at 25.
[39] *Id.*
[40] *Id.* at 9.
[41] *Id.* at 23-24. Plaintiffs assert this argument in each of their motions for partial summary judgment. The Court need not address this argument, though, given its disposition of Plaintiffs' claims.

In opposition, Defendants argue that Plaintiffs' failure-to-itemize claim is untimely under the one-year FDCPA statute of limitations because if the Court decides that a Louisiana ten-year prescriptive period applies to Plaintiffs' claims (*i.e.*, if the time-barred-debt claim falls), then there is no "original claim" to which Plaintiffs' recently asserted failure-to-itemize claim can relate back.[42]  Defendants then contend that no FDCPA violation occurred because (1) they were not required by law to itemize Plaintiffs' debts; (2) there were no "add-on" fees included; and (3) each collection letter included a statement that the debtor could dispute the validity of the debt and request verification of the claim.[43]  Finally, Defendants argue that Cali and Walsh cannot be held personally responsible for any FDCPA violation because the purposes of the act "would not be furthered by holding the individual attorneys liable for a communication sent by a law firm, even if the individual attorneys meet the definition of a 'debt collector.'"[44]

In reply, Plaintiffs maintain that Defendants' collection letters caused unfair confusion and lacked the requisite clarity mandated by the FDCPA.[45]  Plaintiffs contend that Defendants cannot

---

[42] R. Doc. 200 at 5.  The Court has already decided this issue.  *See* R. Doc. 95.  All of the claims Plaintiffs raise in their amended complaints arise out of the same conduct, transaction, or occurrence as their "original" claim that the debt was time-barred (*i.e.*, Plaintiffs' second claim for relief).  *Id*. at 9.  Accordingly, the failure-to-itemize claim stands on its own, regardless of the Court's disposition of the time-barred-debt claim.

[43] R. Doc. 200 at 6-7, 9.  Moreover, in their motion for summary judgment, Defendants argue that the failure-to-itemize claim "fails to state a cause of action, since the letters clearly state the total amount owed by the plaintiffs as the 'total grant repayment amount due' (Calogero), and 'Amount due: $2,800.00 – Road Home Compensation Grant ... funds['] (Randolph)."  R. Doc. 212-1 at 25.  Defendants reiterate that there "are no attorney's fees, costs, or other items added to or included in that [total] amount, and thus there is nothing to itemize."  *Id.*  "Since the defendants were not required to itemize or describe exactly how OCD formulated the grant overpayment owed by the plaintiffs," say Defendants, "the plaintiffs' protestations concerning exactly how the debt was incurred or formulated are of no moment."  *Id.* at 27.  Defendants argue that because they were "simply not required" to itemize, Plaintiffs' claim should be dismissed.  *Id.*

[44] R. Doc. 200 at 9-10.  Again, because the Court dismisses all claims against Defendants, it is unnecessary to address separately the liability of the individual Defendants.

[45] R. Doc. 210 at 2-4.  In their opposition to Defendants' motion for summary judgment, Plaintiffs reiterate that "Defendants' letters so poorly described the nature of the debt as to be misleading or deceptive," and "their deficient presentation further constitutes an unfair means to collect or attempt to collect a debt" in violation of the FDCPA.  R. Doc. 225 at 15.

avoid liability by relying on the letters' offer for Plaintiffs to seek further information because "the debtor is under no obligation to reach out to his tormentor."[46]

### 2. Analysis of Defendants' alleged failure to itemize

As the Plaintiffs note, the Fifth Circuit has yet to address whether the failure to itemize a debt in a debt-collection letter is a violation of the FDCPA.[47]  Both parties acknowledge, and the Court agrees, that the FDCPA does not affirmatively require itemization of a debt in a debt collector's dunning letter.[48]  And so, while the FDCPA does not require itemization, the question is whether, by failing to itemize, Defendants misleadingly conveyed the amount owed or unfairly sought to collect a debt in violation of the FDCPA.  *Gomez*, 2016 WL 3562148, at *8.  This is a "context-specific inquiry."  *Id.*  And in this context, this Court holds that Defendants' failure to itemize did not violate the FDCPA.

### a.  The present situation is not one that requires itemization.

While itemization is not required in every debt collection letter, the failure to itemize is materially misleading in some instances.  *See id.* at *6.  One such instance is when a collection letter lumps charges for additional collection costs and fees into the amount said to be owed.  For example, in *Fields v. Wilber Law Firm, P.C.*, the Seventh Circuit found that, at the motion-to-dismiss stage, the plaintiff had made allegations sufficient to state a claim under § 1692e and § 1692f for failure to itemize where "the demand for payment include[d] add-on expenses like attorneys' fees or collection costs."  383 F.3d 562, 565-66 (7th Cir. 2004).  There, plaintiff Fields owed a debt of $122.06 to a veterinary hospital.  *Id.* at 563.  Fields later received a dunning letter stating that her account balance was $388.54.  The account balance reflected the original debt of

---

[46] R. Doc. 210 at 4.
[47] R. Doc. 174-3 at 12.
[48] R. Docs. 174-3 at 8; 200 at 6.

$122.06, plus interest and service charges assessed pursuant to the contract signed by Fields, along with $250 in attorney's fees for the collection of the debt by the defendant debt collector.  The letter "did not itemize the expenses or explain the amount of the debt in any way."  *Id.* at 564.  The court reasoned that even assuming Fields had saved the original contract specifying that she could be charged for attorney's fees, an unsophisticated consumer in those circumstances could reasonably wonder why her bill had increased so drastically.  *Id.* at 566.

In addition, the court in *Fields* concluded that an unsophisticated debtor who may have lost the bill and forgotten the amount of the debt completely, or the debtor's spouse, or someone else paying the debtor's bills, "might logically assume that [Fields] simply incurred nearly $400 in charges," as opposed to the $122.06 she originally incurred.  *Id.*  "By leaving the door open for this assumption to be made, [the defendant debt collector's] letter was misleading because it gave a false impression of the character of the debt," thereby impairing the debtor's ability "to knowledgeably assess the validity of the debt."  *Id.* at 566.  Accordingly, the court proposed that "[o]ne simple way to comply with § 1692e and § 1692f in this regard would be to itemize the various charges that comprise the total amount of the debt," including add-on expenses like attorney's fees and collection costs.  *Id.*  So, where the total debt includes collection-related add-on fees or expenses, and those fees or costs are not itemized, there may be a violation of the FDCPA.  *See also Vogel v. McCarthy Burgess & Wolff, Inc.*, 2020 WL 6134987, at *9 (N.D. Ill. Oct. 19, 2020) ("Collection fees and attorneys' fees related to debt collection have a different 'character' from debts incurred for goods and services, and must be itemized separately in any debt collection notices.") (citing *Fields*, 383 F.3d at 565-66); *Meyer v. Fay Servicing, LLC*, 385 F. Supp. 3d 1235, 1245 (M.D. Fla. 2019) (finding it plausible that a "corporate advances" line item could be misleading under § 1692e and § 1692f when the collection letter did not include

itemization of attorney's fees, late charges, or other fees associated with the debt, which were contemplated by the line item); *Bradley v. Franklin Collection Serv., Inc.*, 2011 WL 13134961, at *11 (N.D. Ala. Mar. 24, 2011) (finding that plaintiff stated a plausible claim for relief where total amount demanded in collection letter combined collection costs with the principal debt).

In other instances, however, the failure to itemize in a collection letter may not be misleading, such as when a debt collector fails to distinguish the principal amount owed from interest and non-collection-related fees. For example, in *Hahn v. Triumph Partnerships LLC*, the Seventh Circuit concluded that no violation of § 1692e occurred where the debt collector failed to itemize the principal debt and interest due. 557 F.3d at 756-57. There, plaintiff Hahn received a letter which stated that he owed $1,134.55 in overdue credit card debts: $1,051.91 of this amount was an "amount due," and the remaining $82.64 was an "interest due" that accrued after the defendants purchased the debt from the original creditor. *Id.* at 756. Hahn conceded that the total amount due was accurate, but argued that the labels for the two sums comprising the total amount of debt were technically incorrect: the $82.64 labeled "interest" included only *post*-assignment interest, whereas the $1,051.91 labeled "amount due" included *pre*-assignment interest and principal. The court rejected Hahn's argument, holding, in part, that a debt collector need not break out principal and interest. *Id.* at 756-57. "[I]t is enough to tell the debtor the bottom line" without separating principal from interest, the court observed, because "[a]n 'amount' that is due can include principal, interest, penalties, attorneys' fees, and other components." *Id.* This means that the debt collector "could have sent Hahn a letter demanding payment of $1,134.55 without saying where this figure came from," but, "[b]y providing some extra detail[, the debt collector] may have helped consumers understand the situation." *Id.* at 757.

14

Similarly, in *Goodrick v. Cavalry Portfolio Services, LLC*, the court held there was no violation of § 1692e where a debt collector failed to distinguish principal from interest and non-collection-related fees.  2013 WL 4419321, at *4 (D. Ariz. Aug. 19, 2013).  The court reasoned that "[w]hile Defendant's letters could have included additional clarifying language to itemize the principal and the interest portions of the debt or to reiterate the interest rate, the Court does not believe that the lack of those details can be considered false, deceptive, or misleading."  *Id.*  The court concluded that while the lack of specificity as to what portion of the plaintiff's total debt was principal and what portion was interest and other fees might be technically misleading, it was not materially misleading where the total debt was otherwise accurate.  *Id.*  Ultimately, because the plaintiff could still intelligently choose how to respond to the collection letters – by either (1) challenging the debt, or (2) settling the debt by paying in full – the court found that no FDCPA violation had occurred.  *Id.* at *4 (citing *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1034 (9th Cir. 2010) (concluding that plaintiff's ability to intelligently choose her response when debt collector mislabeled "interest" on the collection letter had not been impaired because her only options, irrespective of the falsehood, were to pay the total debt or attempt to challenge the accuracy of the debt)).

Generally, then, the caselaw indicates that collection-related expenses should be itemized in collection letters, but that principal and interest need not be.  *Compare Fields*, 383 F.3d at 564-66 (holding that add-on expenses like attorney's fees and collection costs should be itemized), *with Hahn*, 557 F.3d at 756-58 (holding that a debt collector need not itemize principal and interest), *and Singer v. Pierce & Assocs., P.C.*, 383 F.3d 596, 598 (7th Cir. 2004) (concluding that no § 1692e or § 1692f violation occurred where debt collector segregated attorney's fees from the underlying debt in an itemized list of expenses).  But cases like *Fields* (upon which Plaintiffs

heavily rely) and *Hahn* are inapposite here where there is no dispute that the total debt recited is accurate and did not include any collection-related fees or interest.  Where the total debt is clear and accurate, a precise, itemized breakdown of the component parts of the debt is not necessary. *See, e.g., Vogel*, 2020 WL 6134987, at *11 ("[Plaintiff] points to no case – within the Seventh Circuit or otherwise – holding that a debt collector must itemize ordinary charges that a consumer has rung up for goods and services with a particular creditor.  If anything, the current of Seventh Circuit case law flows in the other direction."); *Taubenfliegel v. EGS Fin. Care, Inc.*, 2018 WL 3079697, at *4 (E.D.N.Y. June 21, 2018) (observing that the Second Circuit "expressly rejected a requirement of exhaustive disclosure" for purposes of complying with § 1692e); *Wilson v. Trott L., P.C.*, 118 F. Supp. 3d 953, 963 (E.D. Mich. 2015) ("[T]here is no language in the FDCPA that requires a debt collector to provide a complete breakdown of the debt owed."); *Moran v. Greene & Cooper Att'ys LLP,* 43 F. Supp. 3d 907, 914 (S.D. Ind. 2014) ("A debt collector need not 'itemize' the debt, so long as its statement of the total is clear and accurate.").

What follows from these cases, and the rule that principal and interest need not be itemized, is that the principal debt itself need not be itemized.  In fact, the Second Circuit has confirmed that the FDCPA does not require debt collectors to itemize the component parts of the principal debt. *See Kolbasyuk v. Cap. Mgmt. Servs., LP*, 918 F.3d 236, 239-42 (2d Cir. 2019); *see also Vogel*, 2020 WL 6134987, at *11 (characterizing *Kolbasyuk* in the same way).  In *Kolbasyuk*, the court concluded that where a debt collector provides the debtor with the "total, present quantity" of the debt and informs the debtor that this amount could increase due to additional fees and interest, the debt collector's failure to provide detailed disclosures of a precise breakdown of the debt "does

not transform [the debt collector's] otherwise-straightforward letter into a 'false, deceptive, or misleading' one" in violation of § 1692e. *Kolbasyuk*, 918 F.3d at 240-42.[49]

In like manner, the court in *Vogel* held that an initial collection letter, which stated the amount of debt in one lump sum, but failed to break down the debt into its component parts, did not violate the FDCPA. *Vogel*, 2020 WL 6134987, at *13. After failing to pay Payless Car Rental the approximately three thousand dollars she owed, plaintiff Vogel received the debt collector's initial collection later, which just reported the bottom-line number. *Id.* at *3. There were no collection-related fees. *Id.* at *8. Vogel disputed the amount of the debt and the debt collector, in turn, sent Vogel a debt-verification notice with an invoice from Payless, which itemized the charges, including "miscellaneous charges" of $789, a "late fee" of $385, and "optional services" of $582.75. *Id.* at *4. Because Vogel believed these were improper add-on charges that "inflated" her bill, she filed suit, arguing that the debt collector violated the FDCPA by failing to separately itemize these charges in the initial collection letter.

The *Vogel* court concluded that the complained-of charges arose from the Payless car rental (*i.e.*, the principal debt), not from the defendant's debt-collection efforts (which might have warranted itemization). *Id.* at *9. Although Vogel believed that an itemized letter from the debt collector would have helped her assess the validity of the debt, the court observed that "[a] dunning letter can comply with the FDCPA without answering all possible questions about the past." *Id.* at *12. The court granted summary judgment in favor of the defendant, reasoning that "[u]nder

---

[49] Interestingly, the Second Circuit also concluded there was no violation of 15 U.S.C. § 1692g, which mandates that, within five days of sending the initial dunning letter, a debt collector must send the debtor a written notice regarding the amount of debt, the name of the current creditor to whom the debt is owed, and a statement regarding the validity of the debt, verification of the debt, the original creditor's identity, if not contained in the initial communication. *Kolbasyuk*, 918 F.3d at 239-40. Even the more detailed § 1692g letter that follows the initial dunning letter need not "inform [the debtor] of the constituent components of that debt or the precise rates by which it might later increase," the court concluded. *Id.* at 240. *A fortiori*, the initial collection letter need not include a detailed breakdown of the component parts of the original debt.

the [FDCPA], it makes no difference whether a debt collector breaks out the principal into separate line items, or reports the principal as a lump sum owed by the debtor. 'A dollar due is a dollar due.'" *Id.* (quoting *Hahn*, 557 F.3d at 757). Additionally, the court explained that under either the text of the statute or the caselaw, "[t]here was nothing 'false, deceptive, or misleading' about telling Vogel the total amount owed, without breaking [it] down," considering there were no added debt-collection charges. *Id.* at *8, *10. Because "[t]he creditor told [Vogel] that she owed $3,036.83, and the debt collector told [her] that she owed $3,036.83," the court held that the collection letter "wasn't false, deceptive, or misleading" and, therefore, did not violate the FDCPA. *Id.* at *13. Accordingly, there was no need for the defendant to break down the principal amount of debt owed.

Against this jurisprudential backdrop, the collection letters sent to Plaintiffs did not require itemization. The reference line of Calogero's letter stated in part, "Total Grant Funds Repayment Amount Due: $4,598.89."[50] The letter further explained the alleged debt as follows:

> The amount due to Road Home [*i.e.*, the OCD] for repayment is described above [in the reference line]. Our client's records indicate that you received more in total insurance proceeds than the amount used to calculate your Grant award. Since you have not repaid those additional insurance funds to Road Home in accordance with your Road Home Grant Agreement, you have breached your Grant obligations. Those obligations are clearly outlined in your Road Home Grant Agreement.[51]

Plaintiffs maintain that Defendants' letter to Calogero required itemization because (1) it "*misrepresented* the source of the duplicate payment as 'insurance proceeds,' when, in fact, the bulk of the alleged overpayment came from FEMA";[52] (2) it "cavalierly faulted Mrs. Calogero for failing to report payments made *after* the Grant closing," when, in fact, "the payments at issue had

---

[50] R. Doc. 174-2 at 105.
[51] *Id.*
[52] R. Doc. 174-3 at 18 (emphasis in original).

been made long before the closing";[53] and (3) "the expression of the alleged debt in a lump sum of $4,598.89 made it impossible for *any* reader, much less the unsophisticated consumer, to understand the basis of the alleged debt or to check the numbers."[54]   These alleged deficiencies purportedly "hamstrung" and "misdirected" Calogero's efforts to investigate the debt and "deprived her of any ability to make an intelligent choice about how to respond to the letter – except to do as she did, and retain counsel."[55]

The reference line of Randolph's letter stated in part, "Total Grant Funds Repayment Amount Due: $2500.00."[56]   The letter further explained the alleged debt as follows:

> The amount due to Road Home [*i.e.*, the OCD] for repayment is described above [in the reference line].  Our client's records indicate that you have breached your Road Home Grant obligations.  Those obligations are outlined in your Road Home Grant Agreement.[57]

Defendants' letter to Randolph required itemization, argue Plaintiffs, because the letter did not explain "why" Randolph owed such an amount or "how" she breached her obligations.[58]   And so, "even assuming Mrs. Randolph still had on hand the twelve pages of separate documents that comprised the Road Home agreements, she would have to study them and make her own assumptions about what she might have done wrong."[59]   This alleged deficiency purportedly caused "utter confusion about why [Randolph] owed thousands of dollars."[60]

But a debt collector need not itemize the constituent components of, or the basis for, the principal debt.  Plaintiffs do not contend that the total debt recited in the collection letters is inaccurate.  Nor do they contend that the amount of debt set out in the letters included any debt-

---

[53] *Id.* (emphasis in original).
[54] *Id.* at 19 (emphasis in original).
[55] *Id.* at 17-18.
[56] R. Doc. 174-2 at 103.
[57] *Id.*
[58] R. Doc. 174-3 at 21.
[59] *Id.*
[60] *Id.* at 23.

collection fees.  In these circumstances, Plaintiffs are wrong to suggest that Defendants' statement of the accurate, current total debt was misleading because it was not readily apparent to Plaintiffs how or why they owed the debt to Road Home.  "[T]he text [of the FDCPA] does not require the debt collector to explain to the debtor how the creditor tallied the amount of the debt.  The affirmative duty to provide *some* information suggests that there is no comparable duty to provide *other* information, such as the back-up for the 'amount' of the debt."  *Vogel*, 2020 WL 6134987, at *7 (emphasis in original).  "[W]hen prohibiting misleading statements, the [statutory] text merely refers to 'the ... amount' of the debt as a whole, without slicing and dicing the amount into separate pieces."  *Id.*  "The 'amount' of the debt does not mean the *basis* for the debt."  *Id.* at *8 (emphasis in original).  The statutory term merely "refers to the size of the debt, not how the debt got there in the first place.  'How much is the bill?' does not mean 'what's the bill *for*?'"  *Id.* (emphasis in original).  And here, having accurately stated the amount owed, Defendants were under no obligation to expound upon the basis for the Road Home bills.  It is enough to give the debtor the bottom-line amount due, so long as it does not include undisclosed add-ons for collection fees.  *See id.* at *10; *see also Hahn*, 557 F.3d at 75; *Allen v. Advanced Call Ctr. Techs., L.L.C.*, 2019 WL 4887683, at *6 (E.D.N.Y. Sept. 30, 2019) (concluding that collection letters complied with the FDCPA where the total, present quantity of the debt due at the time the letters were sent was clearly identified).  To conclude otherwise would put an unreasonable burden on the debt collector to identify each transaction the debtor made that aggregated into the total debt.  *See Vogel*, 2020 WL 6134987, at *13 ("Vogel's interpretation [of the FDCPA to require itemization of the principal debt] would impose enormous burdens on debt collectors (thus making debt more costly), by pressing them into service to explore the basis for a debt owed by a debtor.").

As in *Vogel*, "[t]here was nothing 'false, deceptive, or misleading' about [Defendants] telling [Plaintiffs] the total amount owed, without breaking [that amount] down," or explaining the basis of the debt, where there were no added charges for debt collection. *Vogel*, 2020 WL 6134987, at *8, *10. Nor does Defendants' presentation of the debt in the collection letters constitute an "unfair" attempt or means to collect a debt. Defendants' failure to itemize the basis for the original debt thus does not result in an FDCPA violation under either § 1692e or § 1692f.

### b. The language of the collection letters was not materially misleading.

Plaintiffs also argue that Defendants' failure to itemize caused the language of the collection letters to be misleading in that it hid the true character of the debt.[61] Defendants' letter to Calogero was misleading, say Plaintiffs, because it "misrepresented the grant overpayment as resulting from insurance proceeds alone and misrepresented those payments as having been made after the grant was executed instead of before."[62] Plaintiffs argue that, because Calogero owed the OCD the undisclosed FEMA funds she received in addition to the undisclosed insurance payments, she "would have looked in the wrong places to analyze the alleged debt, which would have led to the wrong decision about any response."[63] Moreover, because the letter allegedly "faulted Mrs. Calogero for failing to report payments made *after* the Grant closing,"[64] Plaintiffs argue that "Defendants misdirected [her] investigation of the debt, this time to payments made after the

---

[61] R. Doc. 174-3 at 9. Contrary to the idea advanced by Plaintiffs, the "character" of the debt does not turn on whether the debt was comprised of undisclosed FEMA or insurance benefits. Instead, "[t]he 'character' of a debt concerns the 'kind of obligation' owed by the debtor: *e.g.*, a secured or unsecured debt, a judgment debt, a subordinated debenture, etc." *Vogel*, 2020 WL 6134987, at *8 (citing *Rhone v. Med. Bus. Bureau, LLC*, 915 F.3d 438, 440 (7th Cir. 2019)). As in *Vogel*, here there is no evidence that any part of the "total due" to the OCD consisted of different kinds of obligations (a secured or unsecured debt, a judgment debt, a subordinated debt, etc.). Accordingly, Defendants' description of the debt – that is, an amount due to the OCD for repayment – did not misrepresent its true character.

[62] R. Doc. 174-3 at 20.

[63] *Id.* at 18.

[64] *Id.* (emphasis in original).

21

closing, instead of before."[65]  Defendants' letter to Randolph was misleading, too, say Plaintiffs, because "the *only* clue Defendants offered as to why Mrs. Randolph owed an alleged $2500 grant repayment was that 'our client's records indicate that you have breached your Road Home obligations.'"[66]  Accordingly, Defendants' non-itemized letter to Randolph "suggested such a broad range of potential breaches of her Road Home obligations that it fundamentally misrepresented the character of the alleged debt ... 'leaving the door open' for the debtor to 'wonder' or make 'assumptions' about the nature of the debt and its calculation."[67]

Plaintiffs' arguments are without merit.  First, there is nothing false or deceptive about the statements Plaintiffs identify in the collection letters.  Again, Plaintiffs do not argue that the amounts the letters state as due are inaccurate.  More to Plaintiffs' point, Calogero did indeed receive insurance payments she did not disclose in applying for her Road Home grant and she was indeed obligated to repay those amounts.  That she was also obligated to repay undisclosed FEMA payments did not make this statement any less true.  Similarly, Randolph did indeed breach her Road Home grant obligations by not disclosing all payments she had received.  That this statement did not explain the precise obligations breached or the precise basis of the debt owed did not make it less true.

Second, the purportedly misleading statements are not material.  For a representation in connection with debt collection to be false, deceptive, or misleading as would violate the FDCPA, it must be material.  *See Peter v. GC Servs. L.P.*, 310 F.3d 344, 350 (5th Cir. 2002); *Gomez*, 2016 WL 3562148, at *4-5 (discussing the materiality standard across the circuits).  "[F]alse but non-material representations are not likely to mislead the least sophisticated consumer and therefore

---

[65] *Id.*
[66] *Id.* at 21 (emphasis in original).
[67] R. Doc. 174-4 at 22.

are not actionable under §§ 1692e or 1692f." *Donohue*, 592 F.3d at 1033-34 (concluding that a debt collector's mislabeling $32.89 as "interest" when the amount included both interest and pre-assignment finance charges did not constitute a materially false misrepresentation under the FDCPA); *see also Powell*, 782 F.3d at 126 (holding that technical error like misstating interest as principal is not material).

The Ninth Circuit in *Donohue* explained that it was "not concerned with mere technical falsehoods that mislead no one, but instead with genuinely misleading statements that may frustrate a consumer's ability to intelligently choose his or her response." 592 F.3d at 1034; *see also Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 645-46 (7th Cir. 2009) (rejecting plaintiff's "hypertechnical" argument that collection letter was false and violated the FDCPA where letter misstated interest as principal but accurately stated the total amount owed). Because the plaintiff in *Donohue* could still challenge the accuracy or legality of the total debt, the court could "conceive of no action [the plaintiff] could have taken that was not already available to her on the basis of the information in the [collection communication at issue] – nor has [the plaintiff] articulated any different action she might have chosen." *Id.* at 1034. Thus, the plaintiff's ability to intelligently choose her response to the collection demand had not been improperly influenced, the court reasoned, where her only options, irrespective of the falsehood, were to pay the total debt or attempt to challenge the accuracy of the debt. *Id.* Said the court: "[I]mmaterial statements, by definition, do not affect a consumer's ability to make intelligent decisions." *Id.* (citing *Hahn,* 557 F.3d at 757-58); *see also Anselmi v. Shendell & Assocs., P.A.*, 2015 WL 11121357, at *7 (S.D. Fla. Jan. 7, 2015) (finding that collection letter was not misleading or deceptive where plaintiff failed to assert that her decision-making regarding the debt would have been affected had the mislabeled fees been labeled differently).

Other courts agree.  In *Hahn*, in which the Seventh Circuit held that a collection letter need not itemize principal and interest, the court also held that the interest statement in question – which included only post-assignment interest in the portion of the debt labeled "interest," but included both pre-assignment interest and principal in the portion labeled "amount due" – was immaterial because "the difference between principal and interest is no more important to the Fair Debt Collection Practices Act than the color of the paper that [a collector] used [for its collection letters]. A dollar due is a dollar due."  557 F.3d at 757.  The FDCPA "is designed to provide information that helps consumers to choose intelligently," the court explained, "and by definition immaterial information neither contributes to that objective (if the statement is correct) nor undermines it (if the statement is incorrect)."  *Id*. at 757-58.  Therefore, the court concluded that a "statement cannot mislead unless it is material, so a false but non-material statement," such as the interest statement at issue, "is not actionable."  *Id.* at 758.

And, as also discussed previously, the court in *Goodrick* held that a debt collector's failure to distinguish principal from interest was not materially misleading where the total debt was otherwise accurate and the plaintiff could still intelligently choose how to respond to the collection letters.  2013 WL 4419321, at *4.  The court reasoned that "[e]ven if [it] were to find that the lack of specificity in this case could mislead a debtor as to what portion of his total debt was principal and what portion was interest and other fees, the Court d[id] not [believe] this would 'frustrate a consumer's ability to intelligently choose his or her response.'"  *Id.* (quoting *Donohue,* 592 F.3d at 1034).  After all, the lack of specificity did not hinder the plaintiff's ability to intelligently choose to pay the debt or dispute it, her only options.  Accordingly, the court found that no FDCPA violation existed.  *Id.*

24

Similarly, the court in *Cortellessa v. Urden Law Offices P.C.* held that a debt collector's use of the term "Corporate Advance Balance" was not materially misleading under the FDCPA because the statement would not affect the least-sophisticated debtor's decision-making. 2017 WL 467348, at *2 (E.D. Pa. Feb. 3, 2017). There, the plaintiffs complained that the term "Corporate Advance Balance" on their collection letter was subject to multiple interpretations, some false, and, therefore, was misleading. *Id.* at *2-3. The court acknowledged that the term "Corporate Advance Balance" was ambiguous and subject to multiple interpretations, but reasoned that "there [was] no evidence that any of these interpretations could have reasonably impacted the least sophisticated debtor's ability to make an intelligent decision about how to respond to the complaint." *Id.* at *3.

At most, Defendants' collection letters, like the letters in *Hahn*, *Donohue*, *Goodrick*, and *Cortellessa*, may contain immaterial omissions or ambiguity. Thus, the statement in Calogero's letter, that her duplicate benefits derived from insurance payments (rather than both insurance and FEMA payments), was technically incomplete; and the statement in Randolph's letter, that she breached her Road Home obligations, may have been ambiguous in that it did not specify which of her multiple obligations she breached. But neither representation is material as would have hindered Plaintiffs' decisions about how to respond.[68]   Regardless of these immaterial

---

[68] Plaintiffs rely on *Tourgeman v. Collins Financial Services, Inc.*, 755 F.3d 1109 (9th Cir. 2014), to argue the opposite. R. Doc. 174-3 at 16-17. But that reliance is unavailing. In *Tourgeman*, the Ninth Circuit held that an initial collection letter was materially misleading in that it misidentified the debtor's original creditor. There, the debt collector falsely identified the plaintiff's original creditor as American Investment Bank, N.A., when, in fact, it was CIT Online Bank. 755 F.3d at 1119-20. The court found the error material because a plaintiff "might engage in a fruitless attempt to investigate the facts of this non-existent debt," and "contact American Investment Bank to obtain background information so that he can remember what had earlier transpired, or to obtain any records that the bank holds pertaining to his debt so that he can prove he already had paid it off, if he believes such is the case." *Id.* at 1121. "American Investment Bank would have no record of a loan agreement," the court explained, "and the unknown account number certainly is of no help in getting to the bottom of things." *Id.* The court concluded that "such 'confusion and delay in trying to contact the proper party concerning payment on the loan' is precisely the kind of infringement of the consumer's best interests that the FDCPA seeks to combat." *Id.* at 1121-22 (quoting *Wallace v. Wash. Mut. Bank, F.A.*, 683 F.3d 323, 327 (6th Cir. 2012)) (alteration omitted). Here, the hypertechnical omission and ambiguity Plaintiffs identify in Defendants' collection letters do not equate to the misidentification of the original

25

representations, Plaintiffs' only two choices were clear: either dispute or pay the amount of the stated debt. *See Donohue*, 592 F.3d at 1034 (finding that the plaintiff's only options, irrespective of any falsehood, were to pay the total debt or attempt to challenge the accuracy of the debt). And this is exactly what occurred. Calogero challenged the accuracy of her Road Home debt, and Randolph entered into a payment plan to satisfy hers.

Plaintiffs have not shown that these immaterial representations caused actual harm to the interests protected by the FDCPA. There is no evidence that Plaintiffs, for example, "took or forewent any action because of the allegedly misleading statements in the letters" because "[s]tatements that induce no reliance," like those at issue here, "do not impede a consumer's ability to intelligently respond to a debt collector." *Adams v. Skagit Bonded Collectors, LLC*, 836 F. App'x 544, 546-47 (9th Cir. 2020) (holding that plaintiff lacked standing to pursue an FDCPA claim where he merely made "a bare allegation of confusion" regarding a debt-collection letter as opposed to an allegation that he was induced to take or forego some action that harmed his interests). Where Plaintiffs have presented no evidence that the omission or ambiguity frustrated their ability to intelligently respond to the collection letters, the Court cannot agree that the letters were materially misleading in violation of either § 1692e or § 1692f. Thus, Plaintiffs' first claim for relief fails on this basis as well.

### D. Plaintiffs' second claim for relief – that Defendants violated the FDCPA by threatening to take legal action on time-barred debts – fails.

#### 1. The parties' contentions

In their motion on their second claim, Plaintiffs argue that Defendants violated the FDCPA by threatening legal action on time-barred debts arising from alleged breaches of Plaintiffs' Road

---

creditor in *Tourgeman*. Plaintiffs were fully able to – and did in fact – contact their original creditor, the OCD, to investigate the debt.

Home obligations.[69]   Plaintiffs say that a federal six-year statute of limitations applies to the collection of funds under the Road Home agreements and, because Defendants sent their letters outside of that six-year prescriptive period, the debts they sought to collect were time-barred.[70]   If state law supplies the limitations period for the alleged debts, however, Plaintiffs argue that Louisiana Civil Code article 1564 applies, which provides a five-year prescriptive period for non-performance of conditions on an onerous donation.[71]   Plaintiffs then argue that "[r]egardless of which time bar is found to apply here, the limitations period begins to run upon breach of an obligation under the Road Home Agreement."[72]   And here, say Plaintiffs, "the alleged breaches of the Road Home Agreements occurred when each member of the class received duplicate benefits that were either undisclosed or unreturned to OCD" or, at the latest, when the OCD received notice of the payments through a data feed from FEMA and private insurers in 2007.[73]   So, even if the Court applies a ten-year statute of limitations, argue Plaintiffs, prescription accrued on the OCD's claim against Calogero and other members of the putative class ten years before Defendants sought to collect the debt.[74]   From this, Plaintiffs conclude that "Defendants' threats of legal action in their form collection letters misrepresented the status of the debt, threatened to take action that could not legally be taken, and used these misrepresentative, harassing, and deceptive means to unfairly attempt to collect a debt."[75]

In opposition, Defendants argue that, because Plaintiffs' repayment obligations are not time-barred under the applicable state-law statute of limitations, they did not violate the FDCPA

---

[69] R. Doc. 214 at 1.
[70] R. Doc. 214-1 at 8-9.
[71] *Id.* at 10.
[72] *Id.* at 42.
[73] *Id.* at 42-43.
[74] *Id.* at 49.
[75] *Id.*

in seeking repayment of the grant funds.[76]  Plaintiffs' debt is not time-barred, say Defendants,

because Plaintiffs entered into a contract with the state, not the federal government;[77] therefore, a

state statute of limitations applies,[78] not the federal six-year statute of limitations.[79]  Defendants

argue that the five-year state statute of limitations is not applicable because it attaches to actions

dissolving a donation and, here, the grants were not donations.[80]  Accordingly, Defendants contend

that the ten-year statute of limitations for breach of contract under Louisiana Civil Code article

3499 applies.[81]  This ten-year prescriptive period had not run when the collection letters were sent,

argue Defendants, because (1) block reporting of benefits paid to Louisiana residents is insufficient

to start the running of prescription; (2) there is no evidence that the OCD became aware of

Plaintiffs' alleged breaches more than ten years before the dunning letters were sent; and (3) both

a three-year compliance period and legislative stay suspended the running of prescription.[82]

In reply, Plaintiffs re-urge that the federal statute of limitations applies or, if Louisiana law

governs, the state five-year statute of limitations applies.[83]  They argue that the compliance period

and legislative stay upon which Defendants rely are not related to the instant case; therefore,

neither suspended the running of prescription.[84]  Finally, Plaintiffs reiterate that, if the state ten-

---

[76] R. Doc. 223 at 3.

[77] Similarly, in their own motion for summary judgment, Defendants argue that the OCD (the entity with which Plaintiffs entered contracts) is a state, not federal, agency and that the Road Home program is a state, not federal, program.  R. Doc. 212-1 at 19.  Defendants contend that the OCD is not a federal agency because "HUD did not run, control or direct the day-to-day operations of the [Road Home] Program."  Id. at 21.  Absent federal control of the day-to-day operations, say Defendants, the OCD acted as a state agency, the Road Home program was state run, and the OCD's Road Home contracts with Plaintiffs are governed by state law.  Id.

[78] R. Doc. 223 at 17, 19.

[79] Id. at 16.  Further, in their motion for summary judgment, Defendants argue that Plaintiffs' obligation to repay the Road Home grant overpayments is not subject to the federal six-year statute of limitations because "[t]he Road Home Grant received by plaintiffs was not a federal grant, and their Road Home Grant Agreement was not a federal contract."  R. Doc. 212-1 at 18 (emphasis omitted).

[80] R. Doc. 223 at 27-28.

[81] Id. at 17, 19.

[82] Id. at 28-31.  Moreover, in their motion for summary judgment, Defendants argue that a prescriptive period does not begin to run "until the party becomes aware of the breach," which did not occur until March 2008.  R. Doc. 212-1 at 25 (citing New Orleans Jazz & Heritage v. Kirksey, 40 So. 3d 394, 408 (La. App. 2010)).

[83] R. Doc. 237 at 2-8.

[84] Id. at 14, 16.

year statute of limitations applies, prescription began to run when the information regarding Plaintiffs' alleged duplicate payments "came into the database in 2007," which is when the OCD allegedly had notice of the alleged breaches.[85]

### 2. Analysis of the alleged time-barred debt

As recounted, Plaintiffs charge Defendants with violating the FDCPA because, *inter alia*, Defendants purportedly attempted to collect a time-barred debt, did not disclose the unenforceability of a time-barred debt, and threatened to sue on that debt.[86] Collection of old debt "can be" violative of the FDCPA, but not always. *Manuel*, 956 F.3d at 828. A violation of the FDCPA depends on whether, read as a whole, the collection letter misrepresents the legal enforceability and character of a time-barred debt. *Id.* at 830. The Fifth Circuit has not yet decided "whether a letter seeking collection on time-barred debt is misleading as a matter of law by its mere silence as to the age and legal unenforceability" of the debt. *Id.* Here, the Court finds no violation of the FDCPA for seeking collection on an alleged time-barred debt because the debts at issue were not time-barred.

### a. A state statute of limitations applies.

Plaintiffs aptly note that the resolution of their time-barred-debt claim turns on the determination of which time bar applies to the collection of funds under the Road Home agreements.[87] Plaintiffs argue that if they owed a debt, it was time-barred from collection under the six-year federal statute of limitations, 28 U.S.C. § 2415, which governs the time for commencing actions brought by the United States.[88] Multiple factors warrant the application of

---

[85] *Id.* at 10-11. More specifically, in their opposition to Defendants' motion for summary judgment, Plaintiffs explain that "[t]he applicable date on which the State had sufficient notice to excite attention and put it on guard or call for inquiry was the date on which FEMA and State Farm notified it of the alleged duplicate payments from grant recipients." R. Doc. 225 at 21.
[86] R. Docs. 147-1 at 1; 214-1 at 4, 45.
[87] R. Doc. 214-1 at 8.
[88] *Id.* at 10.

§ 2415's six-year statute of limitations, say Plaintiffs, including: (1) preemption and Louisiana's conflict-of-law rules;[89] (2) "the language of the statute"; (3) "the close interaction between the federal government and OCD in regards to the recapture of allegedly overpaid federal grant funds"; and (4) "the importance of uniformity in CDBG grant recoveries nation-wide, which should not be regulated by disparate state laws that would frustrate federal objectives."[90]   Defendants disagree, arguing that Plaintiffs entered into a contract with the state, not the federal government, so Plaintiffs' obligation to repay the Road Home grant overpayments is subject to a state statute of limitations.[91]   Consequently, Defendants say that because the federal six-year statute of limitations does not apply and they did not seek to recover a debt that was time-barred under state law, their actions did not violate the FDCPA.[92]

When faced with this same question, another section of this court decided that a state – not federal – statute of limitations applied due to the character of the Road Home grant contracts. *Napoleon v. Shows, Cali & Walsh, LLP*, 2021 WL 5630895, at *6 (E.D. La. Dec. 1, 2021).[93]   In *Napoleon*, the court found that the Road Home grant contracts were subject to a state statute of limitations because the OCD, the contracting entity, was a state, not federal, agency.   The OCD was a state agency, the court held, because "day-to-day governance, development, and implementation of the Road Home grant program was performed by [the state, through the] LRA [and the OCD] not the federal government."   *Id.*   The court reasoned that:

> plaintiff cannot show that HUD controlled the day-to-day operations of the Road Home Program.   Whereas HUD performed audits, provided technical assistance, and ensured that Louisiana's interpretation of the statutory and regulatory requirements was consistent with [the Housing and Community Development Act

---

[89] *Id.* at 10-15.
[90] *Id.* at 16-17.
[91] R. Doc. 223 at 18-19.
[92] *Id.* at 16.
[93] *Napoleon* involved the Road Home program's elevation grant in addition to its homeowners' compensation grant, but this distinction does not affect the analysis of whether the program itself was administered by the state or the federal government.

of 1974], HUD did not participate in the day-to-day governance or implementation of the program.  Day-to-day governance, development, and implementation of the Road Home grant program was performed by the Louisiana Recovery Authority (LRA), which had its Action Plans approved by the Governor of Louisiana, and the Louisiana legislature.  The Road Home program's only connection to the federal government is that the federal government provided funds to the State of Louisiana, which, through the OCD, used those funds for the Road Home Program.  Mere funding, as apparent here, is not enough to establish agency under [*United States v.*] *Orleans*[, 425 U.S. 807 (1976)].

*Napoleon*, 2021 WL 5630895, at *5 (internal citations omitted).  Accordingly, the *Napoleon* court

held that a state, not federal, statute of limitations applied to an FDCPA plaintiff's obligations to

repay his Road Home grant.  *Id.* at *6.

Plaintiffs admit that "[i]n administering the Road Home Program, the OCD had

considerable authority over the day-to-day management of the program.  This is undisputed."[94]

But they suggest that this is not the real issue; instead, say Plaintiffs, the Court should examine

"whether OCD's discretion extended to the recovery of the allegedly overpaid grant awards,"

which, they insist, it did not.[95]  Plaintiffs argue that "[t]he federal government kept a close eye on

the money at all times, which retained its federal character and its dedication to federally-defined

objectives."[96]  But, while Plaintiffs review select statutory and regulatory provisions of the federal

regime for grant funding, they provide no summary-judgment evidence to contravene the

*Napoleon* court's bottom-line conclusion that "day-to-day governance, development, and

implementation of the Road Home grant program was performed by the LRA not the federal

government."  *See Napoleon*, 2021 WL 5630895, at *6.  This, again, is a point Plaintiffs do not

dispute.[97]

---

[94] R. Doc. 214-1 at 17.

[95] *Id.*  Notably, Plaintiffs' observation is contrary to state law, which provides that the OCD is to recover monies that are alleged to have been improperly paid to or misspent by the recipients. La. R.S. 49:633.1.

[96] R. Doc. 214-1 at 17.

[97] Plaintiffs move to strike an exhibit Defendants attach as support for the proposition that the Road Home program is administered by the state.  R. Doc. 220 at 1.  However, because the Court did not need to consider this exhibit in its legal determination that the state administered the program, the motion to strike is denied as moot.

The LRA and the OCD are state agencies as a matter of law.  *Bernofsky v. Rd. Home Corp.*, 741 F. Supp. 2d 773, 777 (W.D. La. 2010).  The state created the LRA to oversee the disbursement of federal funds, La. R.S. 49:220.4-.5, and it created the OCD as part of its division of administration[98] to administer the Road Home program.  *See* La. R.S. 40:600.62(2) ("The [housing] project[s under the Road Home program] may be financed with funds provided in whole or in part from the United States Department of Housing and Urban Development's Community Development Block Grant Program, *as administered by the Louisiana office of community development of the division of administration*.") (emphasis added); *see also Bernofsky*, 741 F. Supp. 2d at 777 (finding that the OCD is a state agency as a matter of law because the state authorized it to administer the Road Home program); *Blanchard v. Newton*, 865 F. Supp. 2d 709, 712 (M.D. La. 2012) ("The state authorized the OCD within the Division [of Administration] to administer The Road Home Program." (citing La. R.S. 40:600.62(2))).  Thus, along with numerous other federal and state courts, this Court likewise concludes that the LRA and the OCD are state agencies authorized to administer the Road Home program on behalf of the state.  *See, e.g.*, *Lumpkins v. Off. of Cmty. Dev.*, 621 F. App'x 264, 266 (5th Cir. 2015) (observing that plaintiff applied for disaster-relief aid administered by the OCD, a Louisiana state agency), *aff'g* 2014 WL 4792188, at *3 (E.D. La. Sept. 24, 2014) ("The Office of Community Development/Louisiana Economic Development & Disaster Recovery Unit, and the Small Rental Property and Hazard Mitigation Program are departments and agencies of the State of Louisiana."); *Robinson v. ICF Emergency Mgmt. Servs., L.L.C.*, 453 F. App'x 528, 530 (5th Cir. 2011) ("The State of Louisiana, through the Office of Community Development ('OCD'), hired defendant ICF to administer the Road Home program on behalf of the State."); *Napoleon v. Shows, Cali & Walsh, LLP*, 2022 WL

---

[98] "'Division of administration' means the division of administration created within the office of the governor by Title 39 of the Louisiana Revised Statutes of 1950."  La. R.S. 40:600.62(1).

721560, at \*6 (E.D. La. Mar. 10, 2022) ("The LRA and the OCD are state agencies taxed with the administration of the road home grants funded by HUD's Community Development Block Grant ('CDBG') Program ...."); *Hall v. Forbes*, 2017 WL 78493, at \*1 (E.D. La. Jan. 9, 2017) ("'The state authorized the OCD within the Division [of Administration] to administer the Road Home Program.  There is no dispute that the OCD is a state agency.'") (quoting *Blanchard*, 865 F. Supp. 2d at 712); *Pelicano v. State ex rel. Off. of Cmty. Dev.*, 2015 WL 6832052 (La. App. 2015) ("After Hurricane Katrina, the State of Louisiana, through the Office of Community Development (State), became the administrator of a federally-funded program known as The Road Home ...."); *Guth v. State*, 2010 WL 2802128, at \*1 (La. App. 2010) ("[T]he Road Home Program [was] administered by the Louisiana Office of Community Development (OCD), an agency of the State of Louisiana, within the Division of Administration.").  In addition, in the prior appeal of this case, the Fifth Circuit described the state, not federal, nature of the program.  Specifically, it noted that Calogero had a Road Home grant agreement with Louisiana.  It added that "Louisiana gave Calogero money to repair her home, and Calogero gave Louisiana her word that she would comply with the significant requirements set forth in the Road Home grant agreement."  *Calogero v. Shows, Cali & Walsh, L.L.P.*, 970 F.3d 576, 583-84 (5th Cir. 2020).

In light of this long line of decisions and the Fifth Circuit's previous observations in this case, the Road Home agreements are most appropriately viewed as state, not federal, in character.  At closing, Plaintiffs each entered into a set of agreements with the OCD in conjunction with their receipt of the Road Home grants.[99]  In one of these contracts, Plaintiffs expressly agreed to repay the state, not the federal government, for any amounts received as a result of false, misleading, or incomplete statements in their applications.[100]  In another of these contracts, Plaintiffs expressly

---

[99] R. Doc. 80 at 7.
[100] R. Doc. 80-1 at 9, 22.

agreed to assign to the state, not the federal government, any amounts they received from FEMA or private insurers that would have reduced the calculated amount of the grants.[101]  These contracts were part and parcel of the day-to-day administration of the Road Home program by state agencies, the LRA and the OCD, including use of the CDBG disaster-recovery grants to carry out the state-run program.  As such, the program and the Plaintiffs' concomitant obligations are state, not federal, in character.

Plaintiffs' contention that the federal government minded the purse strings and program objectives, notwithstanding the state's day-to-day governance, development, and implementation of the Road Home program, does not alter this conclusion.  Plaintiffs argue that the federal Stafford Act requirements that recipients of assistance not receive duplicate payments, 42 U.S.C. § 5155, and that the state's obligation to certify its compliance with these requirements, 24 C.F.R. § 570.485, .487-.491, along with the federal source of the CDBG monies, mean that the Road Home program was federal in character.  In rejecting a similar argument, the *Napoleon* court looked to the Supreme Court's decision in *United States v. Orleans* to observe: "Regulations aimed at assuring compliance with federal goals do not convert the acts of local entities into federal governmental acts," 2021 WL 5630895 at *5 (citing *Orleans*, 425 U.S. at 815-16), and "'the question here is not whether the community action agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government.'"  *Id.* (quoting *Orleans*, 425 U.S. at 815).  Compliance with such federal goals, standards, and regulations undoubtedly extends to any repayment obligations, so under the Supreme Court's guidance in *Orleans*, it is the state's administration of the program, not any federal compliance requirements, that controls the question of whether a

---

[101] *Id.* at 10, 23.

program is essentially state or federal.  Further, Plaintiffs' reliance on cases involving a federal

bribery prosecution, federal insured banks, and the federal Medicare program is unavailing.[102]  In

those cases, the state entities involved had assumed a federal role, essentially standing in the shoes

of the federal government, thereby rendering application of the federal statute of limitations

appropriate.  Here, the state agencies retained their own role in the development, administration,

and implementation of the Road Home program distinct from the federal government, even if they

received federal money and were required to comply with federal standards and regulations.

In sum, then, the LRA and the OCD, as state agencies, provided grants to homeowners

pursuant to state contracts.  Those state contracts were administered by the state as part of its day-

to-day operations of the Road Home program.  Consequently, those state contracts, including any

repayment obligations arising under the contracts, are subject to a state statute of limitations.

### b.  The ten-year state statute of limitations applies.

Having decided that state law governs, the Court must now determine which particular

state prescriptive period applies to Plaintiffs' obligations.  Plaintiffs argue that if a state statute of

limitations applies, the debt obligations under their Road Home grants prescribed under Louisiana

Civil Code article 1564, which provides a five-year prescriptive period for non-performance of

conditions on an onerous donation.[103]  For this period to apply, Plaintiffs must establish that the

Road Home grants are donations.  Donative intent is clear, say Plaintiffs, because the Road Home

compensation is "aid" and the purpose of the grants was to "provide compensation."[104]  Moreover,

Plaintiffs argue that HUD expressed its donative intent because it did not allocate a portion of its

---

[102] R. Doc. 214-1 at 31-35 (discussing *Dixson v. United States*, 465 U.S. 482 (1984), *United States v. Thornburg*, 82 F.3d 886 (9th Cir. 1996), and *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387 (2d Cir. 2001)).  The *Napoleon* court distinguished *Dixson* as applying only in criminal matters, not civil matters, which the court said are more appropriately analyzed under *Orleans*.  2021 WL 5630895, at *5-6.

[103] R. Doc. 214-1 at 37.

[104] *Id.* at 40-41.

funds until the OCD redesigned the program to provide for direct grant awards to homeowners.[105]

Defendants disagree, arguing that the shorter five-year prescriptive period cannot apply because

Plaintiffs present no evidence of the OCD's donative intent[106] and the Road Home documents

"never mention any donation, but rather state that the funds are grants that are subject to

enumerated obligations."[107]  They argue that, tellingly, the grants cannot be simultaneously both

donations and consumer debts under the FDCPA.[108]  Accordingly, Defendants contend that

Louisiana Civil Code article 3499 applies, which confers a ten-year prescriptive period for actions

on a contract.[109]

A donation must be established by proof that is "strong and convincing."  *Schindler v.
Biggs*, 964 So. 2d 1049, 1053 (La. App. 2007).  "In order for the donation to be valid, there must

be a divestment, accompanied by donative intent."  *Cerminaro v. Cerminaro*, 207 So. 3d 633, 637

(La. App. 2016).  The court in *Napoleon* found that there was no donative intent on the part of the

state for its Road Home grants.  *Napoleon*, 2021 WL 5630895, at *7.  There, the plaintiff argued

that donative intent was apparent because the word "grant" implied that the grant was a donation.

The court held that this was insufficient to show donative intent by strong and convincing evidence

and, thus, determined as a matter of law that the ten-year statute of limitations under article 3499

applied to debts arising from a Road Home grant.  *Id.* at *6-7.

The same analysis applies here.  Plaintiffs provide no evidence of the OCD's donative

intent, much less strong and convincing proof.  Their focus for examining donative intent was not

---

[105] *Id.* at 41.

[106] The parties analyze different entities for donative intent: Plaintiffs point to a federal entity (HUD), whereas Defendants point to a state entity (the OCD).  While the federal government may have been the source of the funds for the Road Home program, the Court has already determined that the program was administered by the state.  Thus, the OCD, not HUD, is the appropriate entity to examine for donative intent.

[107] R. Doc. 223 at 28.

[108] *Id.* at 27.

[109] *Id.*

the OCD, as it should have been, but HUD, an entity that was not party to the grant agreements. And, as in *Napoleon*, it is a bridge too far to infer that the funds Plaintiffs received from the Road Home program were donations simply because they are denominated "grants" and were intended to "aid" or provide compensation for hurricane-related damage.[110]   After all, recipients of the grant monies were required to demonstrate eligibility for the Road Home grants and to enter into obligations concerning their receipt and use of the monies.   Hence, as the court in *Napoleon* held, the grants do not constitute donations but are contracts governed by the ten-year prescriptive period of article 3499.   *See Napoleon*, 2021 WL 5630895, at *8.

### c.  The debts are not time-barred.

Now that the Court has decided that the state ten-year statute of limitations applies, it must determine whether the ten-year prescriptive period has run, such that the debts are time-barred. Plaintiffs originally argued that prescription began to run when (1) Plaintiffs allegedly breached their Road Home agreements, which, they say, occurred at signing; or (2) the OCD had notice of the alleged breach, which, they say, occurred in 2007 when FEMA and private insurers provided information to a third-party database about payments that had been made to grant recipients.[111] Plaintiffs, however, ultimately abandon their argument that prescription began to run at signing because they acknowledge that they "have always assumed that the doctrine of *contra non valentem* would apply to suspend the running of prescription until the State knew or should have known about the alleged overpayments."[112]   Defendants agree that prescription began to run when the state, through the OCD, had notice of the breaches, but they disagree with Plaintiffs about

---

[110] R. Doc. 214-1 at 40-41.
[111] R. Docs. 214-1 at 42-43; 237 at 11.
[112] R. Doc. 225 at 18.

when such notice occurred.[113]  Defendants contend that prescription commenced when the OCD

learned of the breaches in March of 2008, not in 2007, as Plaintiffs suggest.[114]

*Contra non valentem* is a Louisiana jurisprudential doctrine under which prescription is

suspended when a person could not bring his or her suit.  *Carter v. Haygood*, 892 So. 2d 1261,

1268 (La. 2005).  It is "an exception to the general rules of prescription."  *Wimberly v. Gatch*, 635

So. 2d 206, 211 (La. 1994).  The Louisiana supreme court recognizes four instances where *contra*

*non valentem* is applied to prevent the running of prescription:

> (1) where there was some legal cause which prevented the courts or their officers
> from taking cognizance of or acting on the plaintiff's action; (2) where there was
> some condition coupled with the contract or connected with the proceedings which
> prevented the creditor from suing or acting; (3) where the debtor himself has done
> some act effectually to prevent the creditor from availing himself of his cause of
> action; and (4) where the cause of action is not known or reasonably knowable by
> the plaintiff, even though this ignorance is not induced by the defendant.

*Id.*  These categories "allow the courts to weigh the equitable nature of the circumstances in each

individual case to determine whether prescription will be tolled."  *Id.* (quotation omitted).

The parties agree that the fourth exception, regarding situations in which the cause of action

is not known or reasonably knowable by a plaintiff, even though the plaintiff's ignorance is not

induced by the defendant, is at issue here.[115]  This exception is known as the "discovery rule."

*Meggs v. Davis Mortuary Serv., Inc.*, 301 So. 3d 1208, 1213 (La. App. 2020).  It applies only in

"'exceptional circumstances' and is not available when the plaintiff's ignorance of his cause of

action is attributable to his own willfulness or neglect."  *Id.* (citing *Renfroe v. State ex rel. Dep't*

*of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002)).

---

[113] R. Docs. 212-1 at 25; 223 at 31.
[114] R. Docs. 212-1 at 25; 223 at 31.
[115] *See* R. Docs. 212-1 at 25; 223 at 31; 225 at 18.

"The law is clear that the prescriptive period begins to run once a party has 'constructive knowledge of the facts that would entitle him to bring a suit,' even if he does not have actual knowledge of those facts." *Ellis v. Evonik Corp.*, 2022 WL 1719196, at *4 (E.D. La. May 27, 2022) (quoting *Campo v. Correa*, 828 So. 2d 502, 510 (La. 2002)) (alteration omitted). "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Campo*, 828 So. 2d at 510-11. "[T]he ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct." *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 246 (La. 2010) (citing *Campo*, 828 So. 2d at 511, and *Griffin v. Kinberger*, 507 So. 2d 821 (La. 1987)). If, by exercising reasonable diligence, the plaintiff could have discovered the cause of action, this fourth exception will not prevent the running of prescription. *Meggs*, 301 So. 3d at 1213; *see also Miles v. MEMC Pasadena, Inc.*, 2009 WL 1323014, at *3 (E.D. La. May 8, 2009) ("The plaintiff must show that the cause of action for his injuries was not reasonably knowable. This is a heavy burden."). "Information or knowledge 'as ought to reasonably put the alleged victim on inquiry is sufficient to start the running of prescription.'" *Ducote v. Touro Infirmary*, 860 So. 2d 125, 129 (La. App. 2003) (quoting *Campo*, 828 So. 2d at 511). "Mere apprehension that something might be wrong, however, is insufficient to begin the running of prescription unless 'the plaintiff knew or should have known through the exercise of reasonable diligence' that the injury suffered may have been caused by certain acts." *Id.* (quoting *Campo*, 828 So. 2d at 511).

Plaintiffs' contention – that the OCD had constructive knowledge of its claim for repayment when FEMA and private insurers sent to a third-party database information regarding amounts paid to Plaintiffs – is a stretch. At some point unidentified to the Court, the OCD (1)

established a third-party computer database system whereby FEMA and private insurers could report all payments they had made to Road Home grant recipients;[116] and (2) "obtained a software platform, the eGrants Plus program, into which all of this information could be uploaded for its own records and use in determining duplicate benefits owed to HUD under the Stafford Act."[117] Plaintiffs argue that prescription began to run against Calogero, for example, when her undisclosed FEMA and insurance payments were uploaded into this database on July 3, 2007, and August 5, 2007, respectively.[118]   Therefore, Plaintiffs argue that any claims for duplicate payment of these amounts were time-barred by July 4 and August 6, 2017, six months or more before Defendants sent Calogero the February 9, 2018 collection letter,[119] because "prescription began to run when the sought-after data began to flow in from multiple sources."[120]

But the fact that batches of data were sent to a third-party database – even one the OCD helped to establish and its contractors maintained[121] – is insufficient to "excite attention and put [the OCD] on guard and call for inquiry" concerning potential duplicate grant benefits to Plaintiffs, *see Campo*, 828 So. 2d at 510-11, where the OCD, relying on Plaintiffs' declarations that they divulged all information regarding payments received from FEMA and private insurers when they applied for their grants, had no reason to know, and, in fact, did not know, that such data as to Plaintiffs existed.[122]   Indeed, information regarding the dates on which payments were made to

---

[116] R. Docs. 214-1 at 44; 223 at 31.

[117] R. Doc. 214-1 at 44.

[118] *Id.* at 45.

[119] *Id.*

[120] R. Doc. 237 at 13.

[121] Plaintiffs argue that "[f]or the same reasons that the State cannot separate itself from the knowledge acquired by its contractor, ICF, Defendants cannot claim that [their] ignorance of facts known to [their] principal prevented prescription from running." R. Doc. 225 at 28.  Assuming that Plaintiffs are making an argument under an agency theory, the argument fails because Plaintiffs have not established that ICF and GCR, entities that were contracted for database-related purposes, are agents of the state for the purpose of imputing to the state their knowledge, if any, of Plaintiffs' alleged breaches of their Road Home grants.

[122] Plaintiffs concede as much with respect to their original argument that prescription began to run from the date they executed their Road Home contracts.  *See id.* at 17 ("Defendants could fairly argue, however, that the State, having relied on Plaintiffs' (possibly) erroneous declarations in their disclosures had no means of knowing on the date

Plaintiffs, by whom, and when, did not appear on the face of any physical records associated with the database.[123]  Instead, that information could only have been created and generated through a query made to the database.  What would excite attention and put the OCD on guard to call for such an inquiry about either Calogero or Randolph on the dates Plaintiffs say prescription began to run is not explained by them.  The mere fact that this information existed somewhere in the ether does not itself excite the attention of anyone.  And so, that the OCD could have accessed that information "by a simple query" at an early point in time, as Plaintiffs allege, does not equate to constructive notice.[124]  As Defendants observe, "[t]here is no evidence that OCD (and the defendants) learned of the duplicate payments before February 2008, and the fact that insurers (including the plaintiffs) may have sent information (concerning all payments made to all Louisiana residents) to a database owned and run by a third party, on a rolling basis over time, is not sufficient to start the running of prescription on the grant contracts."[125]  The Court agrees.

All parties admit that "[i]n March of 2008, OCD conducted a review of both Plaintiffs' grant files, and noted in their records that each Plaintiff had received duplicate benefits that had not been included in their grant calculations."[126]  In the absence of evidence that any such review was conducted by the OCD on an earlier date, March of 2008 is the date when the OCD had knowledge of the overpayments to Plaintiffs.  This is when prescription began to run.

Although the Court cannot discern the exact day in March of 2008 when prescription began to run – because no specific information was provided to the Court about when the queries concerning Plaintiffs were made – the Court can easily determine that Defendants' collection

---

of contract execution that there was a breach.").  Plaintiffs do not make the same concession with respect to their alternative argument that prescription began to run from the date the payment information from FEMA and private insurers was uploaded into the database.
[123] R. Doc. 174-1 at 3-4.
[124] *Id.*
[125] R. Doc. 223 at 31 (emphasis omitted).
[126] R. Docs. 214-2 at 10; 223-1 at 2.

letters sent on August 3, 2017 (to Randolph) and February 9, 2018 (to Calogero) fell within a ten-year prescriptive window that began sometime in March of 2008 and ended sometime in March of 2018. Thus, the debts Defendants sought to collect were not time-barred, and Defendants, in this way, cannot be said to have misrepresented the enforceability of said debts or engaged in an unfair or unconscionable means to collect a debt. Therefore, the Court finds no violation of either § 1692e or § 1692f, and Plaintiffs' second claim must be dismissed.[127]

### E. Plaintiffs' third claim for relief – that Defendants violated the FDCPA by threatening to assess attorney's fees – fails.

#### 1. The parties' contentions

In their motion, Plaintiffs charge Defendants with violating the FDCPA for allegedly threatening to seek unauthorized recovery of attorney's fees.[128] Each Road Home contract consists of a "suite of form documents," explain Plaintiffs, and only one of these documents contains a relevant attorney's fees provision: the Limited Subrogation/Assignment Agreement.[129] But the Limited Subrogation/Assignment Agreement restricts recovery of attorney's fees to collection of duplicate benefits received after, not before, grant closing, say Plaintiffs,[130] and here, the duplicate payments at issue were received before grant closing.[131] Accordingly, Plaintiffs argue that no

---

[127] Because the ten-year prescriptive period had not yet lapsed at the time Defendants sent Plaintiffs their respective collection letters, the Court need not decide whether a compliance period or statute suspended prescription. Defendants argue that Plaintiffs' contracts provide for a three-year period "to bring themselves into compliance," which suspended the running of the ten-year statute of limitations period "until at least 2010." R. Doc. 223 at 31; *see also* R. Doc. 212-1 at 25. In addition to that three-year period, Defendants contend that La. R.S. 49:663.1, titled "Community Development Block Grant," suspended the running of prescription, although they do not state for how long. R. Doc. 212-1 at 25. Plaintiffs, on the other hand, argue that the three-year compliance period, which is found in a document titled "Declaration of Covenants Running with the Land," had no relation to Plaintiffs' obligation to report duplicate benefits and, therefore, the compliance period cannot apply to the overpayment recapture. R. Doc. 225 at 26-27. And La. R.S. 49:663.1 did not suspend prescription, either, say Plaintiffs, because "the State has not shown that any grant recapture procedures were in effect" on June 18, 2014. R. Doc. 237 at 14. In fact, Plaintiffs state that the state's recapture efforts did not begin until 2016. *Id.* The Court need not and does not resolve these issues concerning suspension of the prescriptive period.
[128] R. Doc. 162-7 at 8.
[129] *Id.* at 11, 14.
[130] *Id.* at 14.
[131] *Id.* at 16.

attorney's fees were authorized for a grantee's breach of contract pertaining to any alleged duplication of benefits received prior to grant closing and, therefore, Defendants had no right to seek attorney's fees for such collection efforts.[132]  Consequently, urge Plaintiffs, Defendants' collection letters stating, "[y]ou may ... be responsible for ... attorneys' fees if it is necessary to bring legal action against you,"[133] mislead the unsophisticated consumer into believing that unauthorized attorney's fees could be taxed against her when, in fact, that action cannot legally be taken.[134]

In opposition, Defendants contend that they are contractually permitted to seek attorney's fees.[135]  All of the form documents that make up the Road Home agreement, including the Limited Subrogation/Assignment Agreement, work in concert,[136] say Defendants, so "when read together, attorney's fees may be recovered in actions caused by the plaintiffs' violations of the suite of agreements they freely entered into."[137]  Further, Defendants contend that for there to be a violation of the FDCPA, "there must exist no legal basis (contractual or otherwise) for the demand."[138] Defendants argue that, given the suite of documents Plaintiffs executed and the language found in the Limited Subrogation/Assignment Agreement, "the conditional language found in the defendants' letters to the plaintiffs did not violate the FDCPA."[139]  Finally, Defendants say that "it is interesting to note that the plaintiffs in this case have denied receiving the funds that caused the

---

[132] *Id.* at 17.

[133] R. Doc. 162 at 1.

[134] R. Doc. 162-7 at 18-19.

[135] R. Doc. 199 at 6.

[136] *Id.* at 6-7.

[137] *Id.* at 7.  In their motion for summary judgment, Defendants present these same arguments.  They reiterate that because the Plaintiffs executed each of the contracts that make up the entire Road Home agreement suite at the same time, the contracts should be read together.  R. Doc. 212-1 at 27-28.  Defendants contend that when read together, the contracts stand for the proposition that attorney's fees may be recovered in actions resulting from a homeowner's breach of the Road Home contract suite.  *Id.* at 28.  Therefore, say Defendants, because the Limited Subrogation/Assignment Agreement allows for the recovery of attorney's fees, there is no FDCPA violation.

[138] R. Doc. 199 at 7.

[139] *Id.*

alleged overpayments," and, therefore, "have not admitted that the funds were received pre-closing" despite Plaintiffs' claim that the Limited Subrogation/Assignment Agreement only applies to funds received by a plaintiff post-closing.[140]

In reply, Plaintiffs argue that there is no support for the Limited Subrogation/Assignment Agreement to apply to all breaches of the entire Road Home contract suite.[141]  Each agreement is a separate contract, say Plaintiffs, and the attorney's fees provision in the Limited Subrogation/Assignment Agreement applies only to that specific agreement, not the others that make up the Road Home contract suite.[142]  Plaintiffs argue that Defendants' unsupported interpretation of the attorney's fees provision would "do violence" to another contract in the Road Home contract suite, the Road Home Grant Agreement, which provides that the state or federal government may recover attorney's fees where the homeowner initiates the legal action and suffers an adverse judgment, and would render it "utterly superfluous."[143]  Plaintiffs argue that "Defendants have left unanswered Plaintiffs' showing that the [Limited Subrogation/Assignment] agreement authorizes the collection of attorney's fees only for actions to recover benefits received or receivable after the grant closing"[144] and that Defendants are wrong to suggest that Plaintiffs cannot make such a claim without confessing the validity of the alleged debt.[145]  Further, Plaintiffs argue that Defendants wrongly fail to distinguish between the collectability of a debt and the legal

---

[140] *Id.* at 7-8.  Defendants also argue that Plaintiffs' attorney's-fees claim is untimely under the one-year FDCPA statute of limitations because, if the Court decides that a Louisiana ten-year prescriptive period applies to Plaintiffs' claims (*i.e.*, if the time-barred-debt claim falls), then there is no "original claim" to which Plaintiffs' more recently asserted attorney's-fees claim can relate back.  *Id.* at 6.  As previously indicated, *see supra* note 42, the Court has already decided this issue.  *See* R. Doc. 95.  All of the claims Plaintiffs raise in their amended complaints arise out of the same conduct, transaction, or occurrence as the "original" claim (*i.e.*, Plaintiffs' second claim for relief).  *Id.* at 9.  Accordingly, like the failure-to-itemize claim, the attorney's-fees claim stands on its own, regardless of the Court's disposition of the time-barred-debt claim.

[141] R. Doc. 208 at 3.

[142] *Id.* at 4.

[143] *Id.*

[144] *Id.* at 5 (emphasis omitted).

[145] *Id.*

basis of a demand.[146]  And finally, Plaintiffs contend that Defendants cannot escape an FDCPA claim by relying on conditional language, as the Act prohibits implied threats as well as actual threats.[147]

### 2. Analysis of Defendants' threat to collect attorney's fees

Whether Defendants had a legal basis to collect attorney's fees is, at least in part, a matter of contract interpretation.  Four documents make up the suite of Road Home contracts.  The first document, titled "Road Home Program Grant Agreement Homeowners Grant ('Grant Agreement')," has three sections.[148]  The first section details the grant recipient's contact and personal information.[149]  The second section details "grant information" including the purpose and source of grant funds, a synopsis of the homeowners' covenants to run with the property for which the grant is awarded (which covenants are set out in another of the contracts in the suite) and the homeowners' agreement to occupy the property, and the state and federal government's limitation of liability for their actions taken related to the grant.[150]  Importantly, the liability provision details that "[i]f Homeowner(s) attempt to use legal action against Disbursement Agent, the State of Louisiana, United States or any other branch or agency of the state or federal government, such entity will have the right to recover from Homeowner(s) the attorneys' fees and other expenses incurred in connection with such action in the event of adverse judgment against Homeowners(s)."[151]  Both sides agree that this attorney's fees provision is inapplicable to the case at bar.[152]  The third section of the Grant Agreement is a fraud acknowledgment, which provides

---

[146] *Id.* at 6.
[147] *Id.*
[148] R. Doc. 162-3 at 19-20.
[149] *Id.* at 19.
[150] *Id.*
[151] *Id.*
[152] R. Docs. 162-7 at 12; 212-1 at 27 (Defendants' motion for summary judgment: stating that the basis for the attorney's fees statement in the collection letters is the provision in the Limited Subrogation/Assignment Agreement).

that the homeowner "asserts, certifies and reaffirms that all information on the application, documents provided and closing documents are true to the best of my/our knowledge and Homeowner(s) acknowledges that such have been relied on by OCD to provide disaster assistance," including the homeowners' affirmation, having acknowledged "the danger of fraud" and their being subject to prosecution for "false, misleading and/or incomplete statements," that they have "disclosed to OCD all insurance proceeds and other funds received from governmental agencies as compensation for damages as a result of the declared disaster in the application process."[153]

The second document, titled "Declaration of Covenants Running with the Land," sets out various obligations concerning, among other things, sale and use of the property, use of the grant proceeds, and insurance.[154]   If violated, the Declaration of Covenants Running with the Land provides that the state or federal government "may demand repayment of Grant proceeds or compel specific performance by the Owner or claim injunctive relief against the Owner."[155]   The document contains no provision for attorney's fees.[156]

The third document, titled "Limited Subrogation/Assignment Agreement," contains the attorney's fees provision upon which Defendants rely.[157]   The agreement begins by providing as follows:

> In consideration of my/our receipt of funds under The Road Home program for Hurricane Katrina/Hurricane Rita victims (the "Program") being administered by the Office of Community Development, Division of Administration, State of Louisiana, subject to the provisions below I/we hereby assign to the State of Louisiana, Division of Administration, Office of Community Development (the "State"), to the extent of the grant proceeds awarded or to be awarded to me under the Program, all of my/our claims and future rights to reimbursement and all

---

[153] R. Doc. 162-3 at 20.
[154] *Id.* at 14-16.
[155] *Id.* at 15.
[156] R. Docs. 162-3 at 14-16; 162-7 at 11.
[157] R. Doc. 212-1 at 27.

payments hereafter received or to be received by me/us (a) under any policy of casualty or property damage insurance or flood insurance on the residence, excluding contents ("Residence") described in my/our application for Homeowner's Assistance under the Program ("Policies"); (b) from FEMA, Small Business Administration, and any other federal agency, arising out of physical damage to the Residence caused by Hurricane Katrina and/or Hurricane Rita.  Such Policies include, but are not limited to, insurance policies characterized as homeowner's, wind, flood or any other type of casualty or property damage or hazard insurance coverage under which I/we have or may assert any claim for physical damage to the Residence due to Hurricane Katrina or Hurricane Rita.[158]

The Limited Subrogation/Assignment Agreement goes on to recite that it is "a limited subrogation and assignment, and is limited to an amount not to exceed the amount of the grant received by the undersigned ... to which the State has not been reimbursed from other sources."[159]  The agreement provides further that if the grant recipient "hereafter receive[s]" any federal assistance or insurance payments that would have reduced the amount of the recipient's grant if received prior to the receipt of the grant proceeds, then the recipient must pay that amount received to the state.[160]  The agreement contemplates other issues, such as settlement of the assigned claim, the state's priority to receive payment, actions against the insurance company, and the state's need for the grant recipients to do all that is required "to consummate and make effective the purposes of this Agreement."[161]  The last sentence of the Limited Subrogation/Assignment Agreement states: "In any proceeding to enforce this Agreement, the State shall be entitled to recover all costs of enforcement, including actual attorney's fees and court costs."[162]

The fourth and final document, titled "Grant Recipient Affidavit," verifies the information provided by the grantee and the obligations undertaken.[163]   In the affidavit, the grant recipient

---

[158] R. Doc. 162-3 at 21 (emphasis omitted).
[159] *Id.*
[160] *Id.*
[161] *Id.*
[162] *Id.* at 22.
[163] R. Doc. 162-7 at 13.

certifies and declares under oath and under penalty of perjury that he or she, among other things: (1) is the owner of the subject property and understands that the Road Home program was being administered by the state; (2) executed the Grant Agreement and Declaration of Covenants Running with the Land; (3) agrees to comply with the terms and conditions therein; (4) has not, since the date of the application for the grant funds, received insurance benefits, grants, or other federal assistance payments for damage to his or her residence that were not disclosed in the application for grant funds; (5) understands that the Road Home program "may have released the funds prior to verification of payouts relating to damage caused by Hurricane Katrina or Hurricane Rita by FEMA and/or the insurance company or companies" so that the disbursement of funds could be expedited; (6) acknowledges that he or she could be prosecuted if he or she made or filed false, misleading, or incomplete statements or documents; and (7) agrees to repay the entire amount of the grant in the event he or she made or filed a false, misleading, or incomplete statement or document in connection with the grant application.[164]   Importantly, the Grant Recipient Affidavit provides:

> Under penalty of perjury and penalty of violation of Federal and State laws applicable to this Grant, I/we hereby certify that the insurance and FEMA information submitted to the Road Home Program is true and correct.
>
> • If the Insurer(s) has paid amounts in excess of the amount disclosed by me/us, I/we agree to repay the Grant, or portion thereof, which I/we received as a result of my/our providing the incorrect information.
>
> • If FEMA has paid amounts for damage to my property in excess of the amount disclosed by me/us, I/we agree to repay the Grant, or portion thereof, which I/we received as a result of my/our providing incorrect information.
>
> • If the overpayment is held by a Servicer or other third party, I/we irrevocably instruct the Servicer or other third party to release the amount of overpayment promptly to OCD.[165]

---

[164] R. Doc. 162-3 at 24.
[165] *Id.*

The Grant Affidavit does not contain a provision for attorney's fees, but it does serve to tie together all of the grant recipients' representations regarding the Road Home agreements.  Together, these four documents make up what the parties interchangeably call a "suite of documents" or a "suite of agreements."[166]

A contract is the law between the parties, and a court must give the contract its legal effect according to the parties' common intent.  *Sanders v. Ashland Oil, Inc.*, 696 So. 2d 1031, 1036 (La. App. 1997); *see* La. Civ. Code art. 2045 ("Interpretation of a contract is the determination of the common intent of the parties.").  This intent is to be determined by the words of the contract when they are "clear and explicit and lead to no absurd consequences." La. Civ. Code art. 2046; *Sanders*, 696 So. 2d at 1036.  "The rules of interpretation establish that, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit." *Sanders*, 696 So. 2d at 1036 (citing La. Civ. Code art. 2046 cmt. b; *Cashio v. Shoriak*, 481 So. 2d 1013, 1015 (La. 1986)) (other citations omitted).  Accordingly, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046; *see also Prejean v. Guillory*, 38 So. 3d 274, 279 (La. 2010) ("[W]hen a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties."). "The determination of whether a contract is clear or ambiguous is a question of law." *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007).

"The words of a contract must be given their generally prevailing meaning.  Words of art and technical terms must be given their technical meaning when the contract involves a technical

---

[166] *See, e.g.,* R. Docs. 162-7 at 15; 199 at 7.

matter."  La. Civ. Code art. 2047.  "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." *Id.* art. 2049.  "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."  *Id.* art. 2050.  "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties."  *Id.* art. 2053.  "When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose."  *Id.* art. 2054.  "Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another.  Usage ... is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation."  *Id.* art. 2055.

If, after applying the foregoing principles of contract interpretation, the common intention of the parties remains ambiguous, the doubtful provision must be interpreted against the drafter of a standard-form contract or against the obligor of a particular obligation.  *See Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002) (citing La. Civ Code art. 2056) (other citations omitted).  "Yet, if the doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor."  La. Civ. Code art. 2057.

### a. Defendants may recover attorney's fees as provided by contract.

The parties agree that the Limited Subrogation/Assignment Agreement provides for attorney's fees.  The parties disagree, however, as to whether the fee-shifting provision applies to (1) the entire suite of documents, as Defendants contend;[167] or (2) just the Limited Subrogation/Assignment Agreement itself, as Plaintiffs contend.[168]  Defendants submit that "the most reasonable interpretation" of the suite of documents "is that, when read together, attorney's fees may be recovered in actions caused by the plaintiffs' violations of the suite of agreements they freely entered into" and, therefore, provides a legal basis for their alleged "threat" of attorney's-fees recovery contained in the collection letters.[169]  They argue that the documents "all work in concert to define and control the contractual obligations of the parties."[170]  Defendants, however, cite no legal authority in support of their argument.[171]  Plaintiffs argue against this position, reasoning that "[e]ach agreement is separately titled, signed, dated, and witnessed,

---

[167] R. Doc. 212-1 at 28.

[168] R. Doc. 208 at 4.

[169] R. Doc. 212-1 at 28.

[170] R. Doc. 199 at 7.

[171] Nevertheless, such authority exists.  In *Robinson v. Marks*, the Louisiana supreme court observed:

"Where several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together although they do not expressly refer to each other.

"As a general rule, sometimes by reason of express statutory provision, where several instruments are made as part of one transaction, they will be read together, and each will be construed with reference to the other.  This is true, although the instruments do not in terms refer to each other.  ..."

"Several instruments constituting part of the same transaction must be interpreted together.  ...  The general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument.  Moreover, when two instruments are entered into between the same parties concerning the same subject matter, whether made simultaneously or on different days, they may, under some circumstances, be regarded as one contract and interpreted together.  ..."

30 So. 2d 200, 204 (La. 1947) (first quoting 17 C.J.S. *Contracts* § 298, at 714, then 12 AM. JUR. *Contracts* § 246, at 781).  In *Robinson*, the court determined that two deeds, a land deed and a mineral deed, which were both executed pursuant to an escrow agreement, "constitute[d] one entire and indivisible contract or one transaction."  *Id.* at 203.

suggesting that each is a separate contract."[172]  Plaintiffs contend that the fee-shifting provision in the Limited Subrogation/Assignment Agreement does not confer the right to recover attorney's fees in the present situation because its language – including phrases like "hereafter received" and "future rights to reimbursement" – limits the right to recover fees to instances when duplicate benefits are received *after* the signing of the Road Home documents, not before.[173]  So, continue Plaintiffs, where, as here, duplicate payments were received (but not disclosed) *before* signing the Road Home documents, the attorney's fees provision in the Limited Subrogation/Assignment Agreement does not apply.[174]

There is some force in Defendants' contention that the "suite of documents" comprising the Road Home agreements should be read together to determine the common intent of the parties on the question of attorney's fees.  Grant recipients like Calogero and Randolph each executed the documents as a package, on a single date.[175]  The Grant Recipient Affidavit, by expressly referencing the Grant Agreement and the Declaration of Covenants and impliedly referencing the Limited Subrogation/Assignment Agreement, effectively ties the suite of contracts together.[176]  The thrust of the agreements is that each grant recipient was limited to a grant amount not to exceed the measure of the recipient's hurricane damage to property reduced by payments received from FEMA and insurance in compensation for such damage – whether received before or after calculation of the grant amount.  Limiting the grant calculation in this way would maximize the availability of the disaster-relief funds to the widest swath of citizens affected by the hurricanes. The two attorney's fees provisions in the suite of agreements were designed to advance this

---

[172] R. Doc. 208 at 4.
[173] R. Docs. 162-7 at 14-15; 208 at 4.
[174] R. Doc. 162-7 at 14-17.
[175] Calogero on May 11, 2007, and Randolph on June 30, 2007.  *See* R. Doc. 162-3 at 14-33.
[176] *Id.* at 24.

purpose as well by protecting against spending public monies dedicated to disaster relief on attorney's fees: if sued by a grant recipient, the state as defendant could recover fees as set out in the liability provision of the Grant Agreement, and if forced to sue grant recipients to recoup FEMA and insurance payments undisclosed in the grant application or received after closing, the state as plaintiff could recover fees.  Understanding the design and structure of these documents in this way, and reading them in concert, advances the parties' respective interests and obligations: on the one hand, that the state expeditiously funnel the CDBG funds into the hands of those in need without fearing the prospect of drawing on these funds to pay recovery-related attorney's fees; and, on the other hand, that grant recipients facilitate this process by making, at the outset, a full disclosure of all information essential to calculating the grant award.  Especially given the homeowners' express acknowledgement that the OCD, in an effort to expedite recovery, may have released grant funds prior to verifying information concerning the insurance and FEMA payments they received, it would contravene the parties' intent as evidenced by the Road Home agreements to allow fee recovery in suits to recoup payment received after, but not before, closing. Nevertheless, the Court need not employ this rationale to resolve the Plaintiffs' attorney's-fees claim.

Even restricting its reading of the Limited Subrogation/Assignment Agreement's attorney's fees provision as applying only to claims arising under this one agreement, the Court rejects the Plaintiffs' position that the agreement governs only post-grant duplicate payments and, therefore, does not provide a contractual basis for attorney's fees where, as here, Plaintiffs received duplicate payments before grant closing.[177]   Plaintiffs argue that "[t]he language of the Subrogation/Assignment Agreement expressly requires the grantee to subrogate or assign their

---

[177] *See* R. Doc. 162-7 at 15.

right to *future* payments by FEMA or the grantee's insurer."[178]   In support of their argument, Plaintiffs point to the clause "[i]f I/we *hereafter* receive any ... payments"[179] and the provision that "'I/we agree to promptly pay such amount to the State if that amount would have reduced the amount of my Program grant *had I/we received such Federal Assistance [or insurance payments] prior to the receipt of grant proceeds*.'"[180]   Plaintiffs contend that subrogation/assignment agreements "can only assign 'rights,' not prior claims that have already been fully actualized," and that "the grantees in this case could not assign to the State or subrogate the State to a right to payment they had already *collected*."[181]   But they cite no legal authority for this proposition.

The Court cannot espouse Plaintiffs' interpretation of the Limited Subrogation/Assignment Agreement because it offers only half the loaf.   Under the express language of the agreement, the grant recipient assigns to the state (in particular, the OCD) "all of my ... claims and future rights to reimbursement and all payments hereafter received or to be received by me" from an insurer and FEMA.[182]   In other words, through this agreement, Plaintiffs assign to the state their (1) claims to reimbursement; (2) future rights to reimbursement; and (3) all insurance and FEMA monies received after grant signing.   Importantly, the adjective "future" is not used to modify the term "claims," so the claims the grant recipient assigned to the state are not limited only to "future claims" or "claims hereafter brought."   The term "claims," used in the Limited Subrogation/Assignment Agreement, stands alone, with no modifier, and should not be confined to a future tense the contracting parties expressly avoided.[183]   That they did not modify the term

---

[178] *Id.* at 14 (quoting R. Doc. 162-3 at 21) (emphasis in original).

[179] *Id.* (quoting R. Doc. 162-3 at 21) (emphasis in original).

[180] *Id.* at 15 (quoting R. Doc. 162-3 at 21) (emphasis and alteration in original).

[181] *Id.* (emphasis in original).

[182] R. Doc. 162-3 at 21.

[183] If this straightforward reading of the clear and unambiguous language of the contract were not sufficient, the Court could look to other canons of contract interpretation.  Used in the interpretation of contracts, "[t]he Latin maxim *expressio unius est exclusio alterius* proves instructive."   *Branson v. Greyhound Lines, Inc., Amalgamated Council Ret. & Disability Plan*, 126 F.3d 747, 758 (5th Cir. 1997) (applying maxim to retirement and disability plan).

"claims" evidences that the assignment intended to be effected by the parties encompassed the whole of the grantee's claim, without limitation.  Therefore, upon assignment, the state received (1) an immediate right to recover payments the grant recipient had already received from FEMA and insurance (to the extent the recipient-homeowner failed to disclose them in the grant application process as would have allowed them to be accounted for in calculating the grant amount); and (2) the right to recover future payments, those yet to be received by the homeowner. In other words, the assignment affords the state the right to receive attorney's fees on claims for the repayment of all undisclosed FEMA and insurance payments, past or future.  That the term "claims" includes the right to FEMA and insurance payments already made to the grant recipients makes sense within the structure of the Road Home contracts because they otherwise provided that (1) such payments should have been disclosed and accounted for in calculating (*i.e.*, reducing) the amount of the grant award, and (2) the contracts gave the OCD the right to recover from the grant recipients the amount of the undisclosed FEMA and insurance payments.  Interpreting this provision in light of the other provisions in the Road Home agreements allows each to be given the meaning suggested by the whole of the contracts, as Louisiana law requires.  *See* La. Civ. Code art. 2050.

---

According to the maxim (also known as the negative-implication canon), "'expressing one item of an associated group or series excludes another left unmentioned.'"  *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (quoting *Chevron U.S.A. Inc. v. Echazabal,* 536 U.S. 73, 80 (2002)) (alteration omitted); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107-11 (2012) ("The expression of one thing implies the exclusion of others.").  "The *expressio unius* canon applies only when 'circumstances support a sensible inference that the term left out must have been meant to be excluded.'"  *SW Gen.*, 137 S. Ct. at 940 (quoting *Echazabal*, 536 U.S. at 81) (alteration omitted).  Here, because the Limited Subrogation/Assignment Agreement uses the adjective "future" to modify only "rights to reimbursement and all [insurance and FEMA] payments hereafter received," the *expressio unius* canon excludes the adjective from applying to the term "claims."  Said another way, because "claims" was excluded from the phrase (encompassing the terms "rights" and "payments to be received") modified by the adjective "future," the negative implication is that the "claims" assigned are not restricted in time but encompass all claims for repayment, whether directed against the undisclosed payments made pre-closing or post-closing.

Because Plaintiffs assigned the state their respective "claims" to FEMA and insurance payments, the state is entitled to seek attorney's fees pursuant to the Limited Subrogation/Assignment Agreement on any action regarding such claims, including an action to recoup the payments Plaintiffs failed to disclose before closing.  Consequently, the fee-shifting provision in the Limited Subrogation/Assignment Agreement provides the basis for Defendants' "threat" of attorney's fees contained in the collection letters,[184] and this alleged "threat" did not violate the FDCPA as Plaintiffs claim.

### b. Defendants may also recover attorney's fees under a theory of fraud.

"Louisiana courts have long held that attorney fees are not allowed except where authorized by statute or contract."  *Stutts v. Melton*, 130 So. 3d 808, 814 (La. 2013).  The suite of agreements has been examined for a contractual basis for Defendant's threat of attorney's fees.  It should also be examined under Louisiana law for a statutory basis – in this case, the possibility Defendants could recover attorney's fees in a claim for fraud concerning Plaintiffs' omissions from their grant-application disclosures.

Under Louisiana law, "[f]raud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.  Fraud may also result from silence or inaction."  La. Civ. Code art. 1953.  Fraud vitiates consent, *id.* art. 1948, and is, therefore, grounds for recission of a contract. *Stutts*, 130 So. 3d at 814 (citing La. Civ. Code art. 2031).  Notably, an action for fraud is expressly contemplated by the Road Home agreements.  In the Grant Agreement, the section titled "Fraud Acknowledgment" provides:

---

[184] Because there is a contractual (and, as developed below, a statutory) basis for the alleged "threat" of attorney's fees, the Court need not address Defendants' argument regarding their use of conditional language in the collection letters.

> Homeowner(s) asserts, certifies and reaffirms that all information on the
> application, documents provided and closing documents are true to the best of
> my/our knowledge and Homeowner(s) acknowledges that such have been relied on
> by OCD to provide disaster assistance. Homeowner(s) certifies that all damages
> claimed in connection with Homeowner(s) application for grant proceeds were a
> direct result of the declared disaster, and that Homeowner(s) have disclosed to OCD
> all insurance proceeds and other funds received from governmental agencies as
> compensation for damages as a result of the declared disaster in the application
> process. Homeowner(s) acknowledge that Homeowner(s) may be prosecuted by
> Federal, State and/or local authorities in the event that Homeowner(s) make or file
> false, misleading and/or incomplete statements and/or documents. Homeowner(s)
> agree to repay the Grant in the event Homeowner(s) make or file false, misleading
> and/or incomplete statements and/or documents. Homeowner(s) acknowledges
> notice of the danger of fraud and scams perpetuated by unscrupulous individuals,
> contractors and businesses and that the State has provided an Office of Fraud to
> address such issues.[185]

Grant recipients made an identical certification in the Grant Affidavits they executed,
acknowledging the danger of fraud and their liability for any false, misleading, or incomplete
statements in the application process – including any failure to disclose insurance and FEMA
payments they received before closing.

An action for fraud carries with it the right to recover attorney's fees. *See Stutts*, 130 So.
3d at 814-15. "As vitiation of consent is grounds for rescission, [Louisiana Civil Code article]
1958 provides that 'the party against whom rescission is granted because of fraud is liable for
damages and attorney fees.'" *Id*. at 814 (quoting La. Civ. Code art. 1958) (alteration omitted).
However, the victim of fraud need not seek the recision of the contract to be entitled to an award
of attorney's fees. In *Stutts v. Melton*, the Louisiana supreme court found that, where a seller
fraudulently failed to disclose defects in the roof of a home for sale, the purchaser-plaintiffs were
entitled to attorney's fees despite only seeking replacement value of the roof rather than recision
of the contract of sale. *Id.* at 815. The court explained:

> Surely, the legislature did not intend the victim of fraud to go uncompensated for
> attorney fees, or for that matter, any damages at all, unless he seeks rescission of

---

[185] R. Doc. 162-3 at 20.

the entire contract. And, if [article] 1958 is interpreted to mean that the plaintiff is only entitled to damages and not attorney fees, then the fraudulent defendant is essentially being treated as a good faith obligor, who is only liable for damages that were foreseeable at the time the contract was made. This is contrary to law as "[i]t should be clear that in Louisiana the liability of an obligor who committed fraud in failing to perform his obligation, rather than just acting in bad faith, would, for greater reasons, be at least as extensive as the liability of an obligor in bad faith." Further, in our view, the intent of the legislation providing attorney fees when the obligor has committed fraud is to punish the fraudulent conduct, regardless of whether the obligee seeks rescission of the contract.

*Id.* at 814-15 (citations omitted). Accordingly, the court reasoned that, "to provide an equitable remedy, it is reasonable and just to assume the legislature intended at least the same type of damages for fraud where rescission of the entire sale is not sought," and held that plaintiffs were entitled to attorney's fees. *Id.* at 815.

Similarly, in *Pan American Life Insurance Company v. Louisiana Acquisitions Corporation*, another section of this court, relying on the *Stutts* decision, reached the same result. 2020 WL 68612, at *5 (E.D. La. Jan. 7, 2020). There, defendants asserted counterclaims for bad-faith breach of contract, breach of fiduciary duty, fraud in the inducement, negligent misrepresentation, and detrimental reliance. *Id.* at *1. The question before the court was whether the defendants were entitled to damages, specifically attorney's fees, under statutory law. *Id.* at *2. Defendants did not seek rescission of their contract; instead, they sought recovery of all damages incurred as a result of plaintiff's breach of contract, including attorney's fees, under a theory of fraud. *Id.* at *3. The court found "that the defendants may recover damages, including attorneys' fees, if they prove that [the plaintiff] engaged in fraud." *Id.* at *5; *see also Baudy v. Adame*, 441 F. Supp. 3d 293, 304 (E.D. La. 2020) ("[T]he Court finds that if the Plaintiffs can prove fraud in this case, they will be entitled to return of the price, damages, and attorney's fees."). The court in *Pan American Life* went on to analyze the defendants' claim for fraud, found that "the evidence clearly support[ed] that [the plaintiff] engaged in fraud by willfully misrepresenting or

suppressing the truth of its intention not to abide by [an agreement between the parties]," and concluded that because the defendants proved fraud, they were entitled to damages, including attorney's fees.  2020 WL 68612, at *6.

Here, if in seeking to recoup the undisclosed insurance and FEMA payments Defendants were to claim that Plaintiffs engaged in fraud by failing to disclose such payments in their grant application, Defendants could seek to recover attorney's fees under an express provision of Louisiana law.  Whether Plaintiffs did, in fact, engage in fraud is not before the Court.  Rather, at this juncture, the Court must determine whether there existed a legally enforceable basis to support Defendants' alleged "threat" – that is to say, the possibility – that Plaintiffs may be responsible for attorney's fees.  And there is: under a theory of fraud.  Because there is a reasonable basis in law for an attorney's fees claim under a theory of fraud, which theory is contemplated by both Louisiana law and the parties' contracts, Plaintiffs' contention that "Defendants have no right to recover any attorney's fees incurred in collecting alleged overpayments from Road Home grantees when the duplicate benefit (e.g., FEMA and/or insurance payment) was made prior to grant signing"[186] is without merit.  Thus, Plaintiffs' third claim for relief fails and is dismissed.

## F. Plaintiffs' fourth claim for relief – that Defendants violated the FDCPA by inducing debtors to make payment or take other action to revive time-barred debts – fails.

Plaintiffs charge Defendants with "inducing debtors to make payment or sign promissory notes without disclosing that such action might revive the statute of limitations on their time-barred debts arising from alleged breaches of Plaintiffs' Road Home obligations, and then actually negotiating such limitation-reviving acknowledgements of the debt after the limitation period has accrued."[187]  But no such violation occurred because, as reviewed above,[188] neither Calogero's

---

[186] R. Doc. 162-7 at 21.
[187] R. Doc. 215 at 1.
[188] *See supra* Section II(D).

debt nor Randolph's debt was time-barred at the time Defendants sent their collection letters.

Accordingly, Plaintiffs' fourth claim must be dismissed.

**G.  Plaintiffs' motion for class certification necessarily fails.**

In their motion for class certification, Plaintiffs move pursuant to Rule 23(a) and (b)(3) of

the Federal Rules of Civil Procedure to certify Plaintiffs as representatives to bring claims for the

following defined classes:

> UMBRELLA CLASS DEFINITION:  The class consists of all Louisiana residents who received a Road Home Homeowner's Grant for personal, family or household purposes to whom Defendants sent a collection letter in the form of Exhibits 4 and/or 5[189] within the one year period prior to the filing of this lawsuit, and who also fall into one or more of the following subclasses.
>
> A.   The first subclass consists of: those to whom Defendants sent a collection letter in the form of Exhibits 4 and/or 5, which letter did not itemize the alleged debt by category including insurance or FEMA benefits which duplicated the grant payment and/or did not state the source of the alleged duplicate payment.
>
> B.   The second subclass consists of: those to whom Defendants sent a collection letter in the form of Exhibits 4 and/or 5 more than five years after the grant Agreement was signed which did not state that the alleged debt was not legally enforceable and that a payment would renew the debt.
>
> C.   The third subclass consists of: those to whom Defendants sent a collection letter in the form of Exhibits 4 and/or 5 which stated that "you may also be responsible for ... attorney fees."
>
> D.   The fourth subclass consists of: those to whom Defendants sent a promissory note in the form of Exhibit 6[190] obligating them to repay alleged grant overpayments, without advising that signing the instrument would revive any statute of limitations that had run against legal action on the alleged debt.[191]

Each subclass corresponds with one of Plaintiffs' four claims that Defendants violated the

FDCPA.[192]  The Court, however, has dismissed each claim.  And, where each of Plaintiffs' claims

fails, so too does the class.  *See Napoleon v. Shows, Cali & Walsh, LLP*, 2021 WL 5816009, at *4

(E.D. La. Dec. 7, 2021) (denying motion for class certification where class representative did not

---

[189] R. Doc. 80-1 at 28-29.
[190] *Id.* at 30.
[191] R. Doc. 127 at 1-2.
[192] R. Doc. 127-1 at 3.

have standing as a result of the court's dismissal of all claims). The class action fails because neither plaintiff, as a proposed class representative, has standing to pursue any case or controversy.

"'[S]tanding is an inherent prerequisite to the class certification inquiry.'" *Id.* (quoting *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 570 F. Supp. 2d 851, 855 (E.D. La. 2008)). It "'must be addressed first, prior to deciding class certification.'" *Id.* (quoting *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769 (5th Cir. 2020)). "[I]f the class representative lacks standing, then there is no Article III suit to begin with – class certification or otherwise." *Flecha*, 946 F.3d at 769 (citing *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 n.6 (5th Cir. 2002)). So, where "none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf on himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). Here, Plaintiffs' lack of standing precludes them from representing the class and subclasses. *See E.B. v. Landry*, 2022 WL 1144834, at *14 (M.D. La. Apr. 18, 2022) (dismissing suit where plaintiffs, the proposed class representatives, did not have standing individually, which precluded them from representing the class). Thus, Plaintiffs' motion for class certification is denied.

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that:

(1)   Plaintiffs' motion for partial summary judgment as to their first claim for relief regarding Defendants' violation of the FDCPA by failing to itemize alleged debts (R. Doc. 174) is DENIED;

(2)  Plaintiffs' motion for partial summary judgment as to their second claim for relief regarding Defendants' violation of the FDCPA by threatening to take legal action on time-barred debts (R. Doc. 214) is DENIED;

(3)  Plaintiffs' motion for partial summary judgment as to their third claim for relief regarding Defendants' violation of the FDCPA by threatening to assess attorney's fees (R. Doc. 162) is DENIED;

(4)  Plaintiffs' motion for partial summary judgment as to their fourth claim for relief regarding Defendants' violation of the FDCPA by inducing debtors to make payment or take other action to revive time-barred debts (R. Doc. 215) is DENIED;

(5)  Plaintiffs' motion to strike references to Exhibit 1 and other unsubstantiated allegations in Defendants' memorandum in support of their motion for summary judgment (R. Doc. 220) is DENIED AS MOOT;

(6)  Defendants' motion for summary judgment (R. Doc. 212) is GRANTED; and

(7)  Plaintiffs' motion to certify class (R. Doc. 127) is DENIED.


New Orleans, Louisiana, this 12th day of July, 2022.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE