UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IRIS CALOGERO, *et al.*                                  CIVIL ACTION

VERSUS                                                          NO. 18-6709

SHOWS, CALI & WALSH, LLP, *et al.*              SECTION M (3)

## ORDER & REASONS

Before the Court is a renewed motion for class certification filed by plaintiffs Iris Calogero and Margie Nell Randolph (together, "Plaintiffs").[1] Defendants Shows, Cali & Walsh, LLP, Mary Catherine Cali, and John C. Walsh (collectively, "SCW") respond in opposition,[2] and Plaintiffs reply in further support of their motion.[3] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons granting the motion and certifying the proposed umbrella class in the form of three subclasses.

## I.      BACKGROUND

This case arises from alleged violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq*., stemming from SCW's attempt to collect repayment of grant funds Plaintiffs received from the Louisiana Road Home program following Hurricanes Katrina and Rita.  In response to the devastation these hurricanes caused, the federal government appropriated disaster-relief funds to affected areas, including Louisiana, through the U.S. Department of Housing and Urban Development's ("HUD") Community Development Block Grant ("CDBG").[4] HUD authorized the State of Louisiana to distribute the federal funds to eligible

---

[1] R. Doc. 256.
[2] R. Doc. 267.
[3] R. Docs. 270; 279.
[4] R. Doc. 80 at 5.

applicants.[5]  The State tasked the Louisiana Office of Community Development (the "OCD") and the Louisiana Recovery Authority with administering the Road Home program, which distributed CDBG funds through grants to Louisiana homeowners who sustained unreimbursed hurricane-related damage.[6]  The OCD calculated the grant amounts by estimating the damage it believed the storm caused to applicants' homes and subtracting from this estimate any payments applicants received from the Federal Emergency Management Agency ("FEMA") or private insurers for the same damage.[7]

Calogero contracted with the OCD for a homeowner's compensation grant[8] on May 11, 2007, and received $33,393.[9]  Randolph contracted with the OCD for the same kind of grant on June 30, 2007, and received $28,793.[10]  When they signed their grant agreements, they acknowledged their obligation to disclose any funds they received from FEMA or private insurers and that they could be sued for their failure to do so.[11]

In the ensuing years, the OCD discovered that thousands of grant recipients had received overpayments (*i.e.,* duplicate payments) by failing to report payments received from their insurers and FEMA.[12]  The State hired SCW to assist with efforts to recover the amount of unreported funds that resulted in grant overpayments.[13]  On August 3, 2017, SCW sent Randolph a collection letter seeking to recover $2,500 in allegedly overpaid grant funds.[14]  On February 9, 2018, SCW

---

[5] *Id.* at 6-7.

[6] *Id.* at 6-8.

[7] *Id.*

[8] The purpose of this type of grant was to compensate for damages incurred and to mitigate against future damages from hurricanes and similar natural disasters.  *See id.* at 7.

[9] *Id.*; R. Doc. 80-1

[10] R. Docs. 80 at 7; 80-1.

[11] *See* R. Docs. 80 at 8; 80-1 at 8-9, 13, 21-22, 26.

[12] R. Doc. 80 at 9.

[13] *Id.* at 9-10.

[14] *Id.* at 10.

sent a similar letter to Calogero seeking to recover $4,598.89.[15]   Both letters charged Plaintiffs

with breach of their Road Home grant obligations and advised that:

> [I]f you do not take any action to resolve this matter within ninety days after your
> receipt of this letter, Road Home may proceed with further action against you,
> including legal action, in connection with the full Grant repayment balance owed
> as outlined above.   You may also be responsible for legal interest from judicial
> demand, court costs, and attorney fees if it is necessary to bring legal action against
> you.[16]

Plaintiffs allege that SCW's communications were intimidating and caused them "fear,

anxiety, and emotional distress."[17]   Randolph contacted the OCD and entered into a payment plan

of $25 a month and, on October 24, 2017, executed a promissory note on this repayment

obligation.[18]   The promissory note provided in part:

> Margie N. Randolph ("Maker") acknowledges that she received funds pursuant to
> the Louisiana Road Home compensation grant program for a residence affected
> during the 2005 hurricane season. MAKER, Margie N. Randolph, further
> acknowledges that the Grant Funds received in the amount of $2,500.00 are subject
> to repayment to State of Louisiana, Office of Community Development, Disaster
> Recovery Unit ("OCD-DRU") because of a duplication of homeowner's insurance
> proceeds benefits received and not reported to Road Home prior to the closing on
> her Road Home grant agreement.[19]

Calogero alleges that she "was afraid that she would be sued for money she did not believe she

owe[d], and could incur additional costs of interest and attorneys' fees, too," so she contacted legal

counsel and disputed the repayment claim in accordance with the instructions in the letter.[20]   In

response, on April 10, 2018, SCW provided Calogero a "verification of the Road Home Grant

Funds owed to [the OCD]" that included a narrative-form and an itemized-list breakdown of

Calogero's debt calculation.[21]

---

[15] *Id.*
[16] R. Doc. 80-1 at 28, 29.
[17] R. Doc. 80 at 14.
[18] R. Doc. 80-1 at 30-31.
[19] *Id.* at 31.
[20] R. Doc. 80 at 12.
[21] R. Doc. 80-1 at 32-33.

Calogero filed suit against SCW on July 16, 2018, alleging claims under the FDCPA.[22] Calogero later amended her complaint to add Randolph as a plaintiff and to include additional allegations.[23]  Plaintiffs allege that SCW's efforts to seek repayment of the grant funds violated §§ 1692e and 1692f of the FDCPA because SCW: (1) misrepresented the amount, character, and nature of the debt by failing to itemize the debts; (2) improperly attempted to collect a time-barred debt; (3) improperly attempted to collect attorney's fees; and (4) improperly required persons to sign a promissory note.[24]

On December 10, 2021, Plaintiffs filed a motion for class certification,[25] and the parties subsequently filed cross-motions for summary judgment.[26]  This Court granted summary judgment in favor of SCW, dismissing Plaintiffs' claims and denying the motion for class certification on account of the dismissal.[27]  The Fifth Circuit reversed the summary-judgment ruling.  *Calogero*, 95 F.4th at 955, 964.  The court held that, "[v]iewing the facts in the light most favorable to plaintiffs, … a reasonable jury could find that SCW violated the FDCPA in three ways: (A) by misrepresenting the judicial enforceability of the time-barred debts; (B) by mischaracterizing Calogero's debt; and (C) by misrepresenting the availability of attorneys' fees."  *Id.* at 959.

The Fifth Circuit did not definitively rule on which statute-of-limitations period applied to Plaintiffs' time-barred debt allegation, instead concluding that "the dunning letters were untimely even under the most liberal, 10-year time window."[28]  *Id.* at 960.  In doing so, the court looked to three specific dates: (1) the dates on which Plaintiffs allegedly breached their grant agreements

---

[22] R. Doc. 1.
[23] *See* R. Doc. 80; *Calogero v. Shows, Cali & Walsh, L.L.P.*, 95 F.4th 951, 958 (5th Cir. 2024).
[24] R. Doc. 80 at 18-22.
[25] R. Doc. 127.
[26] R. Docs. 162; 174; 212; 214; 215.
[27] R. Doc. 244.
[28] In the appeal, Plaintiffs argued that the six-year federal statute of limitations under 28 U.S.C. § 2415(a), or, alternatively, the five-year prescription period under article 1564 of the Louisiana Civil Code, should apply.  SCW argued that Louisiana's general ten-year prescription period should apply.  *See Calogero*, 95 F.4th at 959.

(which occurred when they closed on their Road Home grants, without disclosing duplicate payments), thereby potentially providing SCW with constructive knowledge of same; (2) the dates on which FEMA or Plaintiffs' private insurers notified the State of the alleged overpayments, thereby providing the State with actual knowledge of same; and (3) the dates on which SCW sent Plaintiffs the dunning letters.  Under this framework, Calogero's alleged breach occurred on May 11, 2007, and Randolph's occurred on June 30, 2007 – their respective closing dates.  SWC sent a letter to Calogero in February 2018 and to Randolph in August 2017 – both more than 10 years after the alleged breaches occurred.  *Id.*  The Fifth Circuit then determined that, at the latest, the State acquired knowledge of Calogero's alleged breach in 2007 when FEMA and her insurance carrier notified the State of the alleged overpayment, and of Randolph's alleged breach on October 23, 2007, when her insurance carrier provided notice to the State of the duplicate benefit.  *Id.*  Although the notice from Randolph's insurer was sent within 10 years of SCW sending the letter to her, the letter threatened to sue only if not paid within 90 days, and the 90-day period ran until November 3, 2017, which was outside the 10-year window.  *Id.*

Plaintiffs have now filed the instant renewed motion for class certification, asking the Court to reconsider the arguments raised in their previous motion for class certification in light of the Fifth Circuit's holdings.[29]  In particular, Plaintiffs ask the Court to certify "the Umbrella Class and the Second, Third, and Fourth Subclasses defined by their Second Amended Complaint."[30] Plaintiffs define the "umbrella class" as:

> [A]ll Louisiana residents who received a Road Home Homeowner's Grant for personal, family or household purposes to whom Defendants [*i.e.*, SCW] sent a collection letter in the form of Exhibits 4 and/or 5 within the one year period prior to the filing of this lawsuit, and who also fall into one or more of the following subclasses.[31]

---

[29] *See* R. Doc. 256-1 at 1-2.
[30] R. Doc. 256 at 1.
[31] R. Docs. 80 at 15; 256-1 at 2.

The subclasses, which correspond with each of Plaintiffs' four claims, are defined as:

1. [T]hose to whom Defendants sent a collection letter in the form of Exhibits 4 and/or 5, which letter did not itemize the alleged debt by category including insurance or FEMA benefits which duplicated the grant payment and/or did not state the source of the alleged duplicate payment.

2. [T]hose to whom Defendants sent a collection letter in the form of Exhibits 4 and/or 5 more than [ten[32]] years after the grant Agreement was signed which did not state that the alleged debt was not legally enforceable and that a payment would renew the debt.

3. [T]hose to whom Defendants sent a collection letter in the form of Exhibits 4 and/or 5 which stated that "you may also be responsible for ... attorney fees."

4. [T]hose to whom Defendants sent a promissory note in the form of Exhibit 6 obligating them to repay alleged grant overpayments, without advising that signing the instrument would revive any statute of limitations that had run against legal action on the alleged debt.[33]

Plaintiffs seek certification of the umbrella class in the form of only subclasses 2, 3, and 4, abandoning their request to certify subclass 1.[34]

## II.    LAW & ANALYSIS

A party seeking class certification must demonstrate that the case is appropriate for class treatment under the standards set forth in Rule 23 of the Federal Rules of Civil Procedure. *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). Implied in Rule 23 is the prerequisite that "'the class sought to be represented must be adequately defined and clearly ascertainable.'" *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)). If the proposed class is ascertainable, the party

---

[32] R. Doc. 80 at 15. The second amended complaint states "five years," but Plaintiffs have since conceded that "[i]n light of the Fifth Circuit's ruling, the five-year period asserted in Plaintiffs' amended complaint should be revised to ten years." R. Doc. 256-1 at 3.

[33] R. Doc. 80 at 15-16.

[34] R. Docs. 256-1 at 5; 270 at 5 n.2.

seeking certification must next meet the express requirements of Rule 23.  *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 333 (5th Cir. 2019).  First, the party must meet all four prerequisites of Rule 23(a): (1) numerosity – "the class is so numerous that joinder of all members is impracticable"; (2) commonality – "there are questions of law or fact common to the class"; (3) typicality – "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) adequacy of representation – "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

If all four of the Rule 23(a) prerequisites are satisfied, the case may be maintained as a class action only if the party seeking class certification satisfies the requirements for one or more of the three types of class action under Rule 23(b).  Here, Plaintiffs seek class certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In analyzing predominance and superiority, a court considers:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.*

A district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class.  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).  "Rule 23 requires the court to find, not assume, the facts favoring class certification."  *Prantil v. Arkema*

*Inc.*, 986 F.3d 570, 579 (5th Cir. 2021) (quotation and alteration omitted).  Class certification is a matter for the district court's discretion because it is essentially a fact-based inquiry and arises from "the district court's inherent power to manage and control pending litigation."  *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 418 (5th Cir. 2023) (quotation omitted).   Although a court should not reach the merits of plaintiffs' claims in a class certification decision, it may look beyond the pleadings to understand the claims, defenses, substantive law, and relevant facts in determining whether the case may proceed as a class action.  *Castano*, 84 F.3d at 744.

"When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."  Fed. R. Civ. P. 23(c)(5).  Thus, when a plaintiff seeks to have individual subclasses certified, each subclass must independently meet the requirements of Rule 23.  *Elson v. Black*, 56 F.4th 1002, 1007 (5th Cir. 2023); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 2008 WL 5423488, at *2 n.3 (E.D. La. Dec. 29, 2008) ("Each subclass is treated as an individual class, and must independently meet the requirements of Rule 23."); *but see* 1 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 3:16 (6th ed. Nov. 2023 update) ("[I]f the subclass members are also members of the larger, already certified class, courts have held that the subclass may not be required to satisfy independently the numerosity requirement." (citing *Bates v. United Parcel Serv.*, 204 F.R.D. 440, 443 (N.D. Cal. 2001), and *Christina A. ex rel. Jennifer A. v. Bloomberg*, 197 F.R.D. 664, 667-71 (D.S.D. 2000))).

## A. Ascertainability

As noted above, the proposed class must be adequately defined and clearly ascertainable. In other words, the class must be "defined 'mechanically' by reference to 'objective criteria,' and *not* dependent on an 'individualized causal determination on the merits.'"  *A. A., by & through P.A. v. Phillips*, 2023 WL 3994358, at *5 (M.D. La. June 14, 2023) (emphasis in original) (quoting

*Union Asset*, 669 F.3d at 640); *see Seeligson*, 761 F. App'x at 334 (observing that the defendant's records and the public records provided "sufficient objective criteria from which to identify class members," in concluding that the district court did not abuse its discretion in finding the class ascertainable). "'However, the court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding.'" *Seeligson*, 761 F. App'x at 333 (quoting *Frey v. First Nat'l Bank Sw.*, 602 F. App'x 164, 168 (5th Cir. 2015)). "Ultimately, 'the touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *A.A., by & through P.A. v. Phillips*, 2023 WL 334010, at *2 (5th Cir. Jan. 20, 2023) (quoting *Brecher v. Republic of Arg.*, 806 F.3d 22, 24 (2d Cir. 2015)).

Although not addressed in their briefing as a separate requirement of Rule 23, Plaintiffs argue that the members of the umbrella class and three subclasses are ascertainable through SCW's records.[35]  Plaintiffs define subclass 3 as consisting of all umbrella class members whose collection letters threatened suit for attorney's fees.  They point out that SCW has identified approximately 2,577 grant recipients who were sent the form collection letter,[36] and, being a form letter, Plaintiffs allege that they all contained the same threat for attorney's fees.[37]  Plaintiffs define subclass 4 as consisting of all members of the umbrella class who were also sent a form promissory note obligating them to repay alleged grant overpayments, without advising that signing the instrument would revive the applicable limitations period.  Plaintiffs point out that SCW has identified approximately 142 grantees who entered into payment agreements with OCD, 97 of whom signed

---

[35] *See* R. Docs. 154 at 7; 256-1 at 9-10; 270 at 3-7.

[36] *See* R. Docs. 127-1 at 5; 85-2 at 43; *see also* R. Doc. 267 at 4.

[37] R. Doc. 127-1 at 5-6.

promissory notes.[38]  SCW does not challenge the ascertainability of subclasses 3 and 4.  Given the foregoing, the Court finds that the members of proposed subclasses 3 and 4 are ascertainable.

Identifying the members of subclass 2 involves an additional step, however.  This subclass includes those umbrella class members whose form collection letters threatened suit on *time-barred* debt.  In order to determine whether each putative class member's debt was time-barred, certain dates – namely, when the State knew or should have known of a subclass member's breach and when SCW sent the member a collection letter[39] – must be examined.  Plaintiffs contend that the relevant dates are contained within the OCD's database and can easily be accessed, as they were for Plaintiffs.[40]  SCW does not specifically challenge the ascertainability of subclass 2.[41] Instead, it merely points out that these dates will need to be determined for each subclass member.[42]

Similar to the instant matter, in *Sadler v. Midland Credit Management, Inc.*, 2009 WL 901479 (N.D. Ill. Mar. 31, 2009), a plaintiff brought suit against debt collectors for allegedly violating the FDCPA by sending a letter threatening suit on time-barred debt and sought to certify the suit as a class action.  The proposed class was defined as:

> (1) all natural persons with Illinois addresses; (2) who were sent a "3A68 Pre-Legal" letter [the type of form letter sent to Plaintiff]; (3) on or between a date one year prior to the filing of this action and twenty days after the filing of this action; (4) with respect to a debt originally owed to First Consumers National Bank …; (5) where both the date of charge-off and the date of last payment (prior to the sending

---

[38] R. Doc. 154-1 at 20.
[39] *Calogero*, 95 F.4th at 955, 960.
[40] R. Docs. 154 at 7; 256-1 at 9; 270 at 5.
[41] *See* R. Docs. 146; 267.
[42] R. Docs. 146 at 4-6; 267 at 1-2, 4-6.

of the "3A68 Pre-Legal" letter), as shown by Defendant's records, were more than five years prior to the date of the correspondence.

*Id.* at *1 (brackets in original).  The primary issue was whether the class was "identifiable" – that is, whether the class was "ascertainable through 'objective criteria,' such that the information necessary to determine membership [would be] ascertainable through 'ministerial review' rather than 'arduous individual inquiry.'"  *Id.* at *2 (first quoting *Lau v. Arrow Fin. Servs., LLC*, 245 F.R.D. 620, 624 (N.D. Ill. 2007), and then quoting *Ramirez v. Palisades Collection LLC*, 250 F.R.D. 366, 370 (N.D. Ill. 2008)).  The court held that an automated query of the defendants' records, followed by a manual review of the results, would yield the information required to identify the class members, such as the "origin of debt, date of discharge, date of any partial payment, and date of correspondence."  *Id.*  According to the *Sadler* court, although such a review may be "administratively burdensome," it "nevertheless remains ministerial in nature" because it amounts to "a review for … straightforward 'objective criteria.'"  *Id.*; *see also Ramirez*, 250 F.R.D. at 370 & n.2 (holding, in an FDCPA case, that the class definition was objectively identifiable because class members could be ascertained with only a ministerial review of the collection complaint filed against each putative member – to see if a written contract was attached to it – and of the "charge-off and last-payment dates" for each member, which were listed in the defendant's computer files).

In contrast, in *Riffle v. Convergent Outsourcing, Inc.*, 311 F.R.D. 677 (M.D. Fla. 2015), the court held that a plaintiff, who brought suit against debt collectors for allegedly attempting to collect time-barred credit card debt in violation of the FDCPA, failed to satisfy the ascertainability requirement because the plaintiff failed to present proof of the viability of her proposed method of ascertaining class members.  The plaintiff had suggested that the identification of putative class members, including the nature of their debt, could be ascertained through a review of the records

of the defendants or the original creditor.  *Id.* at 680.  But the plaintiff failed to produce evidence that the creditor still possessed the relevant transaction information or that the records would reveal the nature of each credit card transaction, and, instead, the defendants presented declarations attesting that their records did not show the reasons each putative class member's debt was incurred.  Thus, the plaintiff "simply intimated [through speculation] that the records of [the d]efendants or the original creditor [would] be useful in identifying potential class members," but she "neither presented evidence nor precedent" allowing the court to confirm the validity of those methods.  *Id.* at 681.

Here, the Fifth Circuit has provided specific guidance concerning what relevant events must be examined to determine whether the debt is time-barred.  *See Calogero*, 95 F.4th at 960-61.  And, unlike in *Riffle*, Plaintiffs not only suggest a method for determining when those events occurred for each putative class member, but they have also demonstrated the viability of the method.  Plaintiffs have shown that OCD contracted with ICF Emergency Management Services, LLC ("ICF") to gather grant applicant information and input it into a data system.[43]  ICF in turn subcontracted with STR, the developer and operator of "eGrants Plus," a proprietary software platform, to implement and maintain an eGrants Plus database for the Road Home program.[44] External data concerning the grant applications (including information received from FEMA and the applicants' private insurers) were fed into the eGrants Plus database and tracked by STR during the grant application, award, closing, and review processes.[45]  eGrants Plus was purchased by GCR, Inc. ("GCR") in 2019, and GCR now maintains the platform.[46]  Through discovery, OCD produced to Plaintiffs a spreadsheet prepared by GCR that contains certain relevant dates for each

---

[43] R. Doc. 80 at 9; *see* R. Doc. 132-2 at 2.
[44] R. Doc. 132-2 at 2.
[45] *Id.*
[46] *Id.* at 2-3.

Plaintiff, including when STR uploaded the fact that it was notified by FEMA and Plaintiffs' private insurers of the alleged duplicate payments.[47]   Although OCD states that the information may not have been uploaded into the program the exact day the State was notified of the alleged duplicate payments, OCD admits that the information was uploaded "within days" of its being notified of such.[48]   And a month after OCD provided the spreadsheets in discovery, GCR admitted in a deposition that the same information can be obtained for each putative class member using the same query.[49]   Indeed, GCR admitted that the pertinent information could be ascertained through a "fairly quick" computer query.[50]   SCW does not challenge the ease with which the relevant information can be ascertained by means of Plaintiffs' proposed method.[51]

Although certain key dates will need to be determined for each putative class member, the query process here, as in *Sadler*, appears to be a straightforward review for objective criteria that is ministerial in nature, and there is no evidence to suggest that the proffered method involves arduous individual inquiry.   Since the key dates are already contained within the eGrants Plus database, a simple computer query – what Plaintiffs describe as "pushing a button" on a computer – will reveal the relevant information.   Accordingly, the Court finds that Plaintiffs have demonstrated an administratively feasible method for identifying and ascertaining the members of the umbrella class who fit within subclass 2.

## B. Numerosity

Numerosity for the purposes of Rule 23(a)(1) means that "the class is so numerous that joinder of all members is impracticable."   Fed. R. Civ. P. 23(a)(1).   "To satisfy the numerosity

---

[47] R. Doc. 154-1 at 5-7.  The Court is aware that GCR, Inc. has since rebranded itself as "Civix."  R. Docs. 154-1 at 5; 132-2 at 2-3.  For simplicity purposes, this Order will refer to the company as "GCR."

[48] *See* R. Doc. 154-1 at 5; *see also* R. Doc. 154-2 at 18, 27.

[49] *See* R. Docs. 154 at 7, 9-10; 154-2 at 10-13.

[50] *See* R. Docs. 154-2 at 10-13; 256-1 at 10.

[51] *See* R. Docs. 146; 267.

prong, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000) (quotation omitted). However, "'the proper focus (under Rule 23(a)(1)) is not on numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors,'" including "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (alteration omitted) (quoting *Philips v. Joint Legis. Comm.*, 637 F.2d 1014, 1022 (5th Cir. 1981)). "Although the number of members in a proposed class is not determinative of whether joinder is impracticable," the Fifth Circuit has held that a class with over 100 members "is within the range that generally satisfies the numerosity requirement." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (citations omitted).

### 1. Subclass 2

Plaintiffs assert the that the numerosity requirement is satisfied because the umbrella class consists of approximately 2,577 grant recipients who received a single form collection letter and whose claims arise out of that letter.[52]   In opposition, SCW "admit[s] that [it] attempted to re-capture over 2000 elevation grants from Louisiana citizens in the period of time commencing one year before the filing of this suit," but nonetheless points to alleged factual differences it contends must be addressed with respect to each putative class member's claim.[53]

Plaintiffs have satisfied the numerosity prong as to subclass 2.  SWC admitted that it sent letters to approximately 2,577 Louisiana grant recipients in the year before Plaintiffs filed suit,[54]

---

[52] R. Doc. 127-1 at 5-6.

[53] R. Doc. 267 at 4.

[54] *Id.*  In addition, in an interrogatory, Plaintiffs asked SCW to "provide the names and addresses of each and every grantee to whom defendants sent a collection letter in the form of Exhibit 4, after July 15, 2017, without

and joinder of over two thousand individuals is impracticable.  The collection letters threaten suit over the alleged duplicate payments without acknowledging that there may be a "timeliness problem" – that is, the potential involvement of time-barred debt.  *Calogero*, 95 F.4th at 960.  The Fifth Circuit observed in *Calogero* that "a debt-collector can run afoul of the FDCPA by threatening judicial action while completely failing to mention that a limitations period might affect judicial enforceability."  *Id.* at 959.  Because none of the 2,577 collection letters mentions the potential timeliness problem, the numerosity requirement is easily satisfied as to subclass 2, and the factual issues (dates of certain events) concerning whether the class members' debts were time-barred are left to be addressed through the administratively feasible mechanism of computer inquiry.[55]  Thus, it appears that identifying the putative subclass 2 members will be relatively straightforward[56] and that the size of each putative class member's claim is relatively small, as the FDCPA restricts the amount of damages that may be awarded, further making joinder impracticable.[57]  *See Kelly v. Cont. Callers, Inc.*, 2020 WL 2198981, at *2 (S.D. Miss. May 6, 2020) (finding the numerosity requirement satisfied in an FDCPA case, observing: "[T]he size of

---

itemizing the alleged debt by category, i.e. insurance benefits which duplicated the grant payment and/or did not state the source of the alleged duplicate payment."  SCW responded that "they have discovered approximately 2,577 files that may possibly be responsive to this request."  *See* R. Docs. 85-2 at 43; 127-1 at 5 n.1.

[55] Even if only five percent of the 2,577 letters were sent outside the 10-year window (*i.e.*, after the debt was time-barred), the number of subclass 2 members would still be greater than 100, and the numerosity requirement would nonetheless be met in this case.  *See Castro v. Collecto, Inc.*, 256 F.R.D. 534, 540 (W.D. Tex. 2009) (finding in an FDCPA case that "even if one-fifth of the more than 500 letters" were sent for the purpose of collecting a time-barred debt, "joinder would be impracticable"); *see also Bardales v. Fontana & Fontana, LLC*, 2020 WL 5819873, at *3 (E.D. La. Sept. 30, 2020) (finding the numerosity requirement satisfied in an FDCPA case because the defendants confirmed that approximately 821 collection letters were sent to Louisiana consumers, seeking to collect a past-due debt, within the relevant time period).

[56] *See* R. Docs. 256-1 at 8, 10 n.1; 270 at 2.

[57] Plaintiffs are seeking statutory damages of up to $1,000 for each named Plaintiff, and statutory damages for all other class members up to the lesser of $500,000 or 1% of the net worth of SCW, as well as the actual damages sustained by each member (for emotional distress and for each member's portion of the approximately $300,000 in wrongly extracted payments for those who signed promissory notes).  *See* R. Doc. 270 at 7 (citing 15 U.S.C. § 1692k(a)(1)-(2)).

each plaintiff's potential claim is not significant.  In the Court's experience, FDCPA claims of this

sort only generate nominal statutory damages and relatively low fees.").

### 2.  Subclass 3

Just as with subclass 2, Plaintiffs contend that the numerosity requirement is satisfied for

subclass 3 because approximately 2,577 grant recipients received the form collection letter that is

at issue in claim three.[58]  In opposition, SCW again admits that it attempted to recover alleged

overpayments from over two thousand grant recipients in the one-year period before Plaintiffs

filed suit but points to alleged dissimilarities in each putative class member's claim.[59]

Plaintiffs have satisfied the numerosity prong for this subclass as well.  SWC admitted that

it attempted to recover overpayments from 2,577 Louisiana grant recipients in the year before

Plaintiffs filed suit.  Moreover, SCW does not deny that the 2,577 collection letters it sent each

contained the threat of seeking attorney's fees, so again, joinder would be impracticable.  Also, as

with subclass 2, it appears that identifying the putative subclass 3 members will be relatively

straightforward[60] and that the size of each putative class member's claim is relatively small,[61]

which further supports a finding that joinder is impracticable.

### 3.  Subclass 4

Plaintiffs contend that they cannot say how many of the 2,577 umbrella class members,

other than Randolph, received a promissory note, and thus fall into subclass 4, absent class-wide

discovery.[62]  However, in their reply memorandum to the original motion for class certification,

Plaintiffs advised that SCW admitted in discovery that between 97 and 142 grantees entered into

---

[58] R. Doc. 127-1 at 5-6.
[59] R. Doc. 267 at 4.
[60] *See* R. Docs. 256-1 at 8, 10 n.1; 270 at 2.
[61] *See supra* note 57.
[62] R. Docs. 127-1 at 6-7; 256-1 at 4-6.

payment agreements with OCD and that 97 of them signed promissory notes.[63]   Although SCW admits that the umbrella class consists of over two thousand grant recipients, it does not address the numerosity requirement with respect to this subclass (those who were sent a collection letter *and* a promissory note).[64]

Plaintiffs have satisfied the numerosity prong for this subclass.  As explained above, a class with over 100 members is within the range that generally satisfies the numerosity requirement, and 97 falls just below that figure.  Nonetheless, it is generally understood that "any class consisting of more than forty members 'should raise a presumption that joinder is impracticable.'"   *Mullen*, 186 F.3d at 624 (quoting 1 NEWBERG ON CLASS ACTIONS § 3.05, at 3-25 (3d ed. 1992)); *see* 1 RUBENSTEIN, *supra*, § 3:12.  The Court finds that joinder of 97 to 142 individuals would be impracticable in this case, especially since these individuals likely fall into one or both of the other subclasses.  And, as with the other subclasses, it appears that identifying the putative subclass 4 members will be relatively straightforward[65] and that the size of each putative class member's claim is relatively small,[66] further supporting a finding that joinder is impracticable.

## C.  Commonality

Rule 23(a)(2)'s commonality prong requires that there be questions of law or fact common among the class members.  Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, putative class members must demonstrate that their claims depend on a common contention "of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."   *Ahmad v. Old Republic Nat'l Title Ins. Co.*, 690 F.3d 698, 702 (5th Cir. 2012) (quotation omitted).  "The

---

[63] R. Doc. 154 at 6 (citing R. Doc. 154-1 at 20).
[64] R. Docs. 146 at 5; 267 at 4-5.
[65] *See* R. Docs. 256-1 at 8, 10 n.1; 270 at 2.
[66] *See supra* note 57.

17

test for commonality is not demanding and is met where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Mullen*, 186 F.3d at 625 (quotation omitted).

### 1. Subclass 2

Plaintiffs argue that their second claim arises out of a single form collection letter, so the issue of liability for subclass 2 is common to all class members.[67]  They also contend that the same statute-of-limitations period applicable to Plaintiffs' second claim is applicable to the other class members' claims.[68]  In opposition, SCW points to several alleged factual differences it contends must be analyzed for each class member, such as the closing date, the date when the State knew or should have known of each putative class member's alleged breach, and the date of the collection letter.[69]  In reply, Plaintiffs contend that they have presented specific facts and issues common to all putative class members – even if there are individualized determinations to be made concerning whether the debt was time-barred – and have thus satisfied the commonality requirement.[70]

Some courts considering FDCPA class actions have concluded that "the fact that [there] is a form letter establishes the necessary commonality among the claims." *See* 7 RUBENSTEIN, *supra*, § 21:6 (collecting cases); *see also Kelly*, 2020 WL 2198981, at *3 ("In this case, the commonality requirement has been met because it is apparently undisputed that each potential class member received a copy of the same identical form letter that allegedly misidentified their original creditor …. This is the key factual issue in the case, and the claims of each class member hinge on the legal question as to whether the form letter constitutes a violation of 15 U.S.C. § 1692e or § 1692f.").  Here, Plaintiffs have alleged that each class member received a collection letter in the

---

[67] R. Docs. 127-1 at 7-11; 256-1 at 7-9.
[68] *See* R. Docs. 127-1 at 9; 256-1 at 3.
[69] R. Docs. 146 at 4-6; 267 at 4-5.
[70] *See* R. Doc. 270 at 2-3.

form received by Plaintiffs.  Whether SCW violated the FDCPA by sending the letters and threatening suit on time-barred debt is an issue common to all subclass 2 members.  As one court explained in the context of an FDCPA class action, "[i]f potential class members were forced to proceed individually, each would have to prove the facts underlying this alleged scheme and the illegality of it," an imposition which "would run counter to the spirit of Rule 23."  *Walton v. Franklin Collection Agency, Inc.*, 190 F.R.D. 404, 409 (N.D. Miss. 2000).  Although SCW raises alleged factual differences, a single common issue is sufficient to satisfy the commonality prong.  *See Yates v. Collier*, 868 F.3d 354, 365 n.6 (5th Cir. 2017); *Henderson v. Eaton*, 2002 WL 10464, at *2 (E.D. La. Jan. 2, 2002).  Because the resolution of whether the collection letters violated the FDCPA will affect all putative subclass 2 members, Plaintiffs have satisfied the commonality prong.

### 2.  Subclass 3

Plaintiffs also assert that their third claim arises out of the single form collection letter.[71] They argue that, because "the Fifth Circuit found as a matter of fact and law" that SCW violated the FDCPA by threatening to collect attorney's fees, "only a single determination" remains to be made for each subclass 3 member: "did they receive the alleged duplicative funds before or after their grant funds?"[72]  This argument is apparently made in reference to the Fifth Circuit's holding that the LSAA authorizes the State to recover attorney's fees when the grant recipient receives

---

[71] R. Doc. 256-1 at 7; *see also* R. Doc. 127-1 at 7-11.

[72] *See* R. Doc. 256-1 at 4 (citing *Calogero*, 95 F.4th at 962-64), 8.  Plaintiffs previously argued that whether the threat of recovering attorney's fees was justified will turn on an interpretation of the Road Home grant agreements, which were documents common to all class members.  R. Doc. 127-1 at 10.  But the Fifth Circuit held that the grant agreements "authorize[ ] fee-shifting in the tightly circumscribed scenario in which a homeowner sued the Road Home program and suffered an adverse judgment," which did not occur with Calogero or Randolph.  *See Calogero*, 95 F.4th at 963.  The court did, however, hold that another fee-related document, the Road Home Limited Subrogation/Assignment Agreement ("LSAA"), authorizes the State to recover attorney's fees when the grant recipient receives duplicate payments after signing the Road Home contracts, but that this was not the case with Calogero or Randolph either.  *Id.*

duplicate payments after signing their Road Home contract, but not if the grant recipient received duplicate payments before signing the contract.[73]

In opposition, SCW contends that, while the Fifth Circuit ruled that the State could not have recovered attorney's fees against Calogero or Randolph, it also recognized that there were instances in which the State could do so in other circumstances.[74]  SCW thus argues that Plaintiffs cannot satisfy the commonality requirement because "the attorney fee issue will depend on the documents executed by [each] claimant, and when the payments were in fact received."[75]

In reply, Plaintiffs argue that they have satisfied the commonality requirement because they presented specific facts common to all putative class members.[76]  Plaintiffs reiterate that all class members signed the same form agreements and received the same form collection letter.[77]  They again argue that the Fifth Circuit already concluded that the Road Home agreement did not authorize fee-shifting against grant recipients who received payments before signing the contract.[78]

Plaintiffs have alleged that all of the putative subclass 3 members received a form collection letter threatening suit for attorney's fees.  Whether SCW violated the FDCPA by threatening to seek attorney's fees will be an issue common to all subclass members.  The fact that some of the approximately 2,577 consumers may have received payments after signing their Road Home contracts, and thus may have been liable for attorney's fees under the LSAA, does not defeat the commonality prong.  Instead, those members would simply not be included in this subclass. Accordingly, Plaintiffs have satisfied the commonality requirement for subclass 3.

---

[73] *See id.* at 962-64.
[74] R. Doc. 267 at 2.  *See supra* note 72.
[75] R. Doc. 267 at 6.
[76] R. Doc. 270 at 2-3.
[77] *Id.* at 4.
[78] *Id.*

### 3. Subclass 4

Plaintiffs argue that their fourth claim arises out of the single form collection letter in tandem with the promissory note sent to certain recipients of the form collection letter.[79]   In opposition, SCW does not specifically address the commonality requirement with respect to this subclass, but it does broadly state that "each individual claim of any class member must be analyzed on its own facts, to see if the defendants' contacts with them violated the FDCPA."[80]

Plaintiffs have alleged that all putative subclass 4 members were sent a form collection letter and promissory note obligating them to repay alleged grant overpayments, without also advising them of the statute-of-limitations problem.   Whether SCW violated the FDCPA by sending these promissory notes is an issue common to all subclass members.   Although there may be differences from class member to class member in the amounts recited in the letters and notes, the general question of liability is common to all subclass members.   *See Reyes v. Julia Place Condos. Homeowners Ass'n, Inc.*, 2014 WL 7330602, at *8, 12 (E.D. La. Dec. 18, 2014). Accordingly, Plaintiffs have satisfied the commonality requirement for subclass 4.

### B. Typicality

Typicality under Rule 23(a)(3) means that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."   Fed. R. Civ. P. 23(a)(3).   "Like commonality, the test for typicality is not demanding."   *Mullen*, 186 F.3d at 625.   This prong "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent."   *Lightbourn v. Cty. of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997).

---

[79] R. Doc. 256-1 at 7; *see also* R. Doc. 127-1 at 7-11.
[80] R. Docs. 146 at 5; 267 at 4-5.

### 1. Subclass 2

Plaintiffs argue that their second claim is typical to the subclass because each putative class member's claim is based on the same conduct and legal theories – that is, that SCW allegedly sent a single form letter to each putative class member threatening suit on time-barred debt in violation of the FDCPA.[81]  In opposition, SCW argues that the typicality requirement is not satisfied because the Court will need to analyze when relevant events occurred as to each putative class member, such as when each putative class member received his or her grant funds and when the State knew or should have known of each putative class member's alleged breach.[82]  In reply, Plaintiffs contend that they are "similarly situated" to the other putative class members and that the relevant dates can be determined by SCW "pushing a button" on a computer.[83]

Plaintiffs have satisfied the typicality requirement.  They allege that SCW sent them and over two thousand other grant recipients a form letter seeking to collect on time-barred debt.  They allege that each letter was sent in violation of 15 U.S.C. §§ 1692e and 1692f.  Thus, the second of each of Plaintiffs' claims arises out of the same alleged conduct and is based on the same legal theories as the second claim for the rest of the subclass.  *See* 7 RUBENSTEIN, *supra*, § 21:6 ("[S]o long as the proposed class representative received the same form letter and all members are seeking the same statutory damages, the typicality and adequacy requirements should follow.") (footnotes omitted); *cf. Byes v. Telecheck Recovery Servs., Inc.*, 173 F.R.D. 421 (E.D. La. 1997) (holding that plaintiff, who brought claims against debt collectors for allegedly sending five collection letters in violation of the FDCPA, failed to satisfy the typicality requirement because the content of the letters varied, each of the letters allegedly violated different sections of the FDCPA, and not all

---

[81] *See* R. Doc. 127-1 at 11-12.
[82] R. Docs. 146 at 4-6; 267 at 5.
[83] R. Doc. 270 at 2-3.

putative class members received all five letters).  While certain dates will need to be examined with respect to each putative class member to determine whether the members fall in the subclass, that does not defeat typicality.  Instead, like Plaintiffs, all individuals receiving the collection letters within the applicable 10-year window (which letters threatened judicial action, without saying that a limitations period might affect judicial enforceability) would fall within this subclass.

### 2. Subclass 3

Plaintiffs again argue that their third claim is typical to the subclass because each putative class member's claim is based on the same conduct and legal theories – namely, that SCW allegedly sent a single form letter to each putative class member threatening to seek attorney's fees in violation of the FDCPA.[84]  In opposition, SCW argues, just as with the commonality requirement, that the typicality requirement is not satisfied because "the attorney fee issue will depend on the documents executed by the claimant, and when the payments were in fact received."[85]

Plaintiffs have satisfied the typicality requirement for subclass 3 because each of their third claims arises out of the same alleged conduct and is based on the same legal theories as for the rest of the subclass.  Plaintiffs allege that SCW sent them and over two thousand other grant recipients letters threatening suit for attorney's fees.  They allege that the letters were sent in violation of 15 U.S.C. §§ 1692e and 1692f.  The fact that the parties may need to determine whether any of the putative class members received duplicate payments after signing their Road Home contracts, and thus whether SCW may have had a valid claim for attorney's fees against them, merely goes to the issue of who is to be included in the subclass, not whether Plaintiffs' claims are typical of the class.

---

[84] *See* R. Doc. 127-1 at 11-12.
[85] R. Doc. 267 at 6.

### 3.  Subclass 4

Plaintiffs contend that the promissory note "appears to be a standardized form" and will thus be typical of those in this proposed subclass.[86]  In opposition, SCW again argues that the typicality requirement is not satisfied because the Court will need to analyze when relevant events occurred with respect to each putative class member to determine if SCW violated the FDCPA.[87]

Once again, Plaintiffs have satisfied the typicality requirement for the fourth of their claims because each of these claims arises out of the same alleged conduct and is based on the same legal theories as for the rest of the subclass.  Plaintiffs allege that SCW sent Randolph and 97 to 142 other grant recipients promissory notes obligating them to repay purported grant overpayments without advising of the expiration of the statute-of-limitations period applicable to the debt.  They allege that the notes were sent in violation of 15 U.S.C. §§ 1692e and 1692f.  While certain dates will need to be examined as to each putative class member to determine whether they fall in this subclass, that does not defeat typicality here.  All of the individuals receiving the promissory notes, unaccompanied by advice regarding a potential limitations issue, would fall in this subclass.

### C.  Adequacy of Representation

Rule 23(a)(4) requires a court to consider whether the attorneys and named plaintiffs "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  To that end, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Id.* at 625-26 (alteration and quotation omitted).  "The court must find that class representatives, their counsel, and the relationship between the two are

---

[86] R. Doc. 127-1 at 12.
[87] R. Docs. 146 at 4-6; 267 at 5.

adequate to protect the interests of absent class members," and that the class representatives are directing the litigation and are sufficiently informed to do so. *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).

Both Plaintiffs seek to represent the members of the umbrella class and subclasses 2 and 3, and Randolph seeks to represent the members of subclass 4.[88] According to Plaintiffs, the adequacy-of-representation requirement is satisfied for each subclass because they have demonstrated a high level of commitment to the litigation of this case and filed declarations verifying their understanding of the claims and their responsibilities as class representatives.[89] Plaintiffs also contend that their team of counsel, consisting of seven attorneys, three of whom are employed by the Southern Poverty Law Center, are qualified to represent the class.[90] They cite cases in which at least four of these attorneys have been certified as class counsel in the past, including in this district.[91] SCW does not challenge Plaintiffs' or their counsel's adequacy in this case.[92]

Both Plaintiffs received dunning letters from SCW and allege that the letters are in the same form as those received by all putative class members. Randolph received a promissory note and alleges that it is in the same form as those received by all putative subclass 4 members. While each putative class member's actual damages may vary depending on their level of emotional distress and the amount paid, if any, on any promissory note obligation, all putative class members are seeking the same statutory damages.[93] *See* 7 RUBENSTEIN, *supra*, § 21:6 ("[S]o long as the proposed class representative received the same form letter and all members are seeking the same

---

[88] *See* R. Doc. 127-1 at 12.
[89] R. Doc. 127-1 at 13; *see* R. Docs. 127-2; 127-3.
[90] R. Docs. 127-5; 279.
[91] R. Doc. 279 at 2-3.
[92] *See generally* R. Docs. 146; 267.
[93] *See supra* note 57.

statutory damages, the typicality and adequacy requirements should follow.").  Accordingly, the Court finds that Plaintiffs and their counsel are adequate to direct the class litigation and to protect the interests of the absent class members.

### D.  Predominance & Superiority

Plaintiffs are seeking certification of the umbrella class and the three subclasses under Rule 23(b)(3).  That rule requires predominance, meaning that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623.  Courts must, therefore, "give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.'" *Id.* (quoting 2 RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 4:50, at 196-97 (5th ed. 2012)) (alteration omitted).  In other words, a court must examine "'whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Id.* (quoting 2 RUBENSTEIN, *supra*, § 4:49, at 195-96).  "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* at 453-54 (quoting 7AA CHARLES ALAN WRIGHT, ARTHUR R.

MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1778, at 123-24 (3d ed. 2005)).

The predominance inquiry requires a court "to consider how a trial on the merits would be conducted if a class were certified." *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 555 (5th Cir.2011) (quotation omitted). Accordingly, a court must examine the elements of the underlying cause of action to "identify the substantive issues that will control the outcome, assess which issues will predominate, and then determine whether the issues are common to the class." *Haley v. Merial, Ltd.,* 292 F.R.D. 339, 353 (N.D. Miss. 2013) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011); *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010)). Predominance should be considered on a claim-by-claim basis. *Prantil*, 986 F.3d at 577. Further, a court "must respond to the defendants' legitimate protests of individualized issues that preclude class treatment." *Id.* at 578 (quotation omitted). Predominance is a more demanding test than commonality, but "[p]laintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement without satisfying Rule 23(a)'s commonality requirement." *Ahmad*, 690 F.3d at 702.

The superiority element of Rule 23(b)(3) requires a class action to be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To conduct this inquiry, a court must "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication," while considering whether a class action would be more manageable than alternatives, and how the manageability concerns compare with the other advantages or disadvantages of a class action. *Earl v. Boeing Co.*, 2021 WL 4034514, at \*39 (E.D. Tex. Sept. 3, 2021) (quotations omitted).

### 1.   Subclass 2

Plaintiffs contend that the common substantive issue of liability concerning subclass 2 outweighs the "few factual differences among the claims of all the class members" – those being when each Road Home grant was signed, when each alleged overpayment was made, when the State learned or should have learned of each alleged overpayment, and the amounts and sources of each alleged overpayment.[94]   But, according to Plaintiffs, only two dates are relevant to determining the validity of the second claim: "the date on which the State was electronically notified of the alleged overpayment of grant funds … and the date on which Defendants' dunning letter … issued."[95]   They argue that the differences in the amounts sought to be recovered and the dates on which duplicate payments were made are secondary to the common questions regarding the legality of SWC's conduct.[96]   As to superiority, Plaintiffs insist that the relevant dates can easily be pulled from SWC's computerized files and that "[i]t makes infinitely more sense for that query to be run for all potential class members at one time than for each person to seek in separate discovery where the information is warehoused, who has access to it, and who has the capacity to retrieve it."[97]

---

[94] *See* R. Doc. 256-1 at 7-8.   Previously, Plaintiffs cited the following legal determinations as common to all class members: the controlling statute-of-limitations period (as to subclasses 2 and 4), R. Doc. 127-1 at 17-18, and whether the grant agreements or other authorities advanced by SWC authorized attorney's fees (as to subclass 3).   *Id.* at 9.   However, both of these issues have since been addressed by the Fifth Circuit or by Plaintiffs in the wake of the Fifth Circuit's decision.   While the Fifth Circuit did not determine the applicable statute-of-limitations period, it held that SCW misrepresented the judicial enforceability of time-barred debt even under the "most liberal" 10-year limitations period, *Calogero*, 95 F.4th at 960, and Plaintiffs have conceded that the 10-year period applies here.   R. Doc. 256-1 at 3.   Regarding the attorney's fees argument, the Fifth Circuit held that the grant agreements "authorize[ ] fee-shifting in the tightly circumscribed scenario in which a homeowner sued the Road Home program and suffered an adverse judgment," and that another fee-related document, the LSAA, authorizes the State to recover attorney's fees when the grant recipient receives future payments after signing the Road Home contracts.   *Calogero*, 95 F.4th at 962-64.

[95] R. Doc. 256-1 at 8.

[96] R. Doc. 127-1 at 11-12.

[97] *Id.* at 9.

In opposition, SCW argues that "an individualized analysis will need to occur for each potential plaintiff to see if those claims were in fact time barred when contacted [by SCW],"[98] listing the following individual issues: "1) when the funds were received; 2) whether the recipient acknowledged the obligation or made any payments; 3) when the state discovered the non-compliance with the contract, thus commencing the running of the applicable time period; and 4) when the collection letter was sent."[99]  SCW then cites *Riffle*, 311 F.R.D. at 683-84, and *Loughlin v. Amerisave Mortgage Corp.*, 2018 WL 1896409 (N.D. Ga. Feb. 7, 2018), *adopted*, 2018 WL 1887292 (N.D. Ga. Mar. 19, 2018), for the proposition that "where it cannot be affirmatively shown when the applicable statute of limitations *accrued* on each class members' obligation, and where the court will be required to conduct individualized inquiries into exactly when the statute of limitations accrued and ran on each purported class member claim, then the plaintiff fails the commonality [and, presumably, predominance] requirements of Rule 23."[100]  Thus, says SCW, the Court will need to determine when the State knew or should have known of each putative class member's alleged breach.[101]  SCW does not challenge the superiority prong.

In reply, Plaintiffs attempt to distinguish the cases cited by SCW, again arguing that the present matter involves a single form letter sent to all class members.[102]  They contend that the question of *which* statute-of-limitations period applies is central to the second claim and that, once decided (as is the case now), the dates applicable to each individual putative class member's claim can be determined through a "simple clerical function."[103]

---

[98] R. Doc. 267 at 5; *see also* R. Doc. 146 at 5.
[99] R. Doc. 267 at 5.
[100] *Id.* (emphasis in original).
[101] *Id.* at 6.
[102] *See* R. Doc. 270 at 3-4; *see also* R. Doc. 154 at 9-11.
[103] *See* R. Docs. 270 at 3-7; 154 at 6.

Courts have routinely found that "'the predominance and superiority requirements [are] met in FDCPA actions where a single debt collector mails similar debt collection letters to proposed class members.'"   *Bardales*, 2020 WL 5819873, at *5 (quoting *Reyes*, 2014 WL 7330602, at *11).   For example, in *Reyes*, two plaintiffs brought suit against a law firm and several condominium associations, alleging violations of the FDCPA and state law and seeking to certify classes according to the violations.   The court adopted the definition of the "FDCPA monetary relief class" contained in plaintiffs' complaint: "unit owners who received letters identical to or substantially similar to those attached as Exhibits 'A' and 'D' of the original complaint during the year prior to the filing of the action."   *Reyes*, 2014 WL 7330602 at *8.   Turning to the predominance inquiry, the court determined that the substantive issue that would control the outcome of the case was "whether the language shared across these letters violate[d] the FDCPA." *Id.* at *11.   Thus, although the letters were "not identical in their entirety," they "all contain[ed] identical paragraphs demanding payment within seven days and threatening the filing of liens if payment [was] not made" – the language alleged to be actionable there.   *Id.*; *see also Bardales*, 2020 WL 5819873, at *5 (holding that "the issue of whether the language in Defendants' two identical collection letters violates the FDCPA predominates" where debt collector allegedly sent letters that "failed to notify the recipient that interest and/or fees were continuing to accrue on the debt owed").

In contrast, as noted by SCW, the *Riffle* court held that a plaintiff, who brought suit against debt collectors for allegedly attempting to collect time-barred credit card debt in violation of the FDCPA, failed to satisfy the predominance requirement because the court would need to examine each putative class member's debt and discover when each letter was sent to determine if the statute-of-limitations period had lapsed.   311 F.R.D. at 682.   But *Riffle* is distinguishable from the

instant matter.[104]  The plaintiff in that case failed to provide any evidence from which the court could determine when the limitations period began to accrue for each class member's debt, and the defendants asserted that they were not in possession of the cardholder agreements governing the class member's obligations.  *Id.* at 683.  Thus, the court would need to obtain and then review each class member's cardholder agreement.  But even then, the court recognized that the applicable statute-of-limitations expiration date may not be captured in the agreements.  In addition, the predominance requirement was addressed secondarily after the court had already concluded that class certification was inappropriate because, as explained above, the plaintiff failed to present proof that an ascertainable class of claimants existed.  *Id.* at 681.

Again, in this case, the Fifth Circuit has provided specific guidance concerning what relevant events must be examined to determine whether the debt is time-barred.  *See Calogero*, 95 F.4th at 960-61.  And Plaintiffs have suggested a method for determining when the relevant events occurred and have shown that the method is administratively feasible – involving a "fairly quick" and relatively simple computer query.   In addition, these dates are only being examined to determine who fits within subclass 2.  The predominate issue is still whether SCW violated the FDCPA by sending the letters.  In other words, as in *Reyes*, the central issue predominating over all putative subclass 2 members' claims is whether the letters violated the FDCPA – that is, whether the letters misrepresented the judicial enforceability of the debts.  This is so regardless of whether the letters involve different dates and amounts owed.  *See Reyes*, 2014 WL 7330602, at *8.

---

[104] *Loughlin*, 2018 WL 1896409, is also distinguishable.  That court determined that the individualized questions predominating over the common issues would "require significant analysis," *id.* at *24-25, which is not the case here.  Indeed, the court identified the following questions that would need to be addressed for each putative class member, as well as several sub-issues existing within each: whether a payment was made to the defendant, whether the customer was forced to use defendant's services, whether an ABA disclosure was made, whether the loan was a federally related mortgage loan, whether an offset for damages was due, and whether the loan was primarily for business purposes.  *See id.* at *24.

The Court also finds that a class action is superior to other methods of adjudicating the subclass 2 claims.  Requiring each individual claimant to bring his or her individual claims would result in a duplication of effort, would increase the overall cost of litigation, and may result in inconsistent outcomes.  *See Walton*, 190 F.R.D. at 412-13 ("In light of the large number of potential class members, the strong predominance of common issues and the fact that individual claimants are unlikely to bring their small claims individually, the court concludes without reservation that a class action is superior to other methods of adjudication.  The court is convinced that individual actions by claimants would produce considerable duplication of effort, increase the cost of litigation and consume judicial resources through repetition.  Furthermore, even though the individual claims are small, each class member has a stake in vindicating his rights, and the public has an interest in seeing that the Fair Debt Collection Practices Act is obeyed.").  In addition, the Court finds that subdividing the umbrella class into three subclasses, corresponding to the three claims, is the most efficient method for resolving the matter.  *See Daley v. Provena Hosps.*, 193 F.R.D. 526, 530 (N.D. Ill. 2000) ("[W]hile each of the named plaintiffs possesses the same interest as the members of his or her subclass, each named plaintiff may not suffer the same injury as another debtor who received a different collection letter.  Accordingly, the court finds that a class action with three separate subclasses is the superior method for resolving this controversy because a class action will provide an efficient and appropriate resolution."); *see also Evans v. Am. Credit Sys., Inc.*, 222 F.R.D. 388, 396 (D. Neb. 2004).

### 2.  Subclass 3

Plaintiffs contend that the common substantive issue of liability – namely, whether the letters misrepresented the availability of attorney's fees – predominates over individual factual

differences for subclass 3.[105]   In opposition, SCW argues that "[t]he [Fifth Circuit's] ruling recognized that where the claimant received future payments after the grant closing, but did not report same, the state could recoup attorney fees."[106]   Thus, SCW contends that whether "any alleged violation for suggesting attorneys fees might be recoverable will depend on the specifics of when the alleged payments were received by the claimants."[107]

As explained above with respect to subclass 2, the predominance and superiority requirements are often met where a single debt collector sends similar letters to all proposed class members. *Reyes*, 2014 WL 7330602, at *11.   The form letter at issue here threatened suit for attorney's fees, and the Fifth Circuit has held that attorney's fees were not authorized in the case of class representatives Calogero and Randolph. *See Calogero*, 95 F.4th at 963-64.   While a potential defense exists for SCW with respect to grant recipients who received duplicate payments after signing their Road Home grant agreements, the predominate issue is still whether SCW misrepresented its ability to seek attorney's fees.   In addition, the Court has amended the proposed definition of subclass 3 to address the issue, as reflected below.

Since the claims arise out of the same conduct, specifically, SCW sending the form collection letter, each class member's claim requires examination of the same substantive facts and legal inquiry.   If pursued individually, each claimant would have to litigate the overlapping issue of whether the language in the letter violates the FDCPA. *See McWilliams v. Advanced Recovery Sys., Inc.*, 310 F.R.D. 337, 339 (S.D. Miss. 2015) (explaining that since the plaintiff's claims originated out of the same conduct, practice, and procedure on the part of the defendants, specifically, the issuance of standardized debt collection letters and form summonses, "the claims

---

[105] *See* R. Doc. 256-1 at 7-8.
[106] R. Doc. 267 at 2.
[107] *Id.* at 3.

of each class member would require proof of the same material and substantive facts – namely, whether the language in the form initial debt collection letter and form summons violate[s] the FDCPA").  Thus, the Court finds that a class action is superior to other methods of adjudicating the claims, as it avoids any duplication of effort, additional cost of litigation, and potential inconsistent outcomes.  *See Walton*, 190 F.R.D. at 412-13.

### 3.   Subclass 4

Plaintiffs argue that this subclass arises out of form promissory notes and that the common substantive issue of whether the notes misrepresented the judicial enforceability of the debts, and thus whether SCW violated the FDCPA by sending them, predominates over any individual factual issues.[108]  According to Plaintiffs, the individual factual differences are "the date on which the State was electronically notified of the alleged overpayment of grant funds … and the date on which Defendants' dunning letter or promissory note issued," but that these dates can be determined with a "push of a button."[109]

In opposition, SCW does not analyze the individual versus common issues specific to those putative class members who signed promissory notes.[110]  As noted above, however, SCW broadly asserts that "each individual claim of any class member must be analyzed on its own facts, to see if the defendants' contacts with them violated the FDCPA."[111]

Again, the predominance and superiority requirements are often met where a single debt collector sends similar letters to all proposed class members.  *Reyes*, 2014 WL 7330602, at *11. Here, Randolph alleges that SCW sent form promissory notes to her and all putative subclass 4 members, obligating them to repay alleged grant overpayments without advising that the

---

[108] *See* R. Doc. 256-1 at 7-8.
[109] *Id.* at 8-10.
[110] *See* R. Doc. 267 at 3-6.
[111] *Id.* at 3.

limitations period had expired.  While certain dates will need to be examined for each putative class member to determine whether they indeed fall within this subclass, the predominate issue is still whether SCW violated the FDCPA for sending the promissory notes – specifically, whether the notes misrepresented the judicial enforceability of the debts – regardless of whether the promissory notes involve different dates and amounts owed.  *See id.* at *8.

If pursued individually, each claimant would have to litigate separately the same issue of whether the language in the promissory note violates the FDCPA.  A class action is superior to other methods of adjudicating the fourth claim.

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Plaintiffs' renewed motion for class certification (R. Doc. 256) is GRANTED.

IT IS FURTHER ORDERED that the following umbrella class in the form of the following subclasses is CERTIFIED:

> The umbrella class consists of all Louisiana residents who received a Road Home homeowner's grant for personal, family, or household purposes to whom defendants Shows, Cali & Walsh, LLP,  Mary Catherine Cali, and/or John C. Walsh (collectively, "SCW") sent a collection letter in the form of exhibit 4 and/or exhibit 5 of the second amended complaint within the one-year period prior to the filing of this lawsuit, and who also fall into one or more of the following three subclasses:
>
> - Subclass 2 (which relates to Plaintiffs' second claim) consists of those to whom SCW sent a collection letter in the form of exhibit 4 and/or exhibit 5 (which letter did not state that the alleged debt was not legally enforceable or otherwise acknowledge a potential statute-of-limitations problem and that a payment would renew the debt) more than ten years after the grant agreement was signed or the State was notified of his or her alleged duplicate payments.
>
> - Subclass 3 (which relates to Plaintiffs' third claim) consists of those to whom SCW sent a collection letter in the form of exhibit 4 and/or exhibit 5 which stated that "you may also be responsible for ... attorney fees," who did not receive duplicate payments after the grant agreement was signed.

- Subclass 4 (which relates to Plaintiffs' fourth claim) consists of those to whom SCW sent a promissory note in the form of exhibit 6 of the second amended complaint obligating them to repay alleged grant overpayments, without advising that signing the instrument would revive any statute of limitations that had run against legal action on the alleged debt.

IT IS FURTHER ORDERED that Calogero and Randolph are appointed as class representatives for the umbrella class and subclasses 2 and 3, and Randolph is appointed as class representative for subclass 4, and their attorneys are appointed as class counsel.

New Orleans, Louisiana, this 10th day of June, 2024.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE